UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

CRAIG D. RICHARDSON,           )
                               )
            Plaintiff,         )
                               )
      v.                       )        2:14-cv-00139-JAW
                               )
RAY MABUS,                     )
                               )
            Defendant.         )

## SUMMARY JUDGMENT ORDER

Craig Richardson worked as a driver and served as a union steward at the Portsmouth Naval Shipyard (Shipyard) in Kittery, Maine. His relationship with his supervisors was at times contentious, which Mr. Richardson attributes to his work on Equal Employment Opportunity complaints, his help in organizing an affinity group for deaf employees at the Shipyard, and various forms of impermissible discrimination on the part of his supervisors. Mr. Richardson has diabetes and narcolepsy, and because of the narcolepsy, the Shipyard physician disqualified him from driving commercial vehicles. Navy management later determined that he could not retain his position. He left the Shipyard, ultimately finding work as a railroad repairer at another Navy facility.

In this lawsuit, Mr. Richardson alleges disability discrimination on the basis of diabetes and narcolepsy, age discrimination on account of his supervisors' remarks about his retirement and their selection of a younger applicant for promotion, retaliation for his EEO complaints and affinity group activities, and failure to

accommodate.   Mr. Richardson moves for partial summary judgment on the narcolepsy discrimination count, and the Navy moves for summary judgment on all counts.

After parsing the voluminous, hotly contested record, the Court determines that Mr. Richardson has failed to generate a genuine dispute of material fact as regards the diabetes- and age-based discrimination claims, as the facts are too thin for a reasonable jury to conclude there was severe, pervasive harassment giving rise to a hostile work environment on either of these bases.  Although Mr. Richardson can make out a prima facie case that the Navy failed to promote him on account of his age, he cannot overcome the Navy's legitimate, non-discriminatory reason with a showing of pretext.   Mr. Richardson does, however, produce sufficient facts from which a reasonable jury could conclude that his supervisors retaliated against him for his protected conduct: the EEO complaints and the affinity group.   Especially revealing is Mr. Richardson's account, which the Court accepts for the purposes of summary judgment, of his supervisors berating him in no uncertain terms at a meeting convened to discuss his protected conduct.

As a matter of law, the Court finds that the Navy was justified in disqualifying Mr. Richardson from driving commercial vehicles due to his narcolepsy diagnosis. Both Mr. Richardson and the Navy advanced cogent arguments supported by considerable authority on this point, and after due consideration, the Court reads the relevant First Circuit caselaw together with long-standing and recently reiterated agency guidance to arrive at its determination that the Navy acted permissibly in

treating narcolepsy as a categorically disqualifying condition.  Because the two claims are legally intertwined, this leaves no genuine dispute of material fact as to the narcolepsy-based disability discrimination and failure-to-accommodate claims.

In sum, what remains of this lawsuit is Mr. Richardson's retaliation claim.

## I.   PROCEDURAL POSTURE

On April 3, 2014, Plaintiff Craig Richardson brought suit against Defendant and Secretary of the Navy, Ray Mabus, *Compl. and Demand for Trial by Jury* (ECF No. 1), and the Navy filed its Answer on June 20, 2014.  *Answer* (ECF No. 6).  The parties subsequently agreed to seventy stipulated facts.  *Joint Stipulations* (ECF No. 47) (*Stip.*).

### A.   Craig Richardson's Motion for Partial Summary Judgment

On September 17, 2015, Mr. Richardson moved for summary judgment as to Count I, adverse action constituting disability discrimination, with a supporting statement of material facts.  *Pl.'s Mot. for Partial Summ. J. with Incorporated Mem. of Law* (ECF No. 49) (*Pl.'s Mot.*); *id.* Attach. 1 *Pl.'s Statement of Undisputed Material Facts in Supp. of his Mot. for Partial Summ. J.* (PSMF).  On October 8, 2015, the Navy opposed Mr. Richardson's motion.  *Def.'s Resp. to Pl.'s Mot. for Partial Summ. J.* (ECF No. 64) (*Def.'s Resp.*). That same day, it filed a reply to Mr. Richardson's statement of material facts, *Def.'s Local Rule 56(c) Opposing Statement of Material Facts and Statement of Additional Facts* at 1-7 (ECF No. 65) (DRPSMF), as well as a statement of additional material facts.  *Id.* at 7-13 (DSAMF).  Mr. Richardson replied to the Navy's opposition on October 22, 2015.  *Pl.'s Reply in Supp. of his Mot. for*

*Summ J.* (ECF No. 74) (*Pl.'s Reply*).  He also filed a reply to the Navy's statement of additional material facts.  *Pl.'s Reply to Def.'s Opposing Statement of Material Facts and Pl.'s Reply to Def.'s Statement of Additional Material Facts* (ECF No. 75) (PRDSAMF).[1]

### B.   The Navy's Motion for Summary Judgment

On September 17, 2015, the Navy moved for summary judgment with a supporting statement of material facts.  *Def.'s Mot. for Summ. J. with Incorporated Mem. of Law* (ECF No. 50) (*Def.'s Mot.*); *Statement of Undisputed Material Facts in Supp. of Def.'s Mot. for Summ. J.* (ECF No. 51) (DSMF).  On October 7, 2015, Mr. Richardson opposed the Navy's motion.  *Pl.'s Opp'n to Def.'s Mot. for Summ. J. with Incorporated Mem. of Law* (ECF No. 63) (*Pl.'s Opp'n*).  That same day, he filed a reply to the Navy's statement of material facts, *id.* Attach. 1 *Pl.'s Resp. to Def.'s Statement of Material Facts and Pl.'s Statement of Additional Material Facts* at 1-43 (ECF No. 63) (PRDSMF), as well as a statement of additional material facts.  *Id.* at 43-48 (PSAMF).  The Navy replied to Mr. Richardson's opposition on October 22, 2015.  *Def.'s Reply Br. in Supp. of Mot. for Summ. J.* (ECF No. 76) (*Def.'s Reply*).  It also filed a reply to Mr. Richardson's statement of additional material facts.  *Def.'s Resp. to Pl.'s Statement of Additional Material Facts* (ECF No. 77) (DRPSAMF).

---

[1]     To the extent that Mr. Richardson files a reply to the Navy's response to his statement of material facts, *see* PRDSAMF at 3-20, the Court disregards these replies as in contravention of the District of Maine local rules.  The provision for the reply statement of material facts is "limited to any additional facts submitted by the opposing party."  D. ME. LOC. R. 56 (d).  In short, there is no mechanism for replying to a response to one's own statement of material facts; it is a point, counter-point process—not a point, counter-point, counter-counter-point process.

## II.    SUMMARY JUDGMENT FACTS[2]

For coherence, the Court begins with the parties' stipulated facts as submitted. Next, it pieces together the facts submitted by the parties in their motions for summary judgment; the facts are copious and vigorously contested, and the Court has done its best to consolidate them into a single comprehensible volume. Where the parties have included stipulations in their statements of facts, the Court has kept them for context.

### A.    Stipulated Facts

### 1.    Shipyard Command Structure and Mr. Richardson's Position

Multiple naval commands operate at the Portsmouth Naval Shipyard in Kittery, Maine, including NAVSEA (which commands surface-based naval activities), NAVSUB (which commands subsurface naval activities), NAVFAC (which operates and controls naval facilities), and BUMED (Bureau of Medicine and Surgery, Navy and Marine Corps Public Health Center), along with various additional commands and other federal components, such as the Defense Logistics Agency, a sub-component of the Department of Defense. *Stip.* ¶ 1. The local component of NAVFAC,

---

[2]    In keeping with "the conventional summary judgment praxis," the Court recounts the facts in the light most hospitable to nonmovant's case theories consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002) (citing *C.K. Smith & Co. v. Motiva Enters.*, 269 F.3d 70, 72 (1st Cir. 2001)).

Where, as here, the parties have filed cross-motions for summary judgment, the Court must independently evaluate each motion and "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Matusevich v. Middlesex Mut. Assur. Co.*, 782 F.3d 56, 59 (1st Cir. 2015) (citing *Barnes v. Fleet Nat'l Bank, N A.*, 370 F.3d 164, 170 (1st Cir. 2004)). As such, for cross-motions for summary judgment, the standard of review is applied to each motion separately. *Libertarian Party of N.H. v. Gardner*, 759 F. Supp. 2d 215, 221 (D.N.H. 2010) *aff'd*, 638 F.3d 6 (1st Cir. 2011). That being the case, the Court recounts the facts in the light most hospitable to Mr. Richardson as regards the Navy's motion for summary judgment, and in the light most hospitable to the Navy as regards Mr. Richardson's motion for summary judgment.

which operates the Shipyard, is the Public Works Department-Maine, which provides comprehensive shore facilities management, operations maintenance, construction, base operating support services, and environmental management for the Shipyard. *Id.* ¶ 2.  The senior NAVFAC official at the Shipyard is the Public Works Officer ("PWO"), an active-duty naval position.  *Id.* ¶ 3.  The Base Support Vehicles and Equipment (BSVE) Branch of the Public Works Department-Maine, among other tasks, manages and operates the Navy's fleet of vehicles and construction equipment at the Shipyard. The BSVE Branch also provides base operating support in the form of material handling and transportation, snow removal, grounds maintenance, utility maintenance, and site construction.  *Id.* ¶ 4.

Mr. Richardson worked as a WG-7 Motor Vehicle Operator (MVO-7) in the Base Support Vehicles and Equipment (BSVE) Branch of the Public Works Department at the Portsmouth Naval Shipyard (Shipyard) from at least January 1, 2011, through May 3, 2014.  *Id.* ¶ 5.  From January 2011 through May 4, 2014, Mr. Richardson's chain of command was:

- First Line (or immediate) Supervisor (First-Level Transportation Supervisor): Thomas Gauthier 2011, Chris Palmer from October 2013 through May 4, 2014;

- Second Line Supervisor (Base Support Vehicles and Equipment (BSVE) Supervisor): Robert Landry 2011 until approximately December 2012; James Pickering from December 2012 through August 2013, Steve Cook from August 2013 thought May 4, 2014;

6

- Third Line (Production Division Director): Russell Gagner;

- Fourth Line (Deputy Public Works Officer): John Wyeth;

- Fifth Line (Public Works Officer): Commander Brian Weinstein.

*Id.* ¶ 6.  Mr. Richardson was the only MVO-7 in the BSVE Branch.  *Id.* ¶ 7.

### 2.  Craig Richardson's Narcolepsy Diagnosis and Informal Accommodation

Mr. Richardson's medical file maintained by Bureau of Medicine and Surgery, Navy and Marine Corps Public Health Center (BUMED) at the Shipyard clinic contained a May 5, 2008 letter authored by a personal physician of Mr. Richardson's, Dr. Lewis Golden, stating that Mr. Richardson "carries an unequivocal diagnosis of narcolepsy with cataplexy" and that he "represents no risk for his present work environment at the shipyard."  *Id.* ¶¶ 8-9.

On March 28, 2011, Physician Assistant Renald Rouillard from the Shipyard clinic received a single page note from Dr. Donald Cvitkovich, Mr. Richardson's physician, discussing Mr. Richardson's narcolepsy, the treatment, and suggesting that the bus detail and HAZMAT vehicle movement be avoided as his situation is reassessed over the next six to nine months.  *Id.* ¶ 10.  That same day, the Shipyard clinic issued a Portsmouth Naval Shipyard Limited Duty Recommendation with the restriction: "No busses or HAZMAT vehicles.  Next Op License PE to be scheduled with Dr. Longstaff"; these restrictions were recommended for nine weeks.  *Id.* ¶ 11.

In or around April 2011, the BSVE Site Director at the time, Robert Landry, Mr. Richardson's second-line supervisor, contacted Vicki Marshall-Barnes, a Naval Facilities Engineering Command (NAVFAC) Reasonable Accommodation Program

Manager, and sought assistance in addressing Mr. Richardson's requested accommodation of no bus or HAZMAT duties due to his narcolepsy. *Id.* ¶ 12. In May 2011, Ms. Marshall-Barnes provided Reasonable Accommodation (RA) forms for Richardson to complete, the completion and submission of which were necessary to initiate a formal accommodation process. *Id.* ¶ 13. Mr. Landry provided those forms for Mr. Richardson to complete, but neither Mr. Landry nor Ms. Marshall-Barnes received the completed forms, and as a result the Navy initiated no formal accommodation process. *Id.* ¶ 14. Nevertheless, Mr. Landry allowed Mr. Richardson to avoid bus and HAZMAT duties despite the absence of a formal accommodation request. *Id.* ¶ 15.

### 3.   Mr. Richardson's Letter of Reprimand and his Challenges to It

On January 16, 2013, Mr. Richardson received a letter of reprimand from the Deputy Public Works Officer. *Id.* ¶ 16; *see id.* Attach. 2 *Letter of Reprimand* (ECF No. 47). In response to the Letter or Reprimand, on January 28, 2013, Mr. Richardson submitted a second-step union grievance to Commander Brian Weinstein, the Public Works Director at the Shipyard, and Commander Weinstein denied Mr. Richardson's second-step grievance on March 19, 2013. *Stip.* ¶¶ 17-18; *see id.* Attach. 3 *Second-Step Grievance Decision* (ECF No. 47) (*Second-Step Grievance Decision*). On March 29, 2013, Mr. Richardson submitted a third-step grievance to the NAVFAC Mid-Atlantic Executive Officer, Captain P.J. Odenthal, and after a telephonic meeting with Mr. Richardson, Mr. Anderson, and Mr. O'Connor, Captain Odenthal denied Mr. Richardson's grievance on June 7, 2013. *Stip.* ¶¶ 19-20.

### 4.      **Christopher Palmer's Hiring**

On September 20, 2013, NAVFAC announced an opening for a transportation equipment operations supervisor position, WS-5701-10, and the announcement was limited to current employees in the transportation division at the Shipyard and specified that any "[i]nterested employee should submit a statement of interest and current resume to Michelle Wintle-McMillan . . . ." *Id.* ¶¶ 21-22.   Before the publication of the job announcement and prior to receipt of the certification list, Russell Gagner—the selecting official—chose the interview panel of three persons and the questions to be asked of the candidates to be interviewed. *Id.* ¶¶ 24-26.  After the interviews and the scoring of the applicants by the panel, Mr. Gagner identified Christopher Palmer as the selected candidate and Mr. Richardson as the alternate candidate should Mr. Palmer decline the position. *Id.* ¶¶ 27-32.  On October 7, 2013, Ms. Wintle emailed Deputy Public Works Officer John Wyeth to see whether he concurred with the selection of Mr. Palmer, which he did, and the position was offered to and accepted by Mr. Palmer. *Id.* ¶¶ 33-34.

### 5.      **Mr. Richardson's Interactions with Captain Dale Harman, MD, of BUMED**

On August 12, 2012, Navy Captain Dr. Dale Harman issued a Portsmouth Naval Shipyard Limited Duty Recommendation, and in doing so, he maintained Mr. Richardson's existing restriction: "No bus or hazmat vehicles. Otherwise fit for full duty." *Id.* ¶ 35.

On October 30, 2013,[3] Dr. Harman met with Mr. Richardson to conduct his physical examination as part of the process for, among other things, renewing Mr. Richardson's Department of Transportation (DOT) medical examiner's certification to operate commercial vehicles. *Id.* ¶ 36. At the meeting, Dr. Harman discussed with Mr. Richardson that his diagnosis of narcolepsy was a disqualifying diagnosis according to the DOT. *Id.* ¶ 37. Dr. Harman also told Mr. Richardson that "if you want me to consider qualifying you for a DOT motor vehicle operator license, medical card, I'll give you the opportunity to bring anything you want to bring me to make your case form [sic] your provider or anything else." *Id.* ¶ 38.

### 6.    Mr. Richardson's Loss of Driving Privileges

On January 13, 2014, Mr. Richardson brought an undated note from his personal physician, Dr. Cvitokivich. *Id.* ¶ 39; *see id.* Attach. 5 *Dr. Cvitokivich Note* (ECF No. 47). That same day, Dr. Harman informed Mr. Richardson that the Federal Motor Carrier Safety Administration's (FMCSA's) "Frequently Asked Questions" guidelines—a copy of which Dr. Harman provided to Mr. Richardson—recommend the disqualification of a commercial vehicle driver regardless of treatment because of the likelihood of excessive daytime somnolence. *Stip.* ¶¶ 40-41; *see id.* Attach. 6 *FMCSA FAQs* (ECF No. 47) (*FMCSA FAQs*). Dr. Harman rejected Dr. Cvitkovich's opinion that Mr. Richardson could drive without restrictions and concluded that if there was a diagnosis of narcolepsy, he could not issue Mr. Richardson a medical card. *Stip.* ¶¶ 42-43. Dr. Harman's January 13, 2014 office note cites the FMCSA FAQs

---

[3]    The parties submit October 29, 2013; in fact, the meeting occurred on October 30, 2013. *See infra* footnote sixty-eight.

and states that "patients with narcolepsy syndrome should not, therefore, be allowed to participate in interstate driving," *id.* ¶ 44, though he did not know how much interstate driving Mr. Richardson did. *Id.* ¶ 45. In response to Mr. Richardson stating to Dr. Harman that he would have his own physician sign the medical certificate card, Dr. Harman informed Mr. Richardson that "regardless of whether or not his physician signed the card, I was going to assure that he did not drive a commercial vehicle under a DOT/CMV [Commercial Motor Vehicle] license on the shipyard." *Id.* ¶ 46. No one from management had contacted Dr. Harmon about the quality of Mr. Richardson's driving; Dr. Harman had not been given a history from anyone that there was a problem with Mr. Richardson's performance as a driver; and Dr. Harman had no information that suggested to him that "things had become worse from when [Harman] saw [Richardson] in October 2013 and January 2014." *Id.* 47-49.

After the encounter with Mr. Richardson on January 13, 2014, Dr. Harman provided the completed Request for Physical Examination Results form for the medical surveillance program, MES 706, to Wayne Hennessey, the NAVFAC Site Safety Manager, and Ms. Wintle-McMillan, the NAVFAC LANT human resources specialist for staffing and retention assigned to the Shipyard's Public Works Department. *Id.* ¶ 50. MES 706 surveillance is a certification examination performed to certify that MVOs requiring a commercial driver's license (such as an MVO-7), meet the medical standards, including physical qualifications, established for that position. *Id.* ¶ 51. In that completed form, Dr. Harman indicated that Mr. Richardson

was not qualified for the 706 stressor, stating he was "permanently not to operate a vehicle under DOT license on Shipyard"; the facsimile cover sheet from the Shipyard clinic also stated "(706/DOT Ops License) Permanently Not Qual. Per Cpt Harman." *Id.* ¶¶ 52-53.  Dr. Harman then permanently prohibited Mr. Richardson from driving in the MES system, and a copy of the form documenting his permanent disqualification was sent to NAVFAC. *Id.* ¶ 54.  Dr. Harman agreed that if Mr. Richardson was driving solely on the Shipyard, he was not engaged in interstate driving. *Id.* ¶ 55. Dr. Harman believed, as of January 13, 2014, and February 7, 2014, that Mr. Richardson's diagnosis of narcolepsy, "regardless of whether it was controlled, not controlled, medicated managed or not managed disqualified Mr. Richardson from a [sic] having a commercial driver's license." *Id.* ¶ 56.

### 7.   NAVFAC's Response to Dr. Harman's Disqualification of Mr. Richardson

On January 13, 2014, Ms. Wintle-McMillan provided Mr. Richardson's 706 stressor disqualification document to his supervisors, including Stephen Cook, the BSVE Site Director. *Id.* ¶ 57.  Commander Weinstein's superior in Norfolk, Virginia, rejected the option of placing Mr. Richardson on administrative leave. *Id.* ¶ 58.  On January 16, 2014, Mr. Cook and Mr. Palmer spoke with Mr. Richardson and informed him that, because of his disqualification under the 706 stressor, he would not be able to drive government vehicles. *Id.* ¶ 59.

Steven Sawyer, the Reasonable Accommodation Program Manager for NAVFAC-LANT, was assigned Mr. Richardson's case. *Id.* ¶ 60.  Mr. Richardson was directed to attend a medical surveillance program MES 712 (also called a "712

stressor"), a certification examination for driving government vehicles that do not require a commercial driver's license, and on January 27, 2014, Mr. Richardson saw Physician's Assistant Kevin Kelley for his 712 stressor. *Id.* ¶¶ 61-62. At that appointment, Mr. Kelley disqualified Mr. Richardson due to his narcolepsy and stated that Mr. Richardson could not drive any government vehicle. *Id.* ¶ 63. Dr. Harman discussed this conclusion with Mr. Kelley, and Dr. Harman agreed with it. *Id.* ¶ 64.

On January 27, 2014, Mr. Palmer gave Mr. Richardson a letter explaining the reasonable accommodation process. *Id* ¶ 65; *see id.* Attach. 7 *Reasonable Accommodation Letter* (ECF No. 47). Mr. Richardson's reasonable accommodation team comprised Mr. Sawyer, Mr. Palmer, Mr. Cook, Mr. Gagner, Commander Weinstein, Vikki Marshall-Barnes (NAVFAC MIDLANT Deputy EEO Officer), and Lynne Richesin-Ploufe (NAVFAC MIDLANT Labor and Employment Relations). *Id.* ¶ 66. On March 17, 2014, Mr. Palmer presented Mr. Richardson with formal notification of NAVFAC's inability to accommodate him. *Id.* ¶ 67.

On March 31, 2014, Mr. Richardson submitted a request for reassignment to another position at the Shipyard, at the Navy's facility in Kittery, Maine, or at one of the Navy's New Hampshire facilities. *Id.* ¶ 68. On April 1, 2014, Mr. Sawyer requested an updated resume from Mr. Richardson for the placement process. *Id.* ¶ 69. Mr. Richardson formally left NAVFAC and started working as a railroad repairer, WG-8, with NAVSEA on May 4, 2014. *Id.* ¶ 70.

**B.    The Parties' Statements of Fact**

       **1.    Shipyard Structure and Relevant Personnel**

The Portsmouth Naval Shipyard in Kittery, Maine, ("Shipyard") is one of four public shipyards in the United States that perform overhauls and maintenance on the Navy's nuclear fleet.  DSMF ¶ 1; PRDSMF ¶ 1.  As a result, the Shipyard has significantly greater risks of catastrophic accident (due to the presence of nuclear reactors and fuel) and significantly higher levels of scrutiny (due to the presence of national assets in nuclear submarines and submarine dry docks) than many other military facilities.  DSMF ¶ 2; PRDSMF ¶ 2.

The senior NAVFAC official at the Shipyard is the Public Works Officer ("PWO"), an active-duty Naval position.  DSMF ¶¶ 3-4; PRDSMF ¶¶ 3-4.  Between December 2010 and July 2014, the Public Works Officer was Commander Weinstein.  *Id.*  Directly below the PWO is the Deputy Public Works Officer ("DPWO"), a position held at all relevant times by Mr. Wyeth.  DSMF ¶ 5; PRDSMF ¶ 5.  Directly below the DPWO is the Production Division Director; that position was held at all relevant times by Mr. Gagner, and included supervision of the Base Support Vehicles and Equipment (BSVE) Branch.  DSMF ¶ 6; PRDSMF ¶ 6.  Reporting to Mr. Gagner is the BSVE Site Director, who supervises the First-Level Transportation Equipment Operations Supervisor (WS-5701-10), who in turn supervises, among others, motor vehicle operators, including Mr. Richardson while he was employed as an Motor Vehicle Operator, WG 5703-07 ("MVO-7") in the Transportation Division.  DSMF ¶ 7; PRDSMF ¶ 7.

### 2.    Mr. Richardson's Employment Position

Mr. Richardson worked as a WG-7 Motor Vehicle Operator (MVO-7) in the Base Support Vehicles and Equipment (BSVE) Branch of the Public Works Department at the Portsmouth Naval Shipyard (Shipyard) from at least January 1, 2011, through May 3, 2014. *Stip.* ¶ 5. As an MVO-7, Mr. Richardson's position description was generally based on the United States Office of Personnel Management's general position description for motor vehicle operators, grade 7 (WG 5703-07). DSAMF ¶ 12; PRDSAMF ¶ 12.[4] Mr. Richardson's position description, PD 1136A, summarizes the position:

> Drives gasoline diesel or vehicles powered by other sources with a gross vehicle weight of 26,000 LBS or greater, such as but not limited to cargo vans, stake body trucks, snow plows, busses with a seating capacity of 20 passengers or more, fuel tankers, and other special purpose vehicles equipped with power take offs. May occasionally operate engineering ground equipment such as front end loader, backhoe, bull dozer, grader, and skid steers.

DSAMF ¶ 13; PRDSAMF ¶ 13.[5] The vehicle types at Shipyard listed in the first sentence above have air brakes and are commercial vehicles, requiring a Class B Commercial Driver's License to operate. DSAMF ¶ 14; PRDSAMF ¶ 14.

An MVO-7 at the Shipyard was required by position description, PD 1136A, to possess a valid Commercial Driver's License ("CDL") class "B" with air brake, passenger, tanker, and HAZMAT endorsements as a minimum, along with a Navy-

---

[4]    Mr. Richardson qualifies this statement to admit its truth as a general proposition but to "deny that this description accurately described what Mr. Richardson actually did in that position." PRDSAMF ¶ 12 (citing PSMF ¶¶ 2-3; PASMF ¶ 135). The Court takes Mr. Richardson's point, which he makes repeatedly, that the written job description does not accurately describe his actual job duties. But his point does not contradict the fact that the Defendant has accurately set forth the true language of the job description. Mr. Richardson elsewhere addresses what he contends were the actual job duties. Nevertheless, as Mr. Richardson makes this point repeatedly throughout the statement of material facts, the Court refers back to this footnote in addressing his qualified response.

[5]    *See supra* footnote four.

issued OF-346 U.S. Government Motor Vehicle Operator's Identification Card, issued by NAVFAC MidLANT, the relevant licensing authority.  DSMF ¶ 8; PRDSMF ¶ 8;[6] DSAMF ¶ 15; PRDSAMF ¶ 15.[7]  Mr. Richardson's position description also requires the MVO-7 to "have a high degree of manual dexterity [and] maintain alertness, concentrated attention and visual coordination."  DSAMF ¶ 16; PRDSAMF ¶ 16.  An MVO-7 also must carry a valid Medical Examiner's Certificate.  DSMF ¶ 9; PRDSMF 9.[8]  Finally, an MVO-7 also must undergo the BUMED's Motor Vehicle Operators

---

[6]     Mr. Richardson interposes a qualification: "In his position as an MVO-7, the majority of Mr. Richardson's responsibilities did not require a CDL or a Navy-issued OF-364, therefore he was not required to possess a CDL."  PRDSMF ¶ 8.  As the Court sees it, however, the Navy's statement is about what MVO-7s in general are required to possess, rather than what Mr. Richardson in particular was required to possess.  The qualification is rejected.  The Court addresses Mr. Richardson's actual duties, as contrasted with the job description, in its discussion.

[7]     *See supra* footnote four.

[8]     Mr. Richardson both objects to and denies this fact.  The Court briefly considers this objection:

> Objection.  This statement calls for a legal conclusion and is not supported by the record citation.  The Defendant cites to the Declaration of Stephen Cook in support of this statement in which Mr. Cook cites to 49 C.F.R. § 391.41 and an image of a Medical Examiner's Certificate as supporting the statement that MVO-7s must carry a valid Medical Examiner's Certificate.  Nowhere in section 391.41 does it state that MVO-7s must carry a valid Medical Examiner's Certificate.

PRDSMF ¶ 9.
    The Navy cites Mr. Cook's declaration, which states "[a]n MVO-7 must carry a valid Medical Examiner's Certificate."  *Decl. of Stephen Cook* (ECF No. 52) (*Cook Decl.*).  Mr. Cook in turn provides a "*see*" citation to 49 C.F.R. § 391.41, the very first sentence of which reads: "[a] person subject to this part must not operate a commercial vehicle *unless he or she is medically certified as physically qualified to do so . . . .*"  49 C.F.R. § 391.41(a)(1)(i) (emphasis supplied).  It is a short step from a medical certification to Mr. Cook's assertion, based on his personal knowledge as the Construction Manager for the Public Works Department-Maine, that an MVO-7 is required to carry the certificate.  That being the case, Mr. Richardson's statement that "[n]owhere in section 391.41 does it state that MVO-7s must carry a valid Medical Examiner's Certificate", while technically correct, is argumentative because it does not address whether Mr. Cook is correctly stating that the certificate must be carried.  The Court overrules Mr. Richardson's objection and rejects his denial.
    In general, in this intensely contested record, the Court has addressed objections grounded on a valid basis, such as the inadmissibility of the statement or an absence of record support.  *See Asociación de Periodistas de P.R. v. Mueller*, 680 F.3d 70, 78-79 (1st Cir. 2012) (explaining that only admissible evidence and evidence that could be used at trial may be considered for summary judgment).
    Mr. Richardson is correct on the general proposition that the Navy may not introduce legal arguments as if they constitute statements of fact, as the Court can "afford no evidentiary weight to

(DOT) medical surveillance program MES 706 (also called a "706 stressor").  DSMF ¶ 10; PRDSMF ¶ 10.[9]

Nearly all of the duty driving of an MVO-7 at the Shipyard is behind the wheel of a commercial motor vehicle; the reason the MVO-7 position exists is to drive commercial vehicles at the Shipyard.  DSAMF ¶ 19-20; PRDSAMF 19-20.[10]  The vast majority of the transportation division's business is the transportation of freight around the Shipyard; even loads that may not weigh enough to require transport on a commercial motor vehicle often are large enough or loaded on pallets large enough to require the bed size of commercial trucks.  DSAMF ¶ 21; PRDSAMF ¶ 21.

Excepting winter months with significant snow fall, where Mr. Richardson may have been able to spend time operating a skid steer, which does not require commercial driving privileges, the only other work that could be viewed to fall within his position description would be cleaning of the transportation shop and vehicles and

---

'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'"  *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)).  But the Court determines that this statement is not legally conclusory.

  After objecting, he also denies the statement: "In his position as an MVO-7, Mr. Richardson's responsibilities did not require a Medical Examiner's Certificate."  PRDSMF ¶ 9.  As in footnote four, however, the Court perceives the Navy's statement as going to what is generally required of MVO-7s, not what Mr. Richardson claims was required of him individually.  The denial is without merit.

[9]  Mr. Richardson objects on the grounds that "[t]his statement is not supported by the record citation."  PRDSMF ¶ 7.  This is a frivolous objection, as Mr. Cook's and Mr. Harman's declarations clearly support the statement.  *See Cook Decl.* ¶ 7 ("[A]n MVO-7 also must undergo the Navy's Bureau of Medicine and Surgery's (BUMED) Motor Vehicle Operators (DOT) medical surveillance program MES 706 (also called a '706 stressor')"); *Decl. of Dale Harman* ¶ 4 (ECF No. 54) (*Harman Decl.*) ("I am familiar with the requirement that motor vehicle operators at the Shipyard enroll in BUMED's Motor Vehicle Operators (DOT) medical surveillance program MES 706 (also called a '706 stressor')").

  He also denies the statement, in part by citing a source that he has cast as inapposite when the Navy cited it.  *See Cook Decl.* Attach. 2 *Industrial Hygiene Survey of Naval Facilities* (ECF No. 52).  Regardless, the Court is unpersuaded by the denial.

[10]  *See supra* footnote four.

local delivery of vehicles for vendors. DSAMF ¶ 22; PRDSAMF ¶ 22.[11] Mr. Richardson had made it clear in the past that he was not willing to perform cleaning tasks. DSAMF ¶ 23; PRDSAMF ¶ 23.[12] If Mr. Richardson had been excused from driving commercial vehicles, he would have been left with fewer than ten hours in a typical week of productive work that could be viewed as falling within his position description, even assuming he would have agreed to perform tasks such as cleaning the shop. DSAMF ¶ 24; PRDSAMF ¶ 24.[13] That said, it was common for Mr. Richardson to operate vehicles that were under 26,000 pounds such as sedans, pickup trucks, and smaller vehicles of that nature, but these tasks typically arose two or three times per day and took less than thirty minutes, totaling no more than five hours per week of work. PSMF ¶ 2; DRPSMF ¶ 2.[14] Until late 2012, Mr. Richardson

---

[11]    Mr. Richardson denies this statement, claiming to have spent his time on union activities, assisting with the EEO process, or operating smaller vehicles. PRDSAMF ¶ 22. Viewing the facts favorably to the Navy as the nonmovant, however, the Court notes that his statement specifies that it is about duties "that could be viewed to fall within [Mr. Richardson's] position description." DSAMF ¶ 22. The Court admits the statement unaltered.

[12]    Mr. Richardson objects:

> The Court should not consider this assertion as it relies on a fact that is not supported by admissible evidence, namely Mr. Gagner's hearsay statements as to whether Mr. Richardson was willing to perform cleaning tasks, and further objects to the relevancy of this statement as what Mr. Richardson may or may not have stated in the past does not have any relevancy to what Mr. Richardson would have agreed to had the reasonable accommodation team engaged him in any conversation in early 2014. Fed. R. Civ. P. 56(c)(2) & (4). Notwithstanding said objection: Admitted.

PRDSAMF ¶ 23. It is true that the Court may not consider hearsay, but there is a "hoary proposition" in the law of evidence that statements of party opponents are not hearsay. *Int'l Shipping Agency, Inc. v. Unión de Trabajadores de Muelles Local 1740*, 2015 WL 5022794, at *9 n.19 (D.P.R. Aug. 21, 2015); FED. R. EVID. 801(d)(2). Mr. Richardson is a party opponent, and the statement is relevant, so the Court overrules the objection.

[13]    Mr. Richardson denies the statement by saying that "he had been successfully performing his job" and by explaining that he spent "most of his time" on other tasks and that it was "common" for him to operate smaller vehicles. PRDSAMF ¶ 24 (citing PSMF ¶¶ 1-4, 40; PSMF ¶ 135). Again, the Court notes that the Navy's statement specifies that it is about duties "that could be viewed to fall within [Mr. Richardson's] position description." DSAMF ¶ 22. The Court admits the statement.

[14]    *See infra*, footnote one-hundred [DSMF ¶ 85].

drove "off the island" maybe a couple times per month and drove to New Hampshire even less frequently.  PSMF ¶ 3; DRPSMF ¶ 3.[15]

MES 706 surveillance is a certification examination performed to certify that MVOs requiring a CDL (such as an MVO-7) meet the medical standards, including physical qualifications, established for that position.  DSMF ¶ 11; PRDSMF ¶ 11.[16] Physical qualifications for MES 706 surveillance are contained in BUMED's Medical Surveillance Procedures Manual and Medical Matrix ("Surveillance Manual"), which specifically refers to Federal Motor Carrier Safety Administration ("FMCSA") regulations, 49 C.F.R. §§ 391.41-49, and the FMCSA Frequently Asked Questions. DSMF ¶ 12; PRDSMF ¶ 12.[17]

From about January 2011 until the end of his employment with NAVFAC, Mr. Richardson was a union steward for the Tidewater Federal Employees Metal Trades Council ("MTC Tidewater"), an affiliate of the AFL-CIO.  DSMF ¶ 13; PRDSMF ¶ 13. While a union steward for MTC Portsmouth, Mr. Richardson had been allotted forty hours per week for union activities.  DSMF ¶ 14; PRDSMF ¶ 14.  However, MTC Tidewater was allotted two stewards for NAVFAC employees at the Shipyard, a steward and a chief steward, with the steward allotted eight hours a week for union activity and the chief steward eighteen hours per week for union activity.  DSMF ¶

---

[15]    *See infra*, footnote one-hundred [DSMF ¶ 85].

[16]    Once again, Mr. Richardson objects for lack of support in the record citation and denies on account of Mr. Richardson's description of his actual duties.  After reviewing the Navy's statement and supporting citations and Mr. Richardson's response, the Court admits the statement.

[17]    Although he admits the statement, Mr. Richardson objects to it on the ground that it "calls for a legal conclusion."  PRDSMF ¶ 12.  The Court overrules the objection.

15; PRDSMF ¶ 15.[18]  NAVFAC management did not consistently enforce the hour limitations on the steward and chief steward until late 2013.  *Id.*  Throughout Mr. Richardson's time as an MTC Tidewater steward for NAVFAC, he and Lee Anderson were the two assigned stewards, switching off between steward and chief steward positions depending upon the availability of Mr. Anderson, who often worked night shifts.   DSMF ¶ 16; PRDSMF ¶ 16.[19]   In 2013 and 2014, Mr. Richardson predominantly held the position of chief steward.  *Id.*  Additionally, Mr. Richardson contends that he spent most of his time on union duties, and the record indicates that he was allotted between eight and twenty-six hours of union time per week.  PSMF ¶ 3; DRPSMF ¶ 3.[20]

At least as early as January 2011, conflicts arose between Mr. Richardson and NAVFAC management regarding Mr. Richardson's supposed overuse of union time and use of his time as an MTC Tidewater steward to engage in union activity for MTC Portsmouth, his former union.  DSMF ¶ 17; PRDSMF ¶ 17.[21]  Problems with Mr.

---

[18]     Mr. Richardson seeks to qualify the statement by admitting the union steward was allotted eight hours per week while the chief steward got eighteen hours per week, but he "den[ies] that NAVFAC management consistently enforced this decrease in hours from 40." PRDSMF ¶ 15. The Navy's proposed statement does not assert that the hours were enforced. DSMF ¶ 15.
        Regardless, Mr. Richardson cites Mr. Anderson's deposition to support his position.  *Pl.'s Opp'n* Attach. 3 *Lee Anderson Dep.* 18:9-19:18 (ECF No. 63) (when asked at what point management began to have a problem with Mr. Richardson exceeding his allotted union hours, Mr. Lee responded "I'm going to say that changed right around late 2013"). The Court qualifies the statement accordingly.
[19]     Mr. Richardson requests a qualification of the statement to clarify that he was predominantly the chief steward. PRDSMF ¶ 16; *see Decl. of John Osborn* Attach. 2 *Richardson Dep. II* (ECF No. 73) (*Richardson Dep. II*) ("Q: When was that?  A: 2013 to 2014.  Q: What were you predominantly then? A: Chief steward").  The record supports the qualification, which the Court includes.
[20]     *See infra*, footnote one-hundred [DSMF ¶ 85].
[21]     The Navy proposes this statement:

        At least as early as January 2011, conflicts arose between Richardson and NAVFAC management regarding Richardson's overuse of union time and use of his time as an MTC Tidewater steward to engage in union activity for MTC Portsmouth, his former

20

union.  Gagner Decl., ¶ 6.  Problems with Richardson's abuse and overuse of union time existed until his departure from NAVFAC in May 2014.  Gagner Decl., ¶ 6.

DSMF ¶ 17.

Mr. Richardson responds with a lengthy qualification:

> Mr. Richardson admits that there were conflicts between him and NAVFAC management, but denies the remainder of the assertion.  Mr. Richardson denies that he engaged in union activity for his former union.  *See* Osborn Declaration, Exhibit C-2 [Dkt No. 56-5] pg. 12.  Mr. Richardson further denies that he overused his union time; although he was faced with the ongoing battle of completing the same tasks that had required 40 hours per week of time in a reduced 18 hours per week, he frequently completed union work on his own personal time.  *Id.*  The real reason that Mr. Richardson' supervisors were upset was because they did not like that Mr. Richardson represented employees in the EEO process, and therefore wrongfully accused him of utilizing union time for these protected activities.  *See* PASMF ¶¶ 133, 135, 141, 147-49.  Mr. Pickering also gave Mr. Richardson a hard time about using his sick or personal days or annual leave without pay to do his representational work.  *See* Osborn Decl. Ex. C-1 [Dkt No. 56-4] pg. 14.

PRDSMF ¶ 17.

The Court begins with a comment on the record.  Defense counsel, via the Clerk's Office, "corrected" their September 17, 2015 docket entry, *Decl. of John Osborn* (ECF No. 56), with an October 21, 2015 entry.  *Decl. of John Osborn* (ECF No. 73).  The earlier entry lacks Mr. Richardson's answers to the interrogatory but contains supporting exhibits, whereas the later entry contains Mr. Richardson's answers to the interrogatory but lacks supporting exhibits.  The Court assumes the supporting exhibits remain part of the record despite their omission from the later, supposedly corrected entry.  *See Decl. of John Osborn* Attach. 4 *Exs. in Supp. of Richardson Interrog. I* (ECF No. 56) (*Richardson Interrog. Exs. I*); *id.* Attach. 5 *Exs. in Supp. of Richardson Interrog. II* (ECF No. 56) (*Richardson Interrog. Exs. II*).

Turning to the substance of Mr. Richardson's qualification / partial denial, he "admits that there were conflicts between him and NAVFAC management, but denies the remainder of the assertion."  PRDSMF ¶ 17.  In particular, he "denies that he engaged in union activity for his former union" and "that he overused his union time . . . ."  *Id.* (citing *Richardson Interrog. Exs. II* at 12).  Oddly, the only record evidence that Mr. Richardson cites for these two denials is the Decision on Second Step Grievance; this memorandum recounts Mr. Richardson's grievance and the evidence in support of it, then decidedly rejects his grievance.  *See Richardson Interrog. Exs. II* at 13 ("I find that you provided no evidence that the Letter of Reprimand was unsupportable.  Further, I find that you did review settlement agreement documents on behalf of MTC Portsmouth with Ms. Colomb while on NAVFAC MIDLANT official time . . . .  I deny your grievance").

In sum, while the Court must view the facts in the light most favorable to Mr. Richardson, it must do so "consistent with record support."  *Gillen*, 283 F.3d at 17 (citing *C.K. Smith & Co.,* 269 F.3d at 72).  Here, Mr. Richardson's citation contains claims that support his position, *see Richardson Interrog. Ex. II* at 12, but those claims are rejected on the very next page as being without evidence.  Nonetheless, the Court credits Mr. Richardson's quibble with the Navy's proposed fact to an extent; it adds "supposed" before references to his wrongful use of union time.  It does so in view of the fact that Mr. Richardson is the nonmovant on this point.

Finally, the Court does not address the last two sentences of the qualification, as they are beyond the scope of the statement to which they are submitted in response.

Richardson's supposed abuse and overuse of union time existed until his departure from NAVFAC in May 2014. *Id.* Moreover, at least as early as March 2011, NAVFAC management expressed concerns about a strained relationship between MTC Tidewater and NAVFAC. DSMF ¶ 18; PRDSMF ¶ 18; PSAMF ¶ 129; DRPSAMF ¶

129.[22]  The strained relationship continued throughout Mr. Richardson's time as a

union steward for MTC Tidewater.  DSMF ¶ 19; PRDSMF ¶ 19.[23]

---

[22]     The Navy proposed this fact: "Moreover, at least as early as March 2011, NAVFAC management expressed concerns with Richardson's antagonistic style of interaction that resulted in an unnecessarily combative relationship between MTC Tidewater and NAVFAC."  DSMF ¶ 18.

    Mr. Richardson objects on the ground that "[t]he referenced record citation does not support the asserted fact," PRDSMF ¶ 18, but the objection must fail because the statement tracks—nearly verbatim—its record support.  *See Decl. of John Wyeth* ¶ 8 (ECF No. 61) (*Wyeth Decl.*) ("At least as early as March 2011, Russell Gagner and I had concerns with Richardson's antagonistic style of interaction that resulted in an unnecessarily combative relationship between MTC Tidewater and NAVFAC").

    He also denies the statement: "Mr. Richardson's style was not combative, rather, he would stand up to management when he believed they were being unreasonable in order to express his views, but he was also able to have productive conversations with management."  PRDSMF ¶ 18 (citing PSAMF ¶¶ 129-30).

    Here, the Court makes a larger point about how the parties' summary judgment submissions. Local Rule 56 stipulates that an opposing party "shall support each denial or qualification by a *record citation* as required by this rule."  D. ME. LOC. R. 56(c) (emphasis supplied); *see also* D. ME. LOC. R. 56(f) ("The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment.  The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts").  It follows that Mr. Richardson's qualification is improperly supported because he cites to his statement of additional material facts instead of record evidence.  Even if there is a citation to record evidence within a cited statement of additional material facts or separate statement of facts, the Court must flip to that statement, find the record evidence, then consider the other party's response thereto, along with its record evidence.  In other words, Mr. Richardson's shortcut requires the Court to take the long way round and transforms summary judgment practice from the intended point, counterpoint process into an entanglement of cross-references.  What was discrete becomes messy.  Nonetheless, the Court does not let form trump substance, and it will consider these citations and construe the facts in favor of the nonmovant.

    Generally, the Court remarks on how it will address this recurring issue moving forward, though its approach remains flexible so as to address the unusual permutations these submissions often present.

    First, in the case of a qualification, the Court addresses Mr. Richardson's additional material fact, and the Navy's response, separately; i.e., it does not immediately turn to the parallel dispute.  If justified by the record after review, the Court will then qualify the record by adding the additional material fact to the record.  It is not inclined to insert an additional material fact more than once, despite Mr. Richardson's practice of citing the same ones time and again.

    Second, where there is a denial as opposed to a qualification, the Court typically addresses the parallel dispute—i.e., Mr. Richardson's putatively contrary fact, followed by the Navy's response thereto—all at once.  In other words, it looks at the proposed fact, the response that references a contrary opposed fact, and the response to that contrary opposed fact, and then makes its decision. This method seems the most efficient way of putting together these complicated, voluminous facts into a single volume.

    Returning to the particulars of this dispute, as the Court sees it, the parties agree that the relationship was strained, but they disagree on the severity of the strain, how to characterize it, and whose fault it was.  *See* DSMF ¶¶ 18-19; PRDSMF ¶¶ 18-19; PSAMF ¶ 129-30; DRPSAMF ¶ 129. Viewing the facts in the light most favorable to Mr. Richardson as the nonmovant, the Court qualifies the statement so as to acknowledge the strained relationship while excluding the Navy's statement to

### 3.   NAVFAC's Informal Accommodation of Richardson's Narcolepsy

In or around April 2011, the BSVE Site Director at the time, Mr. Landry, Mr. Richardson's second-line supervisor, contacted Ms. Marshall-Barnes, a Naval Facilities Engineering Command (NAVFAC) Reasonable Accommodation Program Manager, and sought assistance in addressing Mr. Richardson's requested accommodation of no bus or HAZMAT duties due to his narcolepsy. *Stip.* ¶ 12.[24]  In May 2011, Ms. Marshall-Barnes provided Reasonable Accommodation (RA) forms for Mr. Richardson to complete, the completion and submission of which were necessary to initiate a formal accommodation process. *Id.* ¶ 13.  Mr. Landry provided those forms for Mr. Richardson to complete, but neither Mr. Landry nor Ms. Marshall-Barnes received the completed forms, and as a result the Navy initiated no formal accommodation process. *Id.* ¶ 14.  Nevertheless, Mr. Landry allowed Mr. Richardson to avoid bus and HAZMAT duties despite the absence of a formal accommodation request. *Id.* ¶ 15.

Ms. Marshall-Barnes followed up with Mr. Landry, and Mr. Landry followed up with Mr. Richardson throughout 2011 and into 2012, but Mr. Richardson never

---

the extent that it that blames this strain on Mr. Richardson's "antagonistic style of interaction."  It refuses, however, to replace the Navy's version with Mr. Richardson's version, as that version finds scant support in the record. *See Pl.'s Opp'n* Attach. 3 *Lee Anderson Dep.* 23:1-24:25 (ECF No. 63).

[23]     The Navy proposes this fact: "Richardson continued to act combatively toward NAVFAC throughout his time as a union steward for MTC Tidewater."  DSMF ¶ 19.  Largely rehashing the dispute in footnote twenty-two, Mr. Richardson denies that "[he] was combative."  PRDSMF ¶ 19.  The Court again opts for more neutral language to describe the strained relationship, and it addresses the particular instance on which Mr. Richardson premises his denial at DSMF ¶ 27-28.

[24]     At several points, the Navy nestles stipulations within its statement of material facts.  Mr. Richardson objects to these submissions as in contravention of Local Rule 56, which requires that statements be numbered.  PRDSMF at 8, 10, 16, 19, 20, 24.  He then admits these statements; after all, they are stipulations.  *Id.*  The Court includes the stipulations for context.

submitted the necessary RA forms.  DSMF ¶ 20; PRDSMF ¶ 20.  That informal accommodation continued until January 13, 2014, when Mr. Richardson was disqualified by Dr. Harman, MD, of BUMED, from driving commercial vehicles on the Shipyard due to his narcolepsy diagnosis.  DSMF ¶ 21; PRDSMF ¶ 21.[25]  Pursuant to FMCSA's answer to an FAQ, the guidelines recommend disqualifying a CMV driver with a diagnosis of narcolepsy, regardless of treatment, because of the likelihood of excessive daytime somnolence.  DSMF ¶ 22; PRDSMF ¶ 22;[26] *see also* DSAMF ¶ 5; PRDSAMF ¶ 5.

### 4.    Mr. Richardson's Interactions with Jim Pickering

---

[25]    Mr. Richardson interposes a qualification in which he partially denies "that Mr. Richardson should have been disqualified solely on the unevaluated basis that he had a narcolepsy diagnosis" and "that this was the sole reason Mr. Richardson was disqualified."  PRDSMF ¶ 21 (citing PSMF ¶¶ 11, 20, 31, 34, 43-44, 49; 49 C.F.R § 391.43; *Decl. of John Osborn* Attach. 1 *Richardson Dep. I* 23:1-25:25, 67:1-25 (ECF No. 73) (*Richardson Dep. I*)).

As the Court sees it, this qualification attempts to engraft legal argument onto a simple statement of fact: i.e., that Dr. Harman disqualified Mr. Richardson on account of his narcolepsy.  Mr. Richardson also fails to support his qualification / partial denial with the requisite specificity, *see* D. ME. LOC. R. 56(f), as he cites seven of his own statements of fact in addition to other materials.  The Court rejects the qualification / partial denial.

[26]    The Navy proposes this statement: "Pursuant to the FMCSA, narcolepsy is a disqualifying condition for commercially licensed drivers."  DSMF ¶ 22.

After objecting on the ground that the statement is legally conclusory, Mr. Richardson denies the statement: "Nowhere in the CFR does it state that narcolepsy is a disqualifying condition, and the FAQs further indicate that narcolepsy *can* be a disqualifying condition, but is not necessarily such a condition and it is one that requires evaluation."  PRDSMF ¶ 22 (emphasis in original).

Viewing the facts in the light most favorable to Mr. Richardson, the Court takes his point that the Navy's proposed statement transforms a recommendation into an imperative disqualification, and in so doing, it imports a legal conclusion into the statement of fact.  By reference to Dr. Harman's declaration, *Harman Decl.* ¶ 18, the Navy cites the FMCSA's answer to the FAQ about whether narcolepsy is a disqualifying condition: "The guidelines recommend disqualifying a CMV driver with a diagnosis of Narcolepsy, regardless of treatment because of the likelihood of excessive daytime somnolence."    *Id.*    (citing    FMCSA,    *Is    Narcolepsy    Disqualifying?*, https://www.fmcsa.dot.gov/faq/narcolepsy-disqualifying (last updated April 1, 2014)).   The Court neither excludes the Navy's statement outright nor modifies it to resemble Mr. Richardson's interpretation of the FMCSA document.  Rather, the Court qualifies the statement so that it tracks the actual language of the FMCSA document.

In December 2012, Jim Pickering began serving as BSVE Site Director, Richardson's second-line supervisor. *Stip.* ¶ 6.

At some point in late 2012 or early 2013, Mr. Pickering had an informal discussion with Mr. Richardson about their respective retirement plans as they were of similar age, and Mr. Pickering suggested to Mr. Richardson that he retire. DSMF ¶ 23; PRDSMF ¶ 23; PSAMF ¶ 132; DRPSAMF ¶ 132.[27]  For his part, Mr. Richardson claims that Mr. Pickering said, "With all of your problems, why don't you retire?" DSMF ¶ 24; PRDSMF ¶ 24.

Mr. Richardson claims that, while Mr. Pickering was filling in for his predecessor, Mr. Landry, in 2012, he stated to Mr. Richardson: "When I take over this job, there's a new guy in town, and your union activities as you guys know it is done. And I will be dishing out the appropriate—what you're going to do, when you're going to do it, how you're going to do it." DSMF ¶ 25; PRDSMF ¶ 25.  Mr. Richardson also claims—and Mr. Pickering denies—that Mr. Pickering asked him, on an unspecified date, "Are you retiring with Billy Brown?"  DSMF ¶ 26; PRDSMF ¶ 26.  In early December 2012, after Mr. Pickering had replaced Mr. Landry, Mr. Richardson sought

---

[27]     In full, the Navy proposes this statement: "At some point in late 2012 or early 2013, Pickering had an informal discussion with Richardson about their respective retirement plans as they were of similar age, but at no point did Pickering suggest that Richardson retire or discuss Richardson's specific retirement date."  DSMF ¶ 23 (citing *Decl. of James Pickering* ¶ 7 (ECF No. 58) (*Pickering Decl.*)).

  Mr. Richardson flatly denies the statement: "Mr. Pickering suggested to Mr. Richardson that he retire."  PRDSMF ¶ 23 (citing *Richardson Dep. II* 230:1-231:25).

  Presented with contrasting accounts of the conversation, the Court perceives a genuine dispute of fact regarding whether Mr. Pickering suggested to Mr. Richardson that he should retire during this conversation.  Charged as it is to view the facts in Mr. Richardson's favor as the nonmovant on this point, the Court excises the latter part of the Navy's statement—i.e., the part where he says that Mr. Pickering did not suggest to Mr. Richardson that he should retire.  The Court need not admit Mr. Richardson's account, as the proposed facts as submitted go on to address his version of events.  *See* DSMF ¶¶ 24-26.

Mr. Pickering out to discuss union and shop matters and to see if they could work together to improve the work environment.  PSAMF ¶ 139; DRPSAMF ¶ 139. [28]  Mr. Pickering response was: "When are you retiring? I have some issues with the union and there are some things that are going to change."  *Id.*

On around December 20, 2012, during a meeting regarding EEO Complaints, attended by Mr. Richardson, Mr. Pickering, Mr. Anderson, Chris Palmer (then-Transportation Supervisor), Craig Mason (NAVFAC Labor Relations), and Mr. Gagner, Mr. Pickering said: "Things are going to be different—we're not doing this shit anymore."  DSMF ¶¶ 27-28; PRDSMF ¶¶ 27-28; PSMAF ¶ 130; DRPSAMF ¶ 130.[29]  Mr. Richardson turned to him and replied, "Excuse me?"  *Id.*  Mr. Pickering

---

[28]    The Navy moves to strike and denies this statement.  DRPSAMF ¶ 139.  It is correct that the proposed statement, for which Mr. Richardson cites a "chronology" attached to a letter that his counsel sent to the Deputy EEO Officer, *see Richardson Interrog. Exs. I* at 26, is contradicted by his deposition testimony.  *Richardson Dep. II* 241:3-9, 242:1-4.  It is also correct that Mr. Richardson cannot create a conflict with contradictory testimony.  *See Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994) ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed") (citations omitted).
        Crucially, Mr. Richardson's deposition testimony on July 13, 2015, post-dates the cited "chronology" document, which is attached to the letter dated May 10, 2013.  It follows that Mr. Richardson may have simply forgotten to mention this incident, as it was not in his interest to refrain from doing so in order to create a conflict.  Viewing the facts in the light most favorable to Mr. Richardson, the Court admits the statement.
[29]    The Navy proposes these facts:

        On around December 20, 2012, during a meeting regarding union issues and the allocation and reporting of official union time, attended by Richardson, Pickering, Lee Anderson, Chris Palmer (then-Transportation Supervisor), Craig Mason (NAVFAC Labor Relations) and Russell Gagner, Pickering and Richardson got into a shouting match, during which both individuals lost their temper and used profanity.  Pickering Decl., ¶ 9; Gagner Decl., ¶ 9; Palmer Decl., ¶ 3-4.  The trigger for Pickering's loss of temper was Richardson's statement that Pickering "was full of shit."  Pickering Decl., ¶ 10; Gagner Decl., ¶ 10; Palmer Decl., ¶ 5.

DMSF ¶¶ 27-28.
        Mr. Richardson denies the statement and puts forward a different version of events:

turned to Mr. Richardson and said, "Get the fuck out of this meeting now." *Id.* Mr. Richardson replied, "What kind of bullshit is that?" *Id.*

On about December 26, 2012, Mr. Pickering heard Mr. Richardson over the radio telling the dispatcher that he had just completed a job at Building 300 and was taking a bathroom break. DSMF ¶ 29; PRDSMF ¶ 29.[30] Shortly thereafter, during a tour of the Shipyard, Mr. Pickering noticed the truck assigned to Mr. Richardson parked outside the Shipyard power plant, where Mr. Richardson had no work responsibilities, but where Mr. Anderson—Mr. Richardson's fellow union steward—was stationed. *Id.* Mr. Richardson pulled over at the power plant because it was the only place that he could easily pull over. *Id.* Mr. Pickering returned approximately ten minutes later and saw that Mr. Richardson's truck was still at the power plant.

---

The gentlemen were talking about EEO complaints and Mr. Pickering said "things are going to be different—we're not doing this shit anymore." Richardson Dep. pg. 56; Osborn Decl. Ex. C-2 [Dkt No. 56-5] pg. 4. Mr. Richardson turned to him and said "Excuse me?" *Id.* Mr. Pickering turned to Mr. Richardson and said "[G]et the fuck out of this meeting now." *Id.* Mr. Richardson replied "What kind of bullshit is that?" *Id.* There was no "shouting match"; Mr. Pickering lost his temper when Mr. Richardson questioned him.

PRDSMF ¶ 27. His denial of the next paragraph is the same, with only the last sentence changing: "It was Mr. Richardson asking 'excuse me' that triggered Mr. Pickering losing his temper." PRDSMF ¶ 28.

As the Court sees it, the parties agree that a confrontation occurred on December 20, 2012, but they disagree on the particulars of the confrontation. The support for Mr. Richardson's version of events comes from his own deposition and his own notes about the incident, *see Richardson Dep. I* 56:1-25; *Richardson Interrog. Exs. II* at 4, whereas several people support the Navy's version. *See Pickering Decl.* ¶¶ 9-10; *Decl. of Russell Gagner* ¶¶ 9-10 (ECF No. 67) (*Gagner Decl.*); *Decl. of Christopher Palmer* ¶¶ 3-5 (ECF No. 70) (*Palmer Decl.*). At the same time, PSAMF ¶ 130 cites Mr. Anderson's recollection, which echoes Mr. Richardson's, albeit in more general terms. *Richardson Interrog. Exs. I* at 1. Adhering to the summary judgment praxis, the Court follows the nonmovant's, Mr. Richardson's, account. It includes only the more specific statement.

[30] Mr. Richardson interposes a qualification to the effect that he went to the power plant because it was "the only place that he could easily pull over." PRDSMF ¶ 29 (citing *Richardson Dep. I* 49:22-24). The Court so qualifies the statement.

DSMF ¶ 30; PRDSMF ¶ 30.[31]  Mr. Pickering came up the stairs onto the mezzanine at almost a dead run to Mr. Richardson who was, after using the bathroom in the area and then getting a drink of water, talking with Mr. Anderson about the holidays; Mr. Pickering screamed and swore at him to "get the fuck back to his truck and what was [he] doing there talking about union stuff." *Id.*  Mr. Pickering never heard Mr. Richardson say anything about his diabetes during that encounter, nor did Mr. Pickering say anything to Mr. Richardson about his diabetes during that encounter. DSMF ¶ 31; PRDSMF ¶ 31.[32]  Mr. Richardson claims that Mr. Pickering was angry

---

[31]    The Navy proposes this statement:

> Pickering returned approximately 10 minutes later and saw that Richardson's truck was still at the power plant.  Pickering Decl., ¶ 12.  Pickering entered the power plant and saw Richardson coming out of an office on the turbine deck with Anderson. Pickering Decl., ¶ 12.  There is no bathroom on the turbine deck, nor was there in December 2012.  Pickering Decl., ¶ 12.

DSMF ¶ 30.  Mr. Richardson denies this statement and provides his own account:

> Mr. Pickering came up the stairs onto the mezzanine at "almost a dead run" to Mr. Richardson who was, after using the bathroom in the area and then getting a drink of water, talking with Mr. Anderson about the holidays.  Mr. Pickering screamed and swore at him to "get the fuck back to his truck and what was [he] doing there talking about union stuff."  *See* Richardson Dep. pgs. 50-52.

PRDSMF ¶ 30.  The Court keeps the Navy's first sentence for context, then substitutes Mr. Richardson's account for the Navy's, as it must view the facts favorably toward Mr. Richardson as the nonmovant.

[32]    The Navy proposes this fact:

> Pickering raised his voice to be heard over the sound of the machinery and told him to get back to work.  Pickering Decl., ¶ 13.  Pickering never heard Richardson say anything about his diabetes during that encounter, nor did Pickering say anything to Richardson about his diabetes during that encounter. Pickering Decl., ¶ 14; Osborn Decl., ¶ 5, Ex. C at 10.

DSMF ¶ 31.

Mr. Richardson qualifies the statement by denying that Mr. Pickering raised his voice "to be heard over the machinery."  PRDSMF ¶ 31 (citing *Richardson Dep. I* 50:1-52:25).  (As a note, Mr. Richardson refers to "Mr. Richardson" raising his voice, but it is apparent from context that this is a mistake and he means "Mr. Pickering.")  As Mr. Richardson is the nonmovant and his citations support

because he thought Mr. Richardson was at the power plant talking to Mr. Anderson about union issues.  DSMF ¶ 32; PRDMF ¶ 32.[33]  Mr. Richardson also claims that Mr. Pickering was angry that Mr. Richardson needed to take a nourishment break for his diabetes.  *Id.*  Mr. Richardson is disabled as a result of his diabetes, which substantially limits one or more of his major life activities, including, but not limited to, sleeping, eating, and thinking.  PSAMF ¶ 127-28; DRPSAMF ¶ 127-28.[34]  Mr. Anderson, who was standing between Mr. Richardson and Mr. Pickering, did not hear either individual mention Mr. Richardson's diabetes during that encounter, but he said in his deposition that "somebody may have said something that I didn't pick up."

this qualification, the Court so qualifies the statement by cutting the first sentence of the proposed fact.

 Part of Mr. Richardson's qualification also "den[ies] that [he] did not say anything about his diabetes during the encounter."  *Id.* (citing *Richardson Dep. II* 227:1-229:25; PASMF ¶ 131).  This is a denial in search of a contrary statement, as the Navy states that Mr. Pickering—and not Mr. Richardson—said nothing about Mr. Richardson's diabetes.  The Court admits this part of the statement unaltered.

[33] The Navy proposes this fact: "Richardson claims that Pickering was angry because he thought Richardson was at the power plant talking to Anderson about union issues."  DSMF ¶ 32.  Mr. Richardson qualifies the statement by writing that "Mr. Pickering was also angry that Mr. Richardson needed to take a nourishment break for his diabetes."  PRDSMF ¶ 32 (citing PASMF ¶ 131).

 The Court considers the record evidence cited in PASMF ¶ 131.  *See Richardson Interrog. Exs. I* Ex. B *Richardson Aff. to Teresa L. Lock*, ¶ 93 (ECF No. 56) (*Lock Aff.*) ("Mr. Pickering knew every morning I tried to take a nourishment break around 9:00 a.m.  I cannot remember what time this incident occurred, but it was early morning.  I told him I was going to head back to the shop anyway because I needed to take my nourishment break"); *id.* ¶ 94 ("Mr. Pickering knew that I needed breaks in the morning for food.  We all take a 9:00 a.m. break anyway").  Although the sequence is somewhat unclear, i.e., at what point Mr. Richardson claims Mr. Pickering became angered by his need for a nourishment break, the Court must view the facts favorably to Mr. Richardson.  The Court qualifies the statement.  The Court also notes that there is a genuine dispute of material fact on this issue, as Mr. Pickering denies that he knew about Mr. Richardson's diabetes.  *See infra* footnote thirty-eight [DSMF ¶ 36].

[34] The Navy moves to strike this statement, "as the record on which it relies does not support the allegation that Plaintiff's diabetes substantially limits one or more major life activities."  DRPSAMF ¶ 128.  The Navy is wrong.  *See Richardson Interrog. Exs. I* Ex. B *Aff. of Craig Richardson*, at 5-6 (ECF No. 56) ("My sleeping is affected, what I can eat and not eat, for how long I can and cannot go with certain foods. . . .  I sometimes think my thinking is less clear than it was . . . .").  As a note, the Court cites the ECF page numbers displayed at the top of the page, not the document page numbers displayed at the bottom of the page, which may be the source of the Navy's confusion.  Because the record supports the statement and because the Navy admits it without prejudice notwithstanding his motion to strike, the Court admits the statement as proposed.

DSMF ¶ 33; PRDSMF ¶ 33.[35]  Mr. Anderson also wrote a letter on January 17, 2013, in which he suggested that Mr. Pickering may have heard Mr. Richardson's remark about diabetes:

> Mr. Richardson told Mr. Pickering he was going back to Building 154 for a break.  Mr. Pickering told Mr. Richardson there are no breaks!  Mr. Richardson responded that he is a diabetic and needs to eat every 2-3 hours to maintain his blood sugar levels.  Mr. Pickering responded, "You need to get in your truck and get the fuck back to work!"

*Id.*

During the summer of 2013, Mr. Richardson was taking a break due to a dip in his blood sugar, and Mr. Pickering came out and yelled and screamed at him that there was not time for breaks and that Mr. Richardson needed to be working.  DSMF ¶ 34; PRDSMF ¶ 34.[36]  Mr. Richardson responded and explained that he was having a sugar low due to his diabetes, and Mr. Pickering still insisted that he get up and get going.  *Id.*  When Mr. Richardson told Mr. Pickering that he needed a break, Mr. Pickering responded, "Good.  I'm going to call the ambulance."  *Id.*  The ambulance

---

[35]    The Navy states this fact: "Anderson, who was standing between Richardson and Pickering, did not hear either individual mention Richardson's diabetes during that encounter."  DSMF ¶ 33.  Mr. Richardson qualifies the statement citing record evidence indicating the matter is not as simple as the Navy would have it.  PRDSMF ¶ 33.
        Both parties cite Mr. Anderson's deposition, which—when considered in full—complicates his statement that he did not hear Mr. Richardson mention diabetes.  *Decl. of John Osborn* Attach. 3 *Dep. of Lee Anderson* 40:9-23 (ECF No. 73) ("So somebody may have said something that I didn't pick up").  The Court determines that qualification is warranted on this point.  Likewise, the fact that Mr. Anderson earlier recollected Mr. Richardson mentioned diabetes during this altercation is relevant and warrants qualification.  *Richardson Interrog. Exs. I* Ex. A *Lee Anderson Letter Dated Jan. 17, 2013* (ECF No. 56) ("Mr. Richardson responded that he is a diabetic and needs to eat every 2-3 hours to maintain his blood sugar levels").
[36]    Mr. Pickering and Mr. Richardson have differing recollections of this incident.  *Compare Pickering Decl.* ¶ 15, *with Richardson Dep. I* 45:11-20.  Mr. Richardson is the nonmovant, so the Court admits his version of events, with one caveat: Mr. Richardson refers to this event as occurring during the summer of 2012, *Richardson Dep. I* 45:13, but it clear from context and from Mr. Pickering's statement that it occurred in the summer of 2013.

came and aided Mr. Richardson with his sugar issue, after which Mr. Richardson ate some food and returned to his job. *Id.* Mr. Richardson claims that Mr. Pickering swore at him for taking a break despite Mr. Richardson's reference to having a sugar low. DSMF ¶ 35; PRDSMF ¶ 35.[37] Mr. Richardson also claims that Mr. Pickering knew about his diabetes before this incident. DSMF ¶ 36; PRDSMF ¶ 36; PSAMF ¶ 131; DRPSAMF ¶ 131.[38] After the ambulance arrived and paramedics treated Mr. Richardson, a treating paramedic told Mr. Pickering that it appeared that Mr. Richardson had an issue with his diabetes. *Id.* At no point during or prior to that event did Mr. Pickering make any statements to Mr. Richardson about his diabetes. DSMF ¶ 37; PRDSMF ¶ 37.[39]

---

[37]    Although Mr. Richardson objects to the Navy's statement on technical grounds, he admits to its substance. The Court admits the statement.

[38]    The Navy proposed a statement that "[a]t the time, Pickering did not know that Richardson had diabetes." DSMF ¶ 36 (citing *Pickering Decl.* ¶ 16). Mr. Richardson seeks to qualify the statement to indicate that Mr. Pickering did know. PRDSMF ¶ 36 (citing *Richardson Dep. II* 227:1-229:25); *see also* PSAMF ¶ 131.

In addition to any comments made about diabetes during the power plant break incident, which the Court addressed above, the thrust of Mr. Richardson's claim is that Mr. Pickering knew about his diabetes because he was present when "[i]t was mentioned" during a meeting with Mr. Landry about his narcolepsy in the fall of 2012. *Richardson Dep. II* 229:7; *see also Lock Aff.* ¶ 98 ("Mr. Pickering knew about my diabetes and break needs as soon as [he] started the new position"). At the same time, Mr. Pickering explicitly denies that he knew about Mr. Richardson's diabetes at the time of the break incident or the ambulance incident. *Pickering Decl.* ¶¶ 14, 16. The Court perceives a genuine dispute of material fact on whether Mr. Pickering knew about Mr. Richardson's diabetes.

Viewing the facts favorably to Mr. Richardson, as it must, the Court qualifies the statement to reflect his position that Mr. Pickering knew about his diabetes at this time. The Court assumes Mr. Richardson casts his partial denial as a qualification because he concedes the second sentence of the statement, which the Court admits.

[39]    Mr. Richardson denies this statement by citation to his description of the incident. *Richardson Dep. I* 45:1-25. The Court has already admitted Mr. Richardson's recollection of the incident. *See supra* footnote thirty-seven [DSMF ¶ 35]. Importantly, Mr. Richardson's recollection does not include a claim that Mr. Pickering made statements about his diabetes; rather, he says that he told Mr. Pickering of his diabetes and Mr. Pickering reacted callously. *Richardson Dep. I* 45: 13-23. As the Court sees it, there is a meaningful difference between (1) Mr. Pickering affirmatively making statements about diabetes and (2) Mr. Pickering telling Mr. Richardson to get back to work despite his protestations that he was unable to do so on account of diabetic symptoms. The Court admits the Navy's statement as submitted.

Mr. Pickering left the BSVE Site Director position after approximately ten months. *Stip.* ¶ 6. During his time as BSVE Site Director, he was counseled multiple times by his supervisor, Mr. Gagner, regarding his temperament and, specifically, anger-management, ultimately returning voluntarily to a lower grade, non-supervisory position. DSMF ¶ 38; PRDSMF ¶ 38. Mr. Richardson concedes that Mr. Pickering was "a loudmouth, swearing, in trouble, had multiple positions, lost them because of his temper" and that Mr. Pickering had acted in that manner since well before he became the BSVE Site Director and Mr. Richardson's second-line supervisor. DSMF ¶ 39; PRDSMF ¶ 39.[40] He also concedes that Mr. Pickering treated Mr. Richardson the same as he did everyone else, stating he complained to Mr. Gagner "[a]bout how [Pickering] treated me and everyone else. The guys absolutely hated him." *Id.* Mr. Richardson's fellow union steward, Mr. Anderson, testified that Mr. Pickering "is an old style manager guy. He's very vocal. He goes from zero to 100 like that. I mean we could be sitting across the table, and the next thing you know he's just flipping out about something." *Id.*

### 5. Letter of Reprimand for Inappropriate Conduct and Misuse of Official Time

On January 16, 2013, Mr. Richardson received a letter of reprimand (LOR) from the Deputy Public Works Officer. *Stip.* ¶ 16; *see id.* Attach. 2 *Letter of*

---

[40]    Rather than admit to statements he has already made, Mr. Richardson tries to qualify the Navy's proposed statement by alleging, inter alia, that "[Mr. Pickering] made Mr. Richardson's work situation incredibly difficult and hostile <u>because of</u> Mr. Richardson's disabilities and in relation for Mr. Richardson's role in protected EEO activities . . . ." PRDSMF ¶ 39 (emphasis in original). The Court rejects Mr. Richardson's attempt to superimpose legal conclusions on the Navy's statement of fact, and it further notes that he cites no fewer than twenty-four of his own statements of fact as his record support.

*Reprimand* (ECF No. 47).  According to the LOR, the first reason for the reprimand was that between December 3, 2012, and December 6, 2012, Mr. Richardson engaged in union activities for MTC Portsmouth bargaining unit members despite the fact that he was a steward for MTC Tidewater, a separate bargaining unit from MTC Portsmouth, and despite the fact that NAVFAC management had instructed Mr. Richardson specifically on multiple occasions that he could not use official time to engage in union activities for MTC Portsmouth.  DSMF ¶ 40; PRDSMF ¶ 40.[41],[42]  Mr. Blanchette told Mr. Wyeth that Mr. O'Connor, President of MTC Portsmouth, had told him that Mr. Richardson would be acting for him during his absence.  DSMF ¶

---

[41]    Mr. Richardson "admit[s] that those are the stated reasons for the LOR" but "den[ies] that these purported reasons were valid or were the real reasons for issuing the LOR."  PRDSMF ¶ 40.  The Court modifies the Navy's statement to clarify that it references the stated reasons.

[42]    The Navy proposes this fact:

> In investigating the charge, Wyeth spoke with Paul Blanchette, Director of Labor Relations for HRO Groton, Portsmouth Site Office, and Penny Colomb, also of HRO Groton, who stated that Richardson had engaged in substantive review of settlement agreements on behalf of MTC Portsmouth bargaining unit members.  Wyeth Decl., ¶ 12.

DSMF ¶ 41.

Mr. Richardson characterizes his response as a qualification, but all he actually does is "[d]eny that Mr. Richardson had engaged in substantive review of settlement agreements on behalf of MTC Portsmouth members."  PRDSMF ¶ 41.  In two pages of cited deposition testimony, Mr. Richardson recounts how he repeatedly refused to participate in a settlement agreement on behalf of MTC Portsmouth members.  *Richardson Dep. I* 95:1-96:25.  Presented with contrasting accounts supported by record evidence, the Court sides with the nonmovant and excludes the navy's statement.

The Court also notes, without relying upon, two factors not raised by Mr. Richardson in his qualification / denial that cut against admitting the Navy's statement.  First, the statement is a textbook example of hearsay, as Mr. Wyeth says that Mr. Blanchette says that Mr. Richardson impermissibly reviewed settlement agreements.  *See* FED. R. EVID. 801 (hearsay is "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement").  Rule 56 allows a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  FED. R. CIV. P. 56(c)(2).  Thus, "inadmissible evidence may not be considered" for summary judgment.  *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993).  Second, there is no mention in the cited portion of Mr. Wyeth's declaration about Ms. Colomb.  *See Wyeth Decl.* ¶ 12.

42; PRDSMF ¶ 42.[43]  Mr. O'Connor later denied that claim but admitted that Mr. Richardson was the third vice president of MTC Portsmouth, despite being in MTC Tidewater and unauthorized to engage in union activities for FEMTC Portsmouth using NAVFAC official union time.  DSMF ¶ 43; PRDSMF ¶ 43.[44]  He also stated that Mr. Richardson had never been assigned MTC Portsmouth work, that his title as vice president of MTC Portsmouth was a figurehead position, and that he did not attend any meetings of the executive council while on NAVFAC MIDLANT time.  *Id.*

According to Mr. Richardson, he was contacted by Penny Coombs of HRO Groton and told that there was a client who went through mediation, and there was going to be a settlement.  PSAMF ¶ 134; DRPSAMF ¶ 134.[45]  She asked if Mr. Richardson could represent the union and agree to the settlement, and he said no, as the client was a NAVSEA, and not NAVFAC, member.  *Id.*  Ms. Coombs subsequently sent Mr. Richardson an email explaining the situation, and in his response, among

---

[43]     Mr. Richardson "[a]dmit[s] that Mr. Blanchette told Mr. Wyeth that Mr. O'Connor had told him that Richardson would be acting for him during his absence" but "den[ies] that this is true as Mr. O'Connor denied this statement."  PRDSMF ¶ 42.  Mr. O'Connor indeed denied this statement.  *Stip.* Attach. 3 *Decision on Second Step Grievances*, at 2 (ECF No. 47) (*Second Step Grievance Decision*) ("Mr. O'Connor also denied the claim made by Paul Blanchette that he had stated that [Mr. Richardson] was acting for him as president when he was away on or about 7 December 2012").  The Court would incorporate this qualification / denial, but it is present in the very next statement of fact.  *See* DSMF ¶ 43.

[44]     Mr. Richardson interposes a qualification to flesh out Mr. O'Connor's statements.  The qualification is supported by record citation, *Second Step Grievance Decision* at 2, and the Court so qualifies.

[45]     Mr. Richardson asserts an additional fact setting out his version of the events precipitating the January 16, 2013 LOR.  PSAMF ¶ 134.  His deposition testimony supports this version, *Richardson Dep. I* 95:1-97:25, and the Court admits it—though it includes language clarifying the events are from Mr. Richardson's perspective.

The Navy qualifies the statement.  First, it writes that Mr. Richardson "does not deny acting on behalf of MTC Portsmouth bargaining unit members while on NAVFAC time."  DRPSAMF ¶ 134.  It cites no record evidence for this claim, and the Court excludes it.  Next, it writes that Commander Weinstein found that Mr. Richardson had indeed acted for MTC Portsmouth members while on NAVFAC time.  *Id.*  The second-step grievance letter supports this claim, *Second-Step Grievance* at 2-3, and the Court admits it.

other things, he reminded Ms. Coombs that he did not have authority to answer her questions. *Id.* Mr. Richardson later received a call from Mr. Blanchette, also of HRO Groton, who also asked Mr. Richardson to give the union the "ok" for the settlement; this resulted in multiple levels of management at the Shipyard being notified of the settlement, and also in Mr. Wyeth and Mr. Blanchette getting upset with Mr. Richardson. *Id.* In response to Mr. Richardson's second-step grievance over the LOR, however, Commander Weinstein stated that he had reviewed emails from Mr. Richardson to Ms. Coombs that demonstrated that Mr. Richardson had reviewed and discussed settlement agreements for MTC Portsmouth bargaining unit members while on NAVFAC time. *Id.*; *see Stip.* ¶¶ 17-18; *see id.* Attach. 3 *Second-Step Grievance Decision* (ECF No. 47).

Mr. Richardson also received the LOR on January 16, 2013, for misuse of official time during the week ending December 8, 2012, during which Richardson was required to work forty-four hours. DSMF ¶ 44; PRDSMF ¶ 44.[46] Mr. Richardson's

---

[46]     Mr. Richardson admits the contents of the letter but "den[ies] that [he] misused union time." PRDSMF ¶ 44 (citing PASMF ¶¶ 133, 135, 148). Mr. Richardson cites these three additional facts for his qualifications to DSMF ¶¶ 44-46. The Court turns to the triad. To the extent it admits Mr. Richardson's qualifications / statements of additional fact, it will do so in the subsequent paragraph.
        PSAMF ¶ 133 reads:

> The January 16, 2013 LOR was retaliation for Mr. Richardson's involvement in protected EEO activities. Richardson Dep. pg. 92. Mr. Blanchette was working with Mr. Wyeth to try and find something that Mr. Richardson was doing wrong in his representational duties. Richardson Dep. pg. 94.

PSAMF ¶ 133. The Navy replies:

> **Request to strike** Paragraph 133 of PASMF as the record on which it relies consists of speculative statements by Plaintiff regarding the intentions of two other individuals and relies on no supporting evidence. It should therefore be stricken. *Celta Agencies, Inc. v. Denizcilksanayi Ve Ticaaret, A.S.*, 396 F.Supp.2d 106, 111 (D.P.R.2005) ("in order to be admissible, the proffered statements must be specific and adequately 'supported with particularized factual information.'"); Fed.R.Civ.P. 56(c)(4) ("A

<hr>

supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated"). Without prejudice, **denied.** Declaration of John Wyeth, dated September 16, 2015 ("Wyeth Decl."), ¶¶ 11, 13; Supplemental Declaration of John Wyeth, dated October 21, 2015 ("Wyeth Supp. Decl."), ¶ 11.

DRPSAMF ¶ 133.

The Court agrees with the Navy that the first sentence of PSAMF ¶ 133 is speculative, and in the Court's view, it also constitutes a legal argument. The second sentence is a closer call. Mr. Richardson cites his deposition. *Richardson Dep. I* 94:21-25 ("Q: And why—why do you think Blanchette trumped that up—that charge up? A: He was working with Mr. Wyeth to try to find something that I was doing wrong in my representational duties as a chief steward"). The Navy, meanwhile, cites Mr. Wyeth's declaration and supplemental declaration to bolster his denial. *Wyeth Decl.* ¶¶ 11, 13 (describing the reasons for the issuance of the LOR); *Suppl. Decl. of John Wyeth* ¶ 11 (ECF No. 81) (*Wyeth Suppl. Decl.*) ("I never retaliated against Richardson due to his EEO representational activities or his filing of his own EEO claim"). Returning to the starting point of the dispute, DSMF ¶ 44, the Navy there cites another paragraph from Mr. Wyeth's declaration as well as the LOR itself. *Wyeth Decl.* ¶ 10 (stating the fact of the LOR's issuance); *Stip.* Attach. 2 *Letter of Reprimand* (ECF No. 47).

After reviewing the record evidence, the Court perceives a genuine issue of material fact as to the true cause for the LOR's issuance. Charged as it is to view the facts in Mr. Richardson's favor, the Court admits only the second sentence of PSAMF ¶ 133. Furthermore, given the comparatively scant evidence—i.e., his claim in his deposition testimony—the Court modifies the statement to indicate that it represents Mr. Richardson's position.

PSAMF ¶ 135 reads:

> Mr. Richardson also represented employees in their EEO complaints; this EEO time did not count against union time. *See* Anderson Dep. pgs. 52-53. Management did not like that Mr. Richardson was spending time on EEO Complaints. *Id.* For example, on January 30, 2012, after Mr. Richardson informed Mr. Gagner that he was going to help Mr. Brown with the EEO process, Mr. Gagner wrote an email to Labor and Employee Relations Specialist, Craig Mason, as well as upper management stating: "According to Mr. Richardson he is working a PNSY related EEO complaint again over and above the David Brown issue. My personal opinion is this is out of control. Guidance?" Exhibit K, Deposition Transcript of John Wyeth ("Wyeth Dep."), Ex. 1, pg. 2.

PSAMF ¶ 135. The Navy denies this statement. DRPSAMF ¶ 135 (citing *Second Suppl. Decl. of Russell Gagner* ¶¶ 5-8 (ECF No. 78) (*Gagner Second Suppl. Decl.*); *Wyeth Suppl. Decl.* ¶¶ 9-10).

So far as the Court can tell, the Navy does not contest that EEO time did not count against union time. The Court admits this statement. The bone of contention is about how to interpret the email: Mr. Richardson considers it proof that management did not like him spending time on EEO complaints, whereas the Navy cites management declarations to the effect that they simply wanted notice regarding when such meetings were to occur so that they could allocate manpower accordingly—i.e., this was about knowing what their employees were up to, not objecting to the substance of it. The Court admits the email without either party's interpretation.

PSAMF ¶ 148 reads:

> Mr. Richardson's supervisors were not happy with Mr. Richardson's involvement in Mr. Brown's complaint and the Affinity Group, and began to retaliate against him. *See* Osborn Declaration Ex. C-1 [Dkt No. 56-4] pg. 26; Richardson Dep. pgs. 23-24, 42. For example, when Mr. Richardson's supervisor, Robert Landry, was retiring, he told Mr. Richardson that Mr. Pickering and the rest of management were upset that Mr. Brown

time records indicated that he had worked assigned NAVFAC tasks for fourteen hours and had used official union time for thirty hours, including time spent conducting union activities for FEMTC Portsmouth. DSMF ¶ 45; PRDSMF ¶ 45.[47] However, Mr. Richardson was limited to a maximum of twenty-six hours of official union time, eight hours for himself as steward and eighteen hours if he used the official time allotment of his chief steward, Mr. Anderson. DSMF ¶ 46; PRDSMF ¶ 46.[48] Mr. Richardson had been cautioned on multiple occasions regarding his use of excessive union time. DSMF ¶ 47; PRDSMF ¶ 47.[49]

---

had filed an EEO complaint, and that Mr. Richardson should "watch his back." Richardson Dep. pg. 232-34. Mr. Landry also believed that Mr. Gagner and Mr. Wyeth would prohibit Mr. Richardson from getting promoted because they did not like him due to his union and Affinity Group representation. Anderson Dep. pg. 93-94.

PSAMF ¶ 148. The Navy denies this statement. DRPSAMF ¶ 148 (citing *Gagner Second Suppl. Decl.* ¶¶ 5, 11; *Wyeth Suppl. Decl.* ¶¶ 9-11; *Decl. of Robert J. Landry* ¶¶ 5-8 (ECF No. 79) (*Landry Decl.*)).

As with PSAMF ¶ 133, the Court rejects the first sentence of PSAMF ¶ 148 as legally conclusory. It focuses instead on the example of supposed retaliation that Mr. Richardson puts forward. Against the claims about what Mr. Landry said and believed recounted in Mr. Richardson's and Mr. Anderson's depositions, *Richardson Dep. II* 233:18-19; *Anderson Dep.* 94:1-13, the Court weighs Mr. Landry's own deposition in which he explicitly denies that he told Mr. Richardson to "watch his back" or said anything about Mr. Gagner and Mr. Wyeth refusing to promote Mr. Richardson on account of his union and Affinity Group representation. *Landry Decl.* ¶¶ 5-8. Once again, the Court perceives a genuine issue of material fact on whether or not Mr. Landry acted in this way. It includes the example, but also includes Mr. Landry's denial.

[47]   Again seeking to qualify, Mr. Richardson admits "those are the stated reasons" but denies that they are "valid" ones. PRDSMF ¶ 45 (citing *Second Step Grievance*; *PASMF* ¶¶ 133, 135, 148). The Court addressed PSAMF ¶¶ 133, 135, 148 in footnote forty-six.

[48]   Mr. Richardson interposes a qualification admitting to the twenty-six-hour limit on union time but "deny[ing] that he exceeded said maximum, as much of the time at issue was not for union activities, but was for EEO complaints." PRDSMF ¶ 46. The qualification is inapposite, as the statement only sets out the undisputed limit on union time. The Court admits the Navy's statement as proposed.

[49]   The Navy's proposed fact includes the statement that the earlier cautions regarding excessive use of union time "ma[de] a Letter of Reprimand for his excessive use during the week ending December 8, 2012 wholly appropriate." DSMF ¶ 47. Mr. Richardson's qualification asserts that the letter was "baseless and inappropriate." PRDSMF ¶ 47. He claims to have been "wrongfully accused" of using union time for "representing employees in the EEO process." *Id.* The record evidence he cites reads as follows: "Mr. Richardson was making a point about the difference between 'EEO rep time' and 'Steward's Time'" when Mr. Pickering interrupted him. *Richardson Interrog. Exs. II* at 4.

The problem for Mr. Richardson is that he never got around to making his point; his notes simply indicate that he was discussing the subject when Mr. Pickering interrupted him. *Id.* The Court

Mr. Richardson believes that Mr. Blanchette was working with Mr. Wyeth to try and find something that Mr. Richardson was doing wrong in his representational duties. PSAMF ¶ 133; DRPSAMF ¶ 133. Mr. Richardson also represented employees in their EEO complaints; this EEO time did not count against union time. PSAMF ¶ 135; DRPSAMF ¶ 135. In or about 2012, Mr. Richardson stepped in to help a fellow employee, David Brown, who was profoundly deaf and whose disability presented him with substantial challenges. PSAMF ¶ 142; DRPSAMF ¶ 142.[50,51] Mr. Brown, at Mr. Richardson's urging and support, asserted EEO claims against these coworkers. PSAMF ¶ 144; DRPSAMF ¶ 144.[52] Mr. Richardson also helped to organize a group of deaf employees, referred to as the "Affinity Group," who were trying to have the Shipyard address their needs on a number of different employment issues ranging from safety and basic communications to opportunities for promotion. PSAMF ¶ 145;

---

is without an evidentiary basis on which to include his allegation about the interaction of EEO time and union time. Nonetheless, the Court modifies the statement so that it does not characterize the letter as either "wholly appropriate," as the Navy proposes, or "baseless and inappropriate," as Mr. Richardson proposes.

[50]     The Navy admits the statement but moves to strike on the ground that it "is unsupported by the cited record material in violation of Local Rule 56(f)." DRPSAMF ¶ 142. The Court excises one clause that it finds unsupported by the citation, i.e., the one claiming that Mr. Richardson intervened on behalf of Mr. Brown "both because of his character and his position as shop steward." *See Richardson Dep. I* 23:1-24:25. It otherwise admits the statement.

[51]     Mr. Richardson proposes this statement: "The Defendant was unprepared for addressing the needs of the hearing impaired, and Mr. Brown was subject to inappropriate discriminatory behavior and abuse by co-workers." PSAMF ¶ 143. The Navy denies the statement and moves to strike on the ground that it is ""is unsupported by the cited record material in violation of Local Rule 56(f)." DRPSAMF ¶ 143. The Navy has a point. While there is mention of Mr. Brown asserting claims against coworkers in a "chronology" attached to a letter that Mr. Richardson's counsel sent to the Deputy EEO Officer, this mention does not support Mr. Richardson's legally conclusory statement. *Richardson Interrog. Exs. I* at 26. The Court excludes the statement.

[52]     The Navy admits the statement and moves to strike as unsupported by the record. DRPSAMF ¶ 144. The statement is supported by the record, *Richardson Interrog. Exs. I* at 26 ("At Mr. Richardson's urging and support, Mr. Brown has asserted claims with the EEO of disability/retaliation"), and is admitted.

DRPSAMF ¶145.[53]  On January 30, 2012, after Mr. Richardson informed Mr. Gagner that he was going to help Mr. Brown with the EEO process, Mr. Gagner sent an email to Labor and Employee Relations Specialist Craig Mason, as well as upper management, stating: "According to Mr. Richardson he is working a PNSY related EEO complaint again over and above the David Brown issue.  My personal opinion is this is out of control.  Guidance?"  *Id.*  On or about July 10, 2012, Mickey Cushing, an employee and management support specialist, wrote in an email that Mr. Wyeth had said to her "that David Brown is the ring leader and stirring the pot with other hearing impaired employees; this isn't and shouldn't be tolerated."  PSAMF ¶ 146; DRPSAMF ¶ 146.[54]  Mr. Wyeth denies saying this.  *Id.*  Upon learning of Mr. Wyeth's alleged statement from Ms. Cushing, Mr. Richardson wrote to fellow union representatives and accused Mr. Wyeth of retaliating against Mr. Brown for his

---

[53]     The Navy admits the statement and moves to strike as unsupported by the record.  DRPSAMF ¶ 145.  The statement is supported by the record, *Richardson Interrog. Exs. I* at 26 ("Mr. Richardson has been an important advocate for . . . the 'Affinity Group'; a number of deaf employees employed by several different commands"), and is admitted.

[54]     In full, Mr. Richardson proposes this statement:

> While the Shipyard was nominally responsive to the Affinity Group, its true feelings became evident when, on or about July 10, 2012, Mr. Wyeth said: "David Brown is the ringleader and stirring the pot with every hearing impaired employee; this isn't and shouldn't be tolerated." Wyeth Dep., Ex. 4, pg. 2. While the e-mail mentions David Brown, the hostility was also intended for Craig Richardson, as Craig was the individual who had been helping Mr. Brown to develop and push the goals of the Affinity Group.  Richardson Dep. pgs. 38-40.

PSAMF ¶ 146.  The Navy denies the statement by citing Mr. Wyeth's denial.  DRPSAMF ¶ 146 (citing *Wyeth Suppl. Decl.* ¶¶ 7-8).

     After reviewing the record evidence and viewing the evidence in the light most favorable to Mr. Richardson, the Court admits Mr. Wyeth's putative statement along with its source and his denial. It rejects (1) the language about Shipyard's true feelings as "empty rhetoric" and (2) the notion that the statement—if in fact uttered—referred also to Mr. Richardson as "unsupported speculation." *Tropigas de P.R., Inc.*, 637 F.3d at 56 (1st Cir. 2011) (quoting *Rogan*, 267 F.3d at 27 (1st Cir. 2001)).

protected EEO activity.  PSAMF ¶ 147; DRPSAMF ¶ 147.[55]  Mr. Richardson claims that when his supervisor, Mr. Landry, was retiring, he told Mr. Richardson that Mr. Pickering and the rest of management were upset that Mr. Brown had filed an EEO complaint, and that Mr. Richardson should watch his back—a statement Mr. Landry denies making.  PSAMF ¶ 148; DSPSAMF ¶ 148.[56]  Mr. Richardson also claims that Mr. Landry believed that Mr. Gagner and Mr. Wyeth would prohibit him from getting promoted because they did not like him due to his union and Affinity Group representation—a belief Mr. Landry denies holding.  *Id.*

In response to the January 16, 2013 LOR, on January 28, 2013, Mr. Richardson submitted a second-step union grievance to Commander Weinstein, the Public Works Director at the Shipyard, and Commander Weinstein denied Mr. Richardson's

---

[55]    In full, Mr. Richardson proposes this statement:

> In response to Mr. Wyeth's abusive email, Mr. Richardson wrote to fellow union representatives and accused Mr. Wyeth of retaliating against Mr. Brown for his protected EEO activity. Wyeth Dep., Ex. 1, pg. 3; *see also* Anderson Dep. Pgs. 59-60, 89-91. This email was then forwarded to upper management. Wyeth Dep., Ex. 1, pg. 1.

PSAMF ¶ 147. The Navy is right in pointing out that Mr. Richardson cites the wrong exhibit, but admits the fact that Mr. Richardson accused Mr. Wyeth of retaliation. The Court incorporates the admitted portion of the proposed statement.

[56]    Apropos EEO complaints, Mr. Richardson also proposes this statement:

> It was well known that management did not like Mr. Richardson because of his involvement in protected EEO activities.  For example, John Wyeth "intense[ly] dislike[d]" the union stewards because he did not like to be challenged on any of his decisions.  Anderson Dep. pg. 45.  Mr. Gagner would also get angry when Mr. Richardson helped Shipyard employees with their EEO complaints.  Anderson Dep. pgs 59-60; Richardson Dep. pg. 43-44.

PSAMF ¶ 141. As the Navy points out in its reply, DRPSAMF ¶ 141, the problem with this statement is that it asserts generalizations that are inadequately supported by the record evidence. For instance, the parties have three submissions of excerpts of Mr. Anderson's deposition, yet none of them contains page forty-five. The Court was left unpersuaded by the record evidence it could locate, and it rejects Mr. Richardson's additional statement.

second-step grievance on March 19, 2013.  *Stip.* ¶¶ 17-18; *see id.* Attach. 3 *Second-Step Grievance Decision* (ECF No. 47).  On March 29, 2013, Mr. Richardson submitted a third-step grievance to the NAVFAC Mid-Atlantic Executive Officer, Captain P.J. Odenthal, and after a telephonic meeting with Mr. Richardson, Mr. Anderson, and Mr. O'Connor, Captain Odenthal denied Mr. Richardson's grievance on June 7, 2013. *Stip.* ¶¶ 19-20.

### 6. Mr. Gagner's Sole Reference to Mr. Richardson's Retirement

Mr. Gagner knew Mr. Richardson's age and his date of birth in 1952.[57]  PSAMF ¶¶ 132, 140; DRPSAMF ¶¶ 132, 140.  Mr. Gagner, as the Production Division Director, and Mr. Wyeth, as Deputy Public Works Officer, were responsible for staffing within the Production Division, including the BSVE branch and MVOs such as Mr. Richardson.  DSMF ¶ 48; PRDSMF ¶ 48.  On December 20, 2012, Mr. Gagner told Mr. Richardson that he had come up on his radar screen as eligible for

---

[57]     In his statement of additional material fact, Mr. Richardson cited his date of birth.  PSAMF ¶ 140.  This is contrary to this Court's advisory concerning information concerning certain personal data. As the District's policy is advisory and as Mr. Richardson put his date of birth forward, the Court has not sealed his filing.  However, the Court has not referred to the date, except the year, in this opinion. The Court will leave it to Mr. Richardson's counsel to determine what, if any, action is necessary in light of the District's policy.

retirement.  DSMF ¶¶ 49, 51; PRDSMF ¶¶ 49, 51.[58,59,60]  In particular, after Mr. Pickering's inappropriate outburst toward Mr. Richardson, Mr. Gagner told Mr. Richardson that he had Mr. Richardson on his "radar" for retirement.  PSAMF ¶ 136; DRPSAMF ¶ 136.[61]  This is why Mr. Richardson, upset at the inquiry and the suggestion that he retire, asked Mr. Gagner why he was asking him that question, as it had nothing to do with the topics of the meeting.  *Id.*  As part of Mr. Gagner's staffing responsibilities in the Production Division, he maintains an organizational chart that identifies employees eligible to retire within five years.  *Id.*  That chart

[58]     First, Mr. Richardson objects on the ground that "[t]his statement contains numerous assertions of multiple facts."  PRDSMF ¶ 49.  He is correct that the Local Rule 56(b) requires "a separate, short, and concise statement of material facts, each set forth in a separately numbered paragraph(s)."  D. ME. LOC. R. 56(b).  But both parties have consistently violated this rule and in a case as contested and dense as this one, some flexibility is necessary to prevent the parties' statements of fact from containing hundreds of separate assertions.  .  Objection overruled.

Mr. Richardson then "den[ies] that Mr. Gagner's statement that he had Mr. Richardson on his 'radar for retirement' was preceded by a statement by Mr. Richardson indicating that he would be retiring in a few years."  PRDSMF ¶ 49.  He cites record evidence for his denial.  *See Richardson Dep. II* 242:222-24 ("He said, I've got you on my radar for retirement.  I said, Russ, what in the hell does this have to do with what we're talking about?").  The Court modifies the Navy's proposed statement to exclude the sequencing.

[59]     The Navy proposes this statement: "Mr. Gagner never suggested that Mr. Richardson retire and he engaged in the conversation only in order to better understand future staffing needs."  DSMF ¶ 50.  Mr. Richardson interposes a denial, pointing out that "Mr. Gagner's statement that he had Mr. Richardson on his 'radar for retirement' and the surrounding conversation contained suggestions that Mr. Richardson should retire."  PRDSMF ¶ 50.

Mr. Richardson's recollection of the remark, as he testified in his deposition, supports his denial.  *See Richardson Dep. II* 243:8-13 ("I said, yeah, [the remark about retirement] doesn't have anything to do with the meeting.  Why are you asking me that question?  Well, you know, I just like to know these things.  And I'm like, no, you don't need to know.  Then there was some other talk").  Viewing the facts in the light most favorable to Mr. Richardson, the Court credits his assertion that a suggestion of retirement could be implied from the context in which Mr. Gagner made the remark; i.e., an unprompted mention of retirement in the middle of a heated meeting.  The Court excludes the Navy's proposed statement in full.

[60]     DSMF ¶ 51 is duplicative of DSMF ¶¶ 49-50.  The Court does, however, include the date on which the parties agree that Mr. Gagner made the retirement remark.

[61]     Mr. Richardson submits his account of the interaction, which is supported by his deposition testimony, as a statement of additional material fact.  PRDSMF ¶ 136.  The Court admits the statement.  *See supra* footnote fifty-eight [DSMF ¶ 49].

allows him to understand what parts of the organization are at risk of multiple retirements in a short period of time. *Id.*

### 7.   NAVFAC's 2013 Hiring of the Transportation Supervisor Position

On September 20, 2013, NAVFAC announced an opening for a transportation equipment operations supervisor position, WS-5701-10, and the announcement was limited to current employees in the transportation division at the Shipyard and specified that any "[i]nterested employee should submit a statement of interest and current resume to Michelle Wintle-McMillan . . . ." *Stip.* ¶¶ 21-22.   The announcement was emailed to all transportation division employees with a valid email account, including Mr. Richardson, and was posted in Building 154, the transportation shop.   DSMF ¶ 52; PRDSMF ¶ 52.   Before the publication of the job announcement and prior to receipt of the certification list, Mr. Gagner—the selecting official—chose the interview panel of three persons and the questions to be asked of the candidates to be interviewed. *Stip.* ¶¶ 24-26.

At 1:11 pm on October 1, 2013, Ms. Wintle—who is not within the same command or supervisory structure as Mr. Wyeth or Mr. Gagner, neither of whom has supervisory authority over her—emailed to Mr. Gagner the certification list of qualified employees to be interviewed, which was limited to Robert Creamer, David Martino, and Christopher Palmer.   DSMF ¶¶ 53-54; PRDSMF ¶¶ 53-54.   Ms. Wintle did not include Mr. Richardson on the first certification list because she had not received Mr. Richardson's resume and statement of interest.   DSMF ¶ 55; PRDSMF

¶ 55.[62]  After the announcement closed on September 27, 2013, Ms. Wintle received Mr. Richardson's resume, which he had earlier submitted for another supervisory position, in Rangeley, Maine.  *Id.*  Mr. Richardson had provided his resume to someone in authority in Ms. Wintle's office who informed him that it would be put on her desk.  *Id.*  He then told Mr. Gagner that he had taken his resume to Ms. Wintle and submitted it, but she wasn't there.  *Id.*  Mr. Gagner instructed Mr. Richardson to get the resume and told Mr. Richardson that he would give it to Ms. Wintle the following Monday.  *Id.*  Ms. Wintle never received a statement of interest.  *Id.*

Shortly after receiving the initial certification list, Mr. Gagner contacted Ms. Wintle and told her that Mr. Richardson had told him that he was interested in the first-line supervisor position.  DSMF ¶ 56; PRDSMF ¶ 56.[63]  Ms. Wintle told Mr. Gagner that Mr. Richardson had failed to provide a resume and statement of interest in the required time-period and that he was therefore not placed on the certification list.  *Id.*  Mr. Gagner requested that Ms. Wintle add Mr. Richardson to the list despite his failure to follow the requirements of the job announcement because Mr. Gagner knew that Mr. Richardson was interested in the position and because Mr. Gagner had told Mr. Richardson that he would provide his resume to Ms. Wintle.  *Id.*  Had Mr. Gagner not made that request, Mr. Richardson would not have been placed on the certificate list or received an interview for the position as he had failed to follow

---

[62]    Mr. Richardson interposes a qualification about how he left his resume with someone at Ms. Wintle's office, told Mr. Gagner he had done so, then—in keeping with Mr. Gagner's instruction—retrieved the resume and gave it to Mr. Gagner to give to Ms. Wintle.  PRDSMF ¶ 55.  The qualification is supported by the record, *Richardson Dep. II* 191:23-192:3, and the Court so qualifies.

[63]    Mr. Richardson requests a qualification stating that Mr. Gagner said he would get Mr. Richardson's resume to Ms. Wintle.  PRDSMF ¶ 56.  For the reasons stated in footnote sixty-two [DSMF ¶ 55], the Court grants the qualification.

the requirements of the job announcement.  DSMF ¶ 57; PRDSMF ¶ 57.[64]  After a

discussion with Mr. Gagner, however, she added Mr. Richardson to the list.  *Id.*

The interviews occurred on October 3, 2013.  DSMF ¶ 58; PRDSMF ¶ 58.[65]

Each candidate was asked the same set of questions from a written list of interview

questions, split into six different categories.  *Id.*  Each panel member scored each

candidate based on his answers to the interview questions.  *Id.*  Each candidate's

scores across the three panel members were then aggregated, with the candidate

receiving the highest score being selected by Mr. Gagner, the selecting official.  *Id.*

After the interviews, the three panel members discussed their reactions and scoring

but did not change their scores.  DSMF ¶ 59; DSMF ¶ 59.[66]  Though Mr. Richardson

---

[64]     Mr. Richardson requests the same qualification the Court granted in the two previous footnotes.  PRDSMF ¶ 57; *see supra* footnotes sixty-two and sixty-three.  This time, the Court rejects the qualification for two reasons.  First, the qualification has been referenced twice and is already part of the record.  Second, and more importantly, the qualification is inapposite here; Mr. Richardson concedes that he did not submit a statement of interest, one of the two documents comprising a properly submitted application, so he failed to follow the requirements of the job announcement regardless of his compliance with the other requirement: the resume.  DSMF ¶ 57.  The Court admits the Navy's statement as submitted.

[65]     In part, the Navy proposes this statement: "Each panel member scored each candidate based on his answers to the interview questions."  DSMF ¶ 58.  Mr. Richardson denies that "the panel members scored each candidate solely on his answers to the interview questions," PRDSMF ¶ 58, alleging that the panel members did not want to hire him "regardless of [his] answers."  *Id.*

In the cited portions of his deposition, Mr. Richardson alleges (1) that Mr. Landry told him Mr. Gagner would not hire him, *Richardson Dep. I* 86:20-92:5, and (2) that he had a conversation with Mr. Cook before the hiring decision that left him with the suspicion that Mr. Palmer would be the panel's choice.  *Richardson Dep. II.* 196:7-197:23.  The former allegation has already been admitted at PSAMF ¶ 148.  *See supra* footnote forty-six [DSMF ¶ 148].  The latter allegation is overly speculative.  *See Tropigas de P.R., Inc.*, 637 F.3d 53, 56 (1st Cir. 2011) (Courts may not rely upon "unsupported speculation, or evidence which, in the aggregate, is less than significantly probative") (quoting *Rogan*, 267 F.3d at 27)).  Finally, his denial of the statement that the panel members based their scores "solely" on a candidate's answers to the panel's questions skewers a straw man, as the Navy does not include that adverb in its proposed fact.  The Court rejects the qualification / denial.

[66]     The Navy proposes this fact:

Gagner gave Palmer a higher score for legitimate, nonretaliatory reasons, including because Palmer better articulated his knowledge, skills, and abilities associated with his experience supervising employees in the transportation field whereas Richardson's articulated supervisory experience was generally outside the transportation field, and

contends that Mr. Gagner went into the interview knowing he did not want to hire

him, Mr. Gagner's asserted reason for giving Mr. Palmer a higher score include that

he better articulated his knowledge, skills, and abilities associated with his

experience supervising employees in the transportation field, whereas Mr.

Richardson's articulated supervisory experience was generally outside the

transportation field, and that Mr. Palmer's Class A CDL—as opposed to Mr.

Richardson's Class B CDL—allowed him to score additional points due to his ability

to articulate a broader depth of knowledge with respect to being a fully licensed motor

---

> because Palmer's Class A CDL, as opposed to Richardson's Class B CDL, allowed
> Palmer to score additional points due to his ability to articulate a broader depth of
> knowledge with respect to being a fully licensed motor vehicle operator and also as a
> tractor operator.  Gagner Decl., ¶ 21.

DSMF ¶ 60.

Mr. Richardson interposes a denial:

> Mr. Gagner did not give Mr. Palmer a higher scorer for "legitimate, nonretaliatory
> reason"—the reasons articulated by Mr. Gagner are pretextual, as he went into the
> interview knowing that he did not want to hire Mr. Richardson, regardless of Mr.
> Richardson's answers because he didn't like that Mr. Richardson had helped Mr.
> Brown with his EEO case and that he had helped with starting the Affinity Group.
> Richardson Dep. pgs. 85-91, 196-97; PASMF ¶¶ 135, 148.

PRDSMF ¶ 60.

The parties essentially litigate this point, with the Navy saying there were legitimate,
nonretaliatory reasons for Mr. Palmer's hiring, and Mr. Richardson saying the asserted reasons were
pretextual.  The Court refuses to admit a contested legal conclusion as a statement of fact.  Thus, it
grants Mr. Richardson's denial in part.

The Court does, however, admit the asserted basis for Mr. Palmer's hiring.  *See Gagner Decl.*
¶ 21.  Viewing the facts favorably to Mr. Richardson, it qualifies the record to incorporate his position
that Mr. Gagner went into the interview knowing that he did not want to hire Mr. Richardson.  For
record support, see, e.g., *Richardson Dep. I* 90:3-9 ("Q: So Landry told you that Gagner thinks you're
a pain in his ass because of the EEO complaint?  A: Yes.  One of the things.  Q: And what else did he
tell you?  A: For my protected activities.  For the grievances that I had submitted.  For other EEO
complaints that people had put in"); *Richardson Dep. II* 196:24-197:2 ("Because, again, it came from
the top through Mr. Landry.  I was told then, and I believe it to this day, that I would never see a
supervisor's, or any other position, other than what I was").  There is also an allegation in the cited
portion of deposition testimony seemingly based on personal knowledge, *Richardson Dep. II.* 197:24
("I [have] seen it too much"), but this statement is about Mr. Gagner and Mr. Wyeth favoring Mr.
Palmer, not disfavoring Mr. Richardson.  *Id.* 197:21-22 (describing Mr. Palmer as their "fair-haired
boy").  In the discussion, the Court will review these facts and determine their legal significance.

vehicle operator and also as a tractor operator.  DSMF ¶ 60; PRDSMF ¶ 60.  Mr.
Palmer was about thirty years younger than Mr. Richardson and had been in the
transportation department for about three years.  PSAMF ¶ 137; DRPSAMF ¶ 137.[67]

After the interviews and the scoring of the applicants by the panel, Mr. Gagner
identified Christopher Palmer as the selected candidate and Mr. Richardson as the
alternate candidate should Mr. Palmer decline the position.  *Stip.* ¶¶ 27-32.  On
October 7, 2013, Ms. Wintle emailed the Deputy Public Works Officer, Mr. Wyeth, to
see whether he concurred with the selection of Palmer, which he did, and the position
was offered to and accepted by Mr. Palmer.  *Id.*  ¶¶ 33-34.

### 8.    Mr. Richardson's Loss of Privilege to Drive U.S. Government Vehicles

On October 30, 2013, Dr. Harman—MD of the Shipyard clinic, which is within
the Naval Health Clinic New England under the command of BUMED—met with Mr.
Richardson to conduct his physical examination as part of the process for, among

---

[67]    Mr. Richardson proposes this additional fact regarding Mr. Palmer's hiring:

> Mr. Palmer, roughly 30 years old, had virtually no supervisory experience and had
> only been in the transportation department for three years when he was hired over
> Mr. Richardson for the transportation supervisor position, as compared to Mr.
> Richardson who had decades of leadership experience and experience at the Shipyard.
> *See* Palmer Dep. pgs. 7-8; Richardson Dep. pgs. 111, 125-128, 132-138.

PSAMF ¶ 137.  The Navy moves to strike, pointing out that the "Palmer deposition excerpt in fact
references his supervisory experience" and that the "Richardson deposition excerpts reference no
supervisory experience beyond [his] job as an insulator foreman in 1986."  DRPSAMF ¶ 137.
    After reviewing the citations, *see e.g.*, *Palmer Dep.* 7:24-8:16 (describing Mr. Palmer's limited
but evident supervisory experience); *Richardson Dep. I* 132:20-138:2 (documenting Mr. Richardson's
work history without clear reference to supervisory authority apart from work as a foreman), even
viewing the facts in the light most favorable to Mr. Richardson, the Court concludes  that the Navy is
correct and excludes Mr. Richardson's additional fact in part.  It also notes that Mr. Richardson's
citations to the record evidence are insufficiently specific.  Nonetheless, it includes the fact about the
age difference between Mr. Richardson and Mr. Palmer.

other things, renewing Mr. Richardson's Department of Transportation (DOT) medical examiner's certification to operate commercial vehicles. *Stip.* ¶ 36.[68] The purpose of Mr. Richardson's appointment was to conduct his biennial renewal of his DOT medical examiners certificate, which had last been issued by PA-C Renald Rouillard of the Shipyard clinic on January 11, 2011, and renewed by Dr. Scaccia of the Shipyard clinic on December 28, 2011, as well as to conduct his MES 706 surveillance examination. DSMF ¶ 61; PRDSMF ¶ 61.

Dr. Harman, who had started working in the Shipyard clinic on about May 2012, had seen Mr. Richardson twice prior to the October 30, 2013 examination. DSMF ¶ 62; PRDSMF ¶ 62.

The first visit, on August 21, 2012, was for a lower back strain, with Dr. Harman completing a limited duty recommendation form, finding Mr. Richardson fit for duty with the previous restriction of no HAZMAT or bus driving for an unrelated medical condition. DSMF ¶ 63; PRDSMF ¶ 63. Although Dr. Harman maintained Mr. Richardson's existing HAZMAT/bus restriction, he was unaware why the restriction was in place, was not aware of Richardson's narcolepsy diagnosis, and was not aware that Mr. Richardson was an MVO. DSMF ¶ 64; PRDSMF ¶ 64.[69] Because

---

[68]    The Court corrects the date to read October 30, 2013—not October 29, 2013. *See Harman Dep.* at 29-30 (health record dated October 30, 2013).

[69]    Mr. Richardson denies the statement:

> Dr. Harman admitted that he reviewed with Mr. Richardson at this visit his medication list which included medications that are used for narcolepsy, and he also admitted that he knew that Mr. Richardson was in the transportation department. *See* Exhibit E attached to PSMF [SEALED], Deposition of Dr. Harman ("Harman Dep.") pgs. 25-26.

PRDSMF ¶ 64.

49

Dr. Harman generally sees Navy employees like Mr. Richardson in the capacity of an

occupational health examiner rather than a treating physician, Dr. Harman often

focuses solely on the specific reason for an employee's visit and does not engage in a

detailed review of that employee's medical record.  DSMF ¶ 65; PRDSMF ¶ 65.[70]

Mr. Richardson's second visit with Dr. Harman, on October 29, 2012, was for

Mr. Richardson's annual asbestos surveillance examination.  DSMF ¶ 66; PRDSMF

¶ 66.[71] Dr. Harman does not recall whether he learned of Mr. Richardson's narcolepsy

---

Mr. Richardson's citation does not support his denial; the first cited page (twenty-five) makes
no mention of narcolepsy medications or of the MVO position, and the second cited page (twenty-six)
is a document related to a later visit by Mr. Richardson to Dr. Harman.  *Pl.'s Mot.* Attach. 6
*Confidential Excerpt of Harman Dep. & Associated Exs.*, at 25-26 (ECF No. 49) (*Harman Dep.*).  The
Court admits the Navy's statement as submitted.

[70]     Mr. Richardson seeks to qualify this statement based on a document dated to the October 29,
2012 visit, not the August 21, 2012 visit at issue here.  *Harman Dep.* at 26.  The Court rejects the
qualification, as it is without evidentiary grounds.

[71]     Mr. Richardson seeks to qualify this statement through citation to his own statement of
material facts in his motion for partial summary judgment, PSMF ¶ 5, which is not, strictly speaking,
record evidence.  *See supra* footnote twenty-two [DSMF ¶ 18] (discussing the Court's approach to such
citations).     Nonetheless, the Court does its best to prevent procedural mishaps from affecting
substantive rights, so it follows this dispute to the parallel statement of material facts.  PSMF ¶ 5
reads:

On October 29, 2012 , Navy Captain, Dr. Dale Harman, examined Mr. Richardson and,
as part of the process, took a history that included the listing of narcolepsy as a chronic
problem as well as listing medications taken for narcolepsy.  On that date, Dr. Harman
released Mr. Richardson without limitations.  *See Exhibit E, Deposition Transcript of
Dale Harman ("Harman Dep.") at pp. 21-25; Harman Deposition Exhibit 11.*

PSMF ¶ 5.  The Navy responds:

**Denied.** The deposition transcript excerpt referenced by Plaintiff in support of his
statement clearly states that Capt. Harman "assumed" or "took over" the medical note
that had been begun by the occupational health nurse.  Harman Dep., pp. 21-22 (ECF
No. 49-6).  **Qualified.**  Harman released Richardson without limitation as to the
reason for that specific visit on October 29, 2012, which was an asbestos screening.
Harman Dep., p. 23, ll. 8-13; p. 24, ll. 22-24.

DRPSMF ¶ 5.

Both parties cite the same deposition testimony, and after review, the Court qualifies the
statement by adding that Dr. Harman assumed a medical note that had been started by a nurse.
*Harman Dep..* 21:10-16.  In his deposition, Dr. Harman explained that the first part of the report was
the nurse's note and under the electronic medical record format, he could either continue with what

diagnosis during that visit.  *Id.*  He did, however, assume a document from a nurse that referenced Mr. Richardson's narcolepsy.  *Id.*  At the time of that visit, Dr. Harman was not aware that Mr. Richardson carried a CDL or was an MVO and, therefore, if he had learned of the narcolepsy diagnosis during the October 29, 2012 visit, he would not have viewed that diagnosis as noteworthy with regard to Richardson's occupational fitness.  DSMF ¶ 67; PRDSMF ¶ 67.[72]

On October 30, 2013, however, when Mr. Richardson visited Dr. Harman for the renewal of his DOT medical examiners certificate, Dr. Harman reviewed his medical records for information relevant to DOT medical examiners certificate. DSMF ¶ 68; PRDSMF ¶ 68.  At that point, Dr. Harman either learned of Mr. Richardson's narcolepsy for the first time or learned of Mr. Richardson's CDL for the first time, or both.  DSMF ¶ 69; PRDSMF ¶ 69.[73]  Dr. Harman declined to qualify Mr. Richardson under the Motor Vehicle Operators medical surveillance program MES 706, the physical examination required for an MVO with a CDL, because he determined narcolepsy is a disqualifying diagnosis for commercial driver's licenses

---

the nurse had written or start a new record with his notes.  *Id.*  He elected to continue or "assume" the nurse's note.  *Id.*  DSMF ¶ 66 otherwise is a true statement of Dr. Harman's deposition testimony, as well as his declaration, and the Court admits it.

[72]    Mr. Richardson denies this statement: "Dr. Harman admitted that he knew that Mr. Richardson was in the transportation department, and that the issue of restrictions such as the prohibition on driving a bus or HAZMAT vehicle would have implied that he was a commercial or non-commercial driver.  Harman Dep. pg. 25-26."  PRDSMF ¶ 68.  After reviewing those two pages of deposition exhibits, the Court found one reference to driving: "No bus or hazmat vehicle operation. Otherwise fit for duty."  *Harman Dep.* at 25.  This is scant evidence from which to infer that Dr. Harman knew that Mr. Richardson carried a CDL or was an MVO—an inference directly repudiated by Dr. Harman's sworn statement to the contrary.  *Harman Decl.* ¶ 14.  Even viewing the facts in the light most favorably to Mr. Richardson, his denial fails.

[73]    Mr. Richardson denies this statement on the same bases on which he sought to deny or qualify DSMFs ¶¶ 64-67.  PRDSMF ¶ 69.  The Court has already addressed those denials and qualifications and does not revisit them here.

pursuant to the recommendation of the FMCSA.  DSMF ¶ 70; PRDSMF ¶ 70.[74] However, Dr. Harman placed Richardson in "pending" status under the medical surveillance program MES 706, rather than failing him, to provide Richardson with the opportunity to obtain information from his personal physician that might be relevant to the narcolepsy diagnosis.  DSMF ¶ 71; PRDSMF ¶ 71.[75]  Dr. Harman gave Mr. Richardson that opportunity because Richardson's existing medical records regarding his narcolepsy were dated.  *Id.*  The only point in asking Mr. Richardson to bring in information on his narcolepsy from his own physician, Dr. Cvitkovich, was to see if the diagnosis had been made in error.  *Id.*; PSMF ¶ 7; DRPSMF ¶ 7.

After initially meeting with Mr. Richardson on October 30, 2013, for his MES 706 surveillance examination, Dr. Harman released Mr. Richardson without limitations because Dr. Harman was aware that Mr. Richardson's commercial driving certificate had expired and assumed he would have informed his supervisors and

---

[74]    In seeking to qualify the statement, Mr. Richardson "den[ies] that narcolepsy is necessarily a disqualifying diagnosis for commercial driver's licenses."  PRDSMF ¶ 70 (citing PSMF ¶¶ 43-44).  For consistency, the Court modifies the statement to clarify that it admits Dr. Harman's reason for disqualifying Mr. Richardson as statement of fact—and not as a legal proposition—by adding the phrase "he determined."  *See supra* footnote twenty-six [DSMF ¶ 22] ("Viewing the facts in the light most favorable to Mr. Richardson, the Court takes his point that The Navy's proposed statement transforms a recommendation into an imperative disqualification").  The Court will assess the legal significance of Dr. Harman's determination in its discussion.

[75]    Mr. Richardson seeks to qualify the Navy's statement by reference to PSMF ¶ 7, which the Navy admits to in substance, so the Court allows the qualification.

would not be driving.  DSAMF ¶ 1; PRDSAMF ¶ 1[76]; PSMF ¶ 6; DRPSMF ¶ 6. [77,78]

For his part, Mr. Richardson claims that Dr. Harman told him at this appointment

that he could not sign off on his certificate until he received documentation from Mr.

---

[76]    The Navy proposes an additional fact about Dr. Harman releasing Mr. Richardson without limitations on the understanding that he would inform his supervisors and would not be driving. DSAMF ¶ 1.  Mr. Richardson seeks to qualify the statement with Mr. Richardson's testimony regarding Dr. Harman's statements at the October 30, 2013 meeting, PRDSAMF ¶ 1 (citing *Richardson Dep.* 69:1-8), as well as Dr. Harman's own testimony that Mr. Richardson's supervisors would be able see his "pending status."  *Id.* (citing *Harman Dep.* 39:10-17).  The Court admits the additional fact, and finds the qualifications appropriate.

    Finally, the Court need not include the part of the Navy's additional statement about Mr. Richardson's "pending" status, as this fact is already present.  *See* DSMF ¶ 71.

[77]    Mr. Richardson proposes this statement:

> On October 29, 2013, Dr. Harman issued a Chronological Record of Medical Care for that date stating that Mr. Richardson was released without restrictions. *Harman Dep. at pp. 27-29; Harman Deposition Exhibit 10.*

PSMF ¶ 6.  This is confusing because there was an October 29, 2012 meeting and an October 30, 2013 meeting, but—as far as the Court can tell—there was not an October 29, 2013 meeting between Dr. Harman and Mr. Richardson.  Mr. Richardson's citations compound the confusion.  Exhibit 10 is about the 2012 visit, *Harman Dep.* at 26-28, whereas the cited portion of Dr. Harman's deposition testimony is about the 2013 visit.  *Id.* 27:15-29:25.  Further, the substance of the statement is that Dr. Harman released Mr. Richardson without restrictions, which happened at both the 2012 and 2013 meetings. *Id.* at 28 ("Disposition Written by HARMAN,DALE R @ 29 Oct 2012 0938 EDT Released w/o Limitations"); *id.* at 30 ("Disposition Written by HARMAN,DALE R @ 30 Oct 2013 1031 EDT Released w/o Limitations").

    The Navy seems to respond to the 2013 visit, not the 2012 visit, and the Court will follow this understanding of Mr. Richardson's proposed statement.  The Navy seeks to qualify Mr. Richardson's statement so as to elaborate on Dr. Harman's October 30, 2013 recommendation.  DRPSMF ¶ 6.  There is record support for the qualification, *Harman Suppl. Decl.* ¶ 5; *Harman Dep.* at 30, which the Court admits.  It also changes the date to read October 30, 2013.

[78]    Mr. Richardson proposes this statement:

> Other than the driving of busses or the HAZMAT vehicles, Chris Palmer was not aware of any other aspect of Mr. Richardson's job that Mr. Richardson did not fulfill, nor did Mr. Richardson fail to fulfill any of Mr. Palmer's expectations regarding the job. *Palmer Dep. at p. 20.*

PSMF ¶ 4.  The Navy denies the statement, contending that Mr. Richardson's own citation "clearly states that Palmer had performance problems with Richardson . . . ."  DRPSMF ¶ 4.

    Viewing the facts in the light most favorable to the Navy as the nonmovant, the Court denies the statement.  When asked whether he had any "performance issues" with Mr. Richardson, Mr. Palmer answered: "Yes."  *Palmer Dep.* 20:5-6.  And while he answered in the negative to the question of whether—apart from HAZMAT and bus—there was "any other aspect of his job" that Mr. Richardson could not fulfill, *id.* 20:1-4, this speaks to Mr. Richardson's capability, not his actual performance.

Richardson's doctor indicting he was okay to drive and that once he got that, "we should be okay." DSAMF ¶ 1; PRDSAMF ¶ 1. Dr. Harman's medical record listed Mr. Richardson as "DOT—pending provider information. asbestos—qualified." PSMF ¶ 6; DRPSMF ¶ 6. Dr. Harman also testified that Mr. Richardson's pending status was indicated in the MES system that communicated that information to Mr. Richardson's supervisors. DSAMF ¶ 1; PRDSAMF ¶ 1. Dr. Harman did not expect Mr. Richardson to be able to provide information that would support a decision not to disqualify him under FMCSA regulations and guidelines. DSAMF ¶ 2; PRDSAMF ¶ 2.[79]

On January 13, 2014, Mr. Richardson returned for a follow-up of his medical surveillance program MES 706 with Dr. Harman. DSMF ¶ 72; PRDSMF ¶ 72. Mr. Richardson provided a note from his personal physician confirming that he had a narcolepsy diagnosis but indicating that he is under treatment and was improved to a point where he may be able to drive without restrictions. DSMF ¶ 73; PRDSMF ¶

---

[79]   In full, the Navy proposes this additional fact:

> Harman did not expect Richardson to be able to provide information that would support a decision not to disqualify him under FMCSA regulations and guidelines, as any narcolepsy diagnosis is disqualifying and so Richardson would have had to have provided Harman with information indicating that his diagnosis had been in error, but Harman wanted to give Richardson the opportunity to provide updated information. Harman Supp. Decl., ¶ 6.

DSAMF ¶ 2.
   Mr. Richardson qualifies the statement, admitting that Dr. Harman makes it, while denying "that patients with narcolepsy syndrome must necessarily be disqualified from participating in interstate driving per the FMCSA." PRDSAMF ¶ 2 (citing PSMF ¶ 43).
   The Court admits the part of the statement about Dr. Harman's expectations but excludes the rest of it as either already present, *see* PSMF ¶ 71 (Dr. Harman wanted to give Mr. Richardson the opportunity to provide updated information), or legally conclusory (i.e., any narcolepsy diagnosis is disqualifying).

73.[80]  Dr. Harman indicated to Mr. Richardson that a narcolepsy diagnosis, even if treated, was a disqualifying diagnosis as recommended by the FMCSA and that Dr. Harman would not qualify Mr. Richardson for the 706 stressor.  *Id.*  Mr. Richardson stated that he would obtain a medical examiner's certificate from his own physician.  *Id.*  Dr. Harman told Mr. Richardson that if his physician provided a DOT certificate he would be violating FMCSA recommendations.  DSMF ¶ 74; PRDSMF ¶ 74.  Dr. Harman also told Mr. Richardson that he would assure that Mr. Richardson would not drive a commercial vehicle under a DOT CDL license on the Shipyard.  *Id.*; *Stip.* ¶ 46.  Dr. Harman was unaware of Mr. Richardson's participation in any EEO complaints—either his own or other employees'[81]—Mr. Richardson's involvement with the Affinity Group, or any other activities of Mr. Richardson's that might be viewed as protected under federal law.  DSMF ¶ 75; PRDSMF ¶ 75.[82]

---

[80]    Mr. Richardson disputes that he became "verbally aggressive" in his conversation with Dr. Harman.  PRDSMF ¶ 73.  After reviewing the cited record evidence, *Richardson Dep. I* 71:14-72:12, the Court grants the requested qualification and excludes the "verbally aggressive" characterization.

[81]    In his additional facts, Mr. Richardson seeks to elaborate on his EEO complaint:

> As a result of the discriminatory and retaliatory acts to which Mr. Richardson was subjected, including Mr. Pickering's discriminatory behavior on the basis of age, disability and protected activity, Mr. Gagner's age discrimination and retaliation, and Mr. Wyeth's retaliation and generation of a frivolous union issue with Mr. Richardson, Mr. Richardson filed his own EEO Complaint for the first time in his life.  *See* Osborn Declaration Ex. C-1 [Dkt No. 56-4] pgs. 3-23.

PSAMF ¶ 149.  The Navy urges that this statement is legally conclusory and disputes that Mr. Richardson's EEO complaint against the Navy was his first.  DRPSAMF ¶ 149.  The Navy is correct on both points.  *See* Richardson *Dep. I* 138:15-139:7 (describing employment discrimination claim against Mercy Hospital in the 1980s).  The Court excludes the additional fact.

[82]    In what he styles as a qualification, Mr. Richardson admits that "Dr. Harman has alleged that he was unaware of any protected activity" but denies "that this is true" based on circumstantial evidence.  PRDSMF ¶ 75 (citing PSMF ¶¶ 5, 6, 10, 12-13, 44; DSMF ¶ 63).  This strikes the Court as in effect a denial; it would be unusual to admit a statement as a fact then characterize it as untrue.  Regardless, Mr. Richardson fails to properly support his proposed qualification / denial, as he cites seven statements of fact, and the Court will not comb through each of them for circumstantial evidence that may or may not cast the veracity of this statement in doubt.

Dr. Harman was not certified by the FMCSA to conduct medical examinations on January 13, 2014.  PSMF ¶ 8; DRPSMF ¶ 8.[83]  As of January 2014, however, one did not need to be a FMCSA certified medical examiner in order to conduct commercial driver medical examinations; Dr. Harman chose not to become certified because he planned to retire in 2016 and because the Shipyard clinic has a sufficient number of certified medical examiners to address certification needs at the Shipyard.  *Id.*

The United States Department of Transportation, Federal Highway Administration, in its July 1988 Conference on Neurological Disorders and Commercial Drivers, specifically recommended:

> Specific Guidelines for Patients with Narcolepsy Syndrome—Narcolepsy is generally a life-long condition, although the sleep attacks can be shortened or reduced in number by pharmacologic treatment in some patients.  These drugs also have other side effects which generally do not control the sleep attacks completely.  Patients with narcolepsy syndrome should not, therefore, be allowed to participate in interstate driving.

DSAMF ¶ 3; PRDSAMF ¶ 3.[84]  Dr. Harman relied on that recommendation, among other things, in disqualifying Mr. Richardson under the MES 706 surveillance, and

---

[83]     The Navy seeks to qualify Mr. Richardson's statement to clarify that while Dr. Harman was not certified, certification was not required at that time.  The qualification is supported.  *Harman Dep.* 56:9-10 ("There was no requirement at this date to be certified.  The certification came into effect in May of 2014"); *Harman Suppl. Decl.* ¶ 8 (reiterating the deposition testimony); FMSCA, *Medical Examiners & Assistants*, https://nationalregistry.fmcsa.dot.gov/NRPublicUI/MedExAssist.seam (last visited July 15, 2016) ("All commercial drivers whose current medical certificate expires on or after May 21, 2014, at expiration of that certificate must be examined by a medical professional listed on the National Registry of Certified Medical Examiners").  The Court grants the qualification.

[84]     Mr. Richardson objects to and qualifies this statement.  DRPSAMF ¶ 3.  The objection asserting inadmissibility is overruled.  The denial, which contests the validity of the statement via citation to another statement of fact asserting a contrary position, is rejected.  As the nonmovant on this point, the Navy is entitled to enter this statement.

he shared that information with Mr. Richardson on January 13, 2014.  PSAMF ¶ 4;

DRPSAMF ¶ 4.[85]  Dr. Harman also relied on FMCSA FAQ number nineteen ("Is

Narcolepsy Disqualifying"), which states "[t]he guidelines recommend disqualifying

a CMV driver with a diagnosis of narcolepsy, regardless of treatment because of the

likelihood of excessive daytime somnolence."  DSAMF ¶ 5; PRDSAMF ¶ 5; *see also*

DSMF ¶ 22; PRDSMF ¶ 22.  Further, at the time that he disqualified Mr. Richardson

from driving commercial vehicles on the Shipyard, Dr. Harman was aware that the

FMCSA Medical Advisory Board, in 2010, had revisited the FMCSA guidance that

---

[85]      Mr. Richardson denies the statement on the ground that "Dr. Harman, in response to a
question as to what he reviewed in making his determination that Mr. Richardson should be
disqualified from maintaining his CDL, . . . testified that he only reviewed the FMCSA FAQ #19 and
a book written by Dr. Hartenbaum."  DRPSAMF ¶ 4 (citing PRDSAMF Attach. 2 *Dep. of Captain Dale
Harman*, at 48 (ECF No. 75) (*Harman Suppl. Dep.*)).  That testimony reads:

> Q:  Did you review from FMCSA anything other than Exhibit 13—I'm sorry—15?  I
> mean, did you go to any other documents or laws or regulations?
> A:  Oh, well, there is a—a guidance that's written by Dr. Natalie Hartenbaum who's
> the individual that helped institute the certification for commercial driver's license
> examiners and she's been instrumental in that work so she—she wrote a book that's
> commonly used as a reference for—for clarification or guidance when DOT
> practitioners encounter problems, so I did reference that book.
> Q:  When?
> A:  It would have been on or about this day.
> Q:  Do you refer to that in your materials?
> A:  No.
> Q:  Did you conduct an examination on this day?
> A:  On this day?

*Harman Suppl. Decl.* 48:10-25.  At this point, the exchange cuts off, as Mr. Richardson has not provided
the next page of deposition testimony.  After review, the Court finds this testimony inconclusive as to
whether Dr. Harman reviewed only (1) the FMCSA FAQ number nineteen and (2) Dr. Hartenbaum's
book—and not the contested document.

       The Court is unable to rule out that Dr. Harman may have relied on the relevant
recommendation.  This is especially so given Dr. Harman's on-point declaration.  *See Harman Suppl.
Decl.* ¶ 13 ("I relied on that recommendation, adopted by the FMCSA, among other things, in
disqualifying Mr. Richardson under the MES 706 surveillance, and I shared that information with Mr.
Richardson on January 13, 2014").  Construing the facts in the light most favorable to the Navy as the
nonmovant, the Court admits the statement.  It also overrules Mr. Richardson's objection, which he
premises on a supposed contradiction between Dr. Harman's supplemental declaration and his
deposition testimony, because—as this footnote has demonstrated—it is not apparent that there is a
contradiction.

narcolepsy be disqualifying for commercial vehicle drivers, regardless of treatment, and that that Medical Advisory Board had concluded that the guidance should not be changed and that narcolepsy should still be considered disqualifying, regardless of treatment.   DSAMF ¶ 6; PRDSAMF ¶ 6.[86]   Dr. Harman did not consider Mr. Richardson's claim that his personal physician was successfully treating his narcolepsy as a justification to ignore FMCSA guidance that a narcolepsy diagnosis is disqualifying for a commercial vehicle operator because that same guidance makes it clear that the diagnosis is disqualifying regardless of treatment.   DSAMF ¶ 7; PRDSAMF ¶ 7.[87]   When he disqualified Mr. Richardson under the MES 706 surveillance examination, Dr. Harman was aware that narcolepsy episodes often occur when individuals are engaged in monotonous or "second nature" activities, including driving, and believed that particular dangers existed in the Shipyard. DSAMF ¶ 8; PRDSAMF ¶ 8.[88]   After Dr. Harman had disqualified Richardson on January 13, 2014, had he been provided with the medical examiner's certificate that Mr. Richardson obtained from his personal physician, Dr. Cvitkovich, on January 14, 2014, Dr. Harman would not have changed his position that Richardson was

---

[86]    Mr. Richardson denies "that patients with narcolepsy syndrome must necessarily be disqualified from participating in interstate driving." PRDSAMF ¶ 6. The denial, which contests the validity of the statement via citation to another statement of fact asserting a contrary position, is rejected. As the nonmovant on this point, the Navy is entitled to enter this statement.

[87]    *See* footnotes twenty-six [DSMF ¶ 22], seventy-four [DSMF ¶ 70].

[88]    Mr. Richardson both objects to and partially denies this statement on essentially the same grounds: i.e., that it is vague and confusing.  PRDSAMF ¶ 8.  While the Court agrees with this characterization to an extent, it does not provide proper grounds on which to exclude the statement given the Navy is the nonmovant.  The Court does, however, modify the statement to reflect its subjectivity to Dr. Harman.  Rather than reading that Dr. Harman "was aware" of the particular dangers existing at the Shipyard, it reads that he "believed" that such dangers existed.

permanently disqualified from driving commercial vehicles on the Shipyard.  DSAMF ¶ 9; PRDSAMF ¶ 9.

Dr. Harman had seen no specific incidences that suggested there was a problem with the restriction of no driving HAZMAT or buses—which had been in place since 2011— being adhered to or posing a threat to anyone.  PSMF ¶ 9; DRPSMF ¶ 9.[89]  Dr. Harman's note for January 13, 2014, states "Patients with narcolepsy syndrome should not, therefore, be allowed to participate in the interstate driving"; Dr. Harman quotes language from an FMCSA document with guidelines for patients with narcolepsy syndrome.  PSMF ¶ 10; DRPSMF ¶ 10.[90]  Dr. Harman agreed that if Mr. Richardson was driving on the Shipyard, he was not engaged in interstate driving.  PSMF ¶ 11; DRPSMF ¶ 11.

After the meeting, Dr. Harman provided the completed Request for Physical Examination Results form for the medical surveillance program MES 706 to Wayne Hennessey, the NAVFAC Site Safety Manager and Ms. Wintle, the NAVFAC LANT human resources specialist for staffing and retention assigned to the Shipyard's Public Works Department.  DSMF ¶ 76; PRDSMF ¶ 76; *Stip.* ¶ 50.  That form, by which a command at the Shipyard requests a medical surveillance examination, specifically requires that the results section be completed by "Branch Medical Clinic,

---

[89]     The parties quibble over the wording of an excerpt from Dr. Harman's deposition.  PSMF ¶ 9; DRPSMF ¶ 9.  The Court has modified the statement to reflect the actual deposition testimony. *Harman Dep.* 58:4-10 ("Q:  Had you seen anything that suggested there was a problem with that restriction being adhered to or posing a threat to anyone?  A:  Meaning specific incidences of where there had been a problem?  Q:  Yes.  A:  No").

[90]     The Navy moves to strike this statement as not supported by the record, DRPSAMF ¶ 10, but it is.  *Harman Dep.* at 32 ("Patients with narcolepsy syndrome should not, therefore, be allowed to participate in interstate driving").  The Court instead qualifies the document to track the language in the record evidence and to acknowledge that this language itself quotes an FMCSA document.

Portsmouth, NH," which refers to the Shipyard clinic. DSMF ¶ 77; PRDSMF ¶ 77. In that section, Dr. Harman indicated that Mr. Richardson was not qualified for the 706 stressor, stating "permanently not to operate a vehicle under DOT license on Shipyard." *Id.*; *Stip.* ¶ 52. The facsimile cover sheet from the Shipyard clinic reiterated that point, stating "(706/DOT Ops License) Permanently Not Qual. Per Cpt Harman." DSMF ¶ 77; PRDSMF ¶ 77; *Stip.* ¶ 53.

Prior to January 13, 2014, some or all of Mr. Richardson's supervisors were aware of his narcolepsy diagnosis, but Mr. Richardson was allowed to drive because BUMED personnel at the Shipyard clinic had previously provided him with a medical examiner's certificate despite his diagnosis. DSMF ¶ 78; PRDSMF ¶ 78; PSMF ¶ 1; DRPSMF ¶ 1.[91] As a result of his supervisors' knowledge of his narcolepsy and

---

[91] In its statement of material facts, the Navy proposes this statement: "Prior to January 13, 2014, some of Richardson's supervisors were aware of his narcolepsy diagnosis, but Richardson was allowed to drive because BUMED personnel at the Shipyard clinic had previously provided him with a medical examiner's certificate despite his diagnosis." DSMF ¶ 78 (citing *Gagner Decl.* ¶ 23). Mr. Richardson denies the statement, referring over to his own statement of material facts: "All of Mr. Richardson's first and second line supervisors knew that Mr. Richardson had been diagnosed with narcolepsy and, as a result, since at least 2011, Mr. Richardson had not been expected to drive busses or HAZMAT vehicles." PRDSMF ¶ 78 (citing PSMF ¶ 1). The Court turns to the parallel dispute.

In his statement of material facts, Mr. Richardson proposes the same statement verbatim and cites record evidence. PSMF ¶ 1 (citing PSMF Attach. 1 *Tr. of Dep. of Robert J. Landry*, at 13 (ECF No. 48) (*Landry Dep.*); *id.* Attach. 2 *Dep. of: James Pickering*, at 16 (ECF No. 48) (*Pickering Dep.*); *id.* Attach. 4 *Dep. of: Christopher Palmer*, at 7, 11, 12, 20 (ECF No. 48) (*Palmer Dep.*); PRDSAMF Attach. 1 *Corrected Tr. of Dep. of Stephen M. Cook*, at 8 (ECF No. 75) (*Cook Dep.*)). The Navy qualifies the statement: "Robert Landry did not expect Richardson to drive bus and hazmat vehicles because he did not have the required licensing." DRPSMF ¶ 1 (citing *Landry Dep.* at 13).

The Court perceives a factual dispute regarding whether some or all of Mr. Richardson's supervisors were aware of his narcolepsy diagnosis. The parties appear to agree that Mr. Richardson could drive some vehicles but could not drive buses or HAZMAT vehicles. They disagree regarding why he could not drive those vehicles; Mr. Richardson says it is as a result of his supervisors' knowledge of his narcolepsy, PSMF ¶ 1; PRDSMF ¶ 78, whereas the Navy says it is because "he did not have the required licensing." DRPSMF ¶ 1. There is record support for both versions. *See, e.g.*, *Landry Dep.* at 13 ("I was looking for guidance from the RA people—the reasonable accommodation people—as to whether or not we needed to proceed with reasonable accommodations or what to do with Craig because of his narcolepsy. Because he didn't hold all the qualifications he needed to hold the WG-7 position").

because he did not have the required licensing since at least 2011, Mr. Richardson had not been expected to drive buses or HAZMAT vehicles. *Id.* NAVFAC managers viewed such medical recommendations from BUMED as mandatory to follow given that BUMED is the Navy's medical command and BUMED had created the 706 MES surveillance program. DSMF ¶ 79; PRDSMF ¶ 79.[92]

---

In the usual course, the Court construes the facts in the light most favorable to the nonmovant. These facts, however, follow an unusual course; rather than opposing the Navy's proposed statement, Mr. Richardson refers over to his own statement of facts. Consequently, both parties are the movants (and the nonmovants), and the Court has neither a single movant against whom to construe the facts (nor a single nonmovant in whose favor to construe them). Regardless, the Court determines that the accounts put forward by the parties are not so contradictory as to be irreconcilable. It includes both accounts and addresses any materiality of the differences in its discussion.

[92]  Mr. Richardson interposes a qualification citing his own statement of facts.  PRDSMF ¶ 79 (citing PSMF ¶¶ 24, 39). This qualification is the first of several contesting statements on the twin basis of PSMF ¶¶ 24, 39. *See* PRDSMF ¶¶ 82-84, 93-94. The nub of the dispute is whether management followed Dr. Harman's disqualification without investigating it. The Court consolidates its treatment of the dispute in this footnote.

PSMF ¶ 24 reads: "The managers of Mr. Richardson concluded that Dr. Harman and BUMED were the decision makers on whether Mr. Richardson could drive and that there was nothing further that NAVFAC management could or should do." PSMF ¶ 24 (citing *Pl.'s Mot.* Attach. 8 *Dep. of John Wyeth* 34:1-25 (ECF No. 49) (*Wyeth Dep.*); *Cook Dep.* 28:1-29:25). The Navy qualifies the statement by writing that "Richardson's supervisors reached this conclusion only after Steve Cook had conducted sufficient research." DRPSMF ¶ 24 (citing DSMF ¶¶ 93-94). As an aside, Mr. Richardson proposes the same fact, verbatim, at PSMF ¶ 37, as the Navy points out. *See* DRPSMF ¶ 37 (referring over to DRPSMF ¶ 24).

PSMF ¶ 39 reads: "None of the five managers of Mr. Richardson took any steps to investigate whether Dr. Harman was correct." PSMF ¶ 39 (citing *Wyeth Dep.* 35:1-25). The Navy denies the statement. DRPSMF ¶ 39 (citing *Cook Suppl. Decl.* ¶ 7).

The Court reviewed the parties' record evidence. On the Navy's side of the ledger, there is unequivocal evidence that Mr. Cook investigated (1) Dr. Harman's authority to disqualify Mr. Richardson and (2) the basis on which Dr. Harman disqualified Mr. Richardson: narcolepsy. *See, e.g., Cook Decl.* ¶ 28 ("I engaged in follow-up research regarding BUMED's authority to conduct 706 stressor examinations and regarding FMCSA's position on narcolepsy as a disqualifier for commercial driver's licensees"); *Cook Decl.* ¶ 29 ("[R]ather than relying blindly on Capt. Harman's disqualification of Richardson, I engaged in extensive efforts to confirm that the disqualification was proper and that BUMED had proper authority to make such a determination"); *Suppl. Cook Decl.* ¶ 7 ("Richardson's other supervisors and I reached the conclusion that we should accede to Capt. Harman's disqualification of Richardson from driving commercial vehicles after I had conducted research to confirm Capt. Harman's authority to disqualify Richardson and on narcolepsy as a disqualifier").

On Mr. Richardson's side, he cited some evidence supportive of the Navy's first point that Mr. Cook investigated Dr. Harman's authority to disqualify Mr. Richardson, *see Wyeth Dep.* 34:13-14 ("Steve Cook was really the lead on it working with Dr. Harman, and that's all I can say about it"); *Cook Dep.* 29:4-8 ("Yeah, I mean Craig's side of it was that documents he got from his personal doctor would trump that and I think I owed it to him to run it down and figure out what was the real authority here"), and some evidence that contradicts it. *Wyeth Dep.* 34:19-35:5 (answering in the affirmative a

On the afternoon of January 13, 2014, Commander Weinstein, Mr. Wyeth, Mr. Cook, and Mr. Gagner met with Ms. Plouffe-Richesin, an HR Specialist from the NAVFAC Groton CT Office participating by phone to discuss the information about Mr. Richardson.  PSMF ¶ 12; DRPSMF ¶ 12.  The decision made at the meeting to put Mr. Richardson on administrative leave was likely a collective one.  PSMF ¶ 13; DRPSMF ¶ 13.[93]  Mr. Richardson was never allowed to operate any motor vehicle for NAVFAC from January 14, 2014, until he found another job with NAVSEA on May 4, 2014.  PSMF ¶ 14; DRPSMF ¶ 14.[94]

---

question as to whether management felt there was nothing further it "could or should do with respect to Dr. Harman's conclusion" after Mr. Cook's investigation into his authority).

As the Court sees it, Mr. Richardson takes issue only with a variant second point: that Mr. Cook—or anyone from management—investigated whether narcolepsy was indeed disqualifying in the particular case of Mr. Richardson.  There is some evidence for this point.  *Cook Dep.* 28:19-29:4 ("Q: So is it a fair summary that you—after learning of Dr. Harman's report of January 13th and a decision was made not to put him on administrative leave, you investigated the situation and came to the conclusion that Dr. Harman—that the issue of the stressors and the passing of the stressors was in the province or the authority of Dr. Harman and he had concluded that was sort of the end of the discussion?  A: That's the way I understood it").

In sum, there is ample evidence for the Navy's position that Mr. Cook investigated Dr. Harman's authority to make the disqualification, and there is conflicting evidence as to whether Mr. Cook investigated whether narcolepsy was a proper basis for disqualification.  Because both parties move for summary judgment on the basis of these facts and because they both rely on their own statements of fact in doing so, *see supra* footnote ninety-one [DSMF ¶ 78], the Court admits DSMF ¶¶ 93-94, excludes PSMF ¶ 39, and admits but modifies PSMF ¶ 24 so that it has an introductory clause referencing Mr. Cook's research.  The Court-modified PSMF ¶ 24 will be inserted after DSMF ¶ 94.  The rest of Mr. the Navy's statements to which Mr. Richardson objects on the twin basis of PSMF ¶¶ 24, 39 are admitted without qualification.

[93]   The Navy argues the statement should be stricken as not supported by the record, despite deposition testimony that clearly supports it.  DRPSMF ¶ 13; *see* PSMF Attach. 7 *Tr. of Dep. of Russell W. Gagner* 109:8-9 (ECF No. 48) ("It was most likely a collective decision . . . ") (*Gagner Dep.*).  The Court qualifies Mr. Richardson's statement to include the "most likely" language, though it rejects the Navy's qualification that administrative leave was "one option investigated" because it adds nothing; if management ultimately decided upon administrative leave, they necessarily considered it as an option.

[94]   The Navy correctly points out that Mr. Richardson's new job was with NAVSEA, DRPSMF ¶ 14, and the Court includes his qualification.  *See Stip.* ¶ 70 ("Mr. Richardson formally left NAVFAC and started working as a railroad repairer, WG-8, with NAVSEA on May 4, 2014").

At 6:23 am, January 14, 2014, Ms. Plouffe-Richesin, as requested, sent an email to Mr. Cook with a draft letter informing Mr. Richardson that he was to be put on Administrative Leave and prohibited him from returning to the work site; the email was copied to Supervisors: Mr. Gagner, Mr. Wyeth, and Commander Weinstein. PSMF ¶ 16; DRPSMF ¶ 16.[95]  Later that day, the proposal to put Mr. Richardson on Administrative Leave was overruled by the Executive Officer of NAVFAC Mid-Atlantic.  PSMF ¶ 17; DRPSMF ¶ 17.[96]

Upon receiving the January 13, 2014 706 stressor disqualification and directive to prohibit Mr. Richardson from driving commercial vehicles on the Shipyard, Mr. Cook (Mr. Richardson's second-line supervisor) and Mr. Palmer (Mr. Richardson's first-line supervisor) met with Ms. Wintle to consider how to address the situation.  DSMF ¶ 80; PRDSMF ¶ 80.  On January 14, 2014, Mr. Richardson took annual or sick leave and obtained a medical examiners certificate from his personal physician.  DSMF ¶ 81; PRDSMF ¶ 81.  On January 15, 2014, Mr. Richardson was either on leave or on union business all day and was not present at the Public Works Department.  *Id.*  Mr. Cook spoke with Michael Berry, NAVFAC MidLANT BSVE Fleet Manager, one of his superiors and a primary point of contact

---

[95]   The Navy moves to strike the statement for lack of support in the record.  DRPSMF ¶ 16.  It is wrong.  *Palmer Dep.* at 18-19 (exhibit with copy of email).  That failed, it seeks to qualify the statement without record support in contravention of Local Rules 56(f), D. ME. LOC. R. 56(f), on the ground that "[t]here is no evidence in the record that Ms. Richeson-Ploufee created the draft letter at issue on the request of anything else rather than on her own initiative."  DRPSMF ¶ 16.  This, too, is wrong.  *See Palmer Dep.* at 19 ("DRAFT for review *as requested*") (emphasis added).

[96]   The Navy calls for a qualification that refers to that which is being overruled a "proposal" rather than a "decision."  DRPSAMF ¶ 17.  Viewing the facts in the light most favorable to the Navy as the nonmovant, the Court so qualifies.  *See Gagner Dep.* 112:5-11 (referring to both a "decision" and what management had "propose[d]").

for BSVE Site Directors in the field when they had questions relating to BSVE operations, who directed him not to let Mr. Richardson drive any government vehicles until cleared by competent authority.  DSMF ¶ 82; PRDSMF ¶ 82.[97]  Mr. Richardson's supervisory chain, from Mr. Palmer up to Commander Weinstein, the Public Works Officer, agreed with that approach and asked Mr. Hennessey, the safety supervisor, to request that the Shipyard clinic conduct a medical surveillance program MES 712 examination, which was for operation of government vehicles that did not require a commercial driver's license.   DSMF ¶ 83; PRDSMF ¶ 83.[98]  Mr. Richardson's supervisors decided to prohibit Mr. Richardson from driving any government vehicles until qualified under the 712 stressor based on the recommendation of Mr. Berry, not only because the Shipyard was a nuclear facility with increased safety scrutiny and risk of catastrophic accidents, but also because of the expectation that a 712 stressor examination would be forthcoming shortly.  DSMF ¶ 84; PRDSMF ¶ 84.[99]  Mr. Richardson remained on paid, active status.  DSMF ¶ 85; PRDSMF ¶ 85.[100]  He did

---

[97]     *See supra* footnote ninety-two.

[98]     *See supra* footnote ninety-two.

[99]     *See supra* footnote ninety-two.  Mr. Richardson also "den[ies] that it was due to the Shipyard's status as a nuclear facility; rather, it was in retaliation for Mr. Richardson's involvement in protected activities."  PRDSMF ¶ 84 (PASMF ¶ 148).  The Court rejects this qualification / denial as legally conclusory.

[100]     The Navy proposes this fact: "Mr. Richardson remained on paid, active status despite being prohibited from performing the vast majority of his job duties.  DSMF ¶ 85

        Mr. Richardson interposes a qualification, denying "that he was unable to perform the vast majority of his jobs."  PRDSMF ¶ 85 (citing PSMF ¶¶ 2-3).  He premises denials and qualifications on PSMF ¶¶ 2-3, often in conjunction with other statements of fact, several times in his response to the Navy.  *See* PRDSMF ¶¶ 90, 104, 108-09, 111-13.  The Court consolidates its treatment of these responses to the extent practicable in this footnote.  Taken together, PSMF ¶¶ 2-3 assert that Mr. Richardson spent his time driving smaller vehicles and on union duties, rather than performing duties within the job description for his position.

        PSMF ¶ 2 reads: "It was common for Mr. Richardson to operate vehicles that were under 26,000 pounds such as sedans, pickup trucks, and smaller vehicles of that nature."  PSMF ¶ 2 (citing *Palmer Dep.* 69:1-25).  This is supported by the record.  *Palmer Dep.* 69:15-17 ("Q: And how common— how often did drivers operate noncommercial vehicles under 26,000 pounds?  A:  It's common").  Of

not, on January 13, 14, or 15, 2014, inform his supervisors that he had been disqualified under the 706 stressor.  DSMF ¶ 86; PRDSMF ¶ 86.[101]

On January 16, 2014, Mr. Cook e-mailed the five levels of managers of Mr. Richardson, NAVFAC Human resources, and NAVFAC's licensing office to address several questions, including: "Why is the Medical Examiner's Certificate for PWD – ME MVO's only available from [Naval Base Health Clinic], and not from outside medical professional?"  PSMF ¶ 23; DRPSMF ¶ 23.[102]  Mr. Cook concluded:

> The way I see it, the Naval Branch Health Clinic is the only authority to evaluate MVOs against the 706 Stressor which was assigned to the position by NAVOSH IH under authority of OPNAVISNT 5100.23G. The 706 Stressor, although linked to and referenced in 49 CFR 391.41, is the [United States Navy] standard that must be met, although the

course, common is a general description of frequency, and the Navy's response to PSMF ¶ 2 is a qualification that provides greater specificity.  DRPSMF ¶ 2; *Suppl. Decl. of Christopher Palmer* ¶ 3 (ECF No. 70) (*Palmer Suppl. Decl.*) (an instance where an MVO drives noncommercial vehicles "typically arises two or three times a day and takes less than 30 minutes, totaling no more than five hours a week of work"); *id.* ¶ 4 (describing this as an "insignificant element" of the position).

PSMF ¶ 3 reads: "Mr. Richardson was a steward and chief steward of his union and spent most of his time on those activities.  He drove 'off the island' maybe a couple times a month and drove to New Hampshire even less frequently."  PSMF ¶ 3 (citing *Landry Dep.* 11:1-12:25).  This is supported by the record, though not where Mr. Richardson has indicated.  *Landry Dep.* 12:2-11.  Again, the Navy's response is a qualification that provides greater specificity.  DRPSMF ¶ 3; *Suppl. Decl. of Russell Gagner* ¶ 4 (ECF No. 67) (*Gagner Suppl. Decl.*) (explaining that Mr. Richardson was allotted between less than eight and up to twenty-six hours of union time per week).  He also points out that Mr. Landry left in late 2012 and cannot speak to the time thereafter.  DRPSMF ¶ 3; *Stip.* ¶ 6.  This, too, is reflected in the facts as admitted.

In sum, the Court credits that Mr. Richardson spent much of his time on union matters and some of his time driving vehicles under 26,000 pounds.  Where Mr. Richardson objects on these grounds, and where the Court deems it necessary, it will modify the facts in keeping with this review of the record evidence.  Here, it cuts the portion of the Navy's proposed statement that reads "despite being prohibited from performing the vast majority of his job duties."  DSMF ¶ 85.  The Court also incorporates PSMF ¶¶ 2-3 into the statement of facts in keeping with the modifications called for by this footnote.

[101]    Mr. Richardson's qualification, which denies in part that he should have informed his supervisors, fails for the reasons set out in footnote eighty-two [DSMF ¶ 75].

[102]    Mr. Richardson proposes a statement that characterizes Mr. Cook's conclusion, PSMF ¶ 23 ("Mr. Cook concluded that only Dr. Harman could sign the Medical Examiner's Certificate"), to which the Navy interposes a denial quoting Mr. Cook's language in his email.  DRPSMF ¶ 23 (quoting PSMF Attach. 8 *Ex. G: 01/16/14 Emails & Exs.*, at 2 (ECF No. 49)).  Viewing the facts favorably to Mr. Richardson, the Court declines to exclude the fact but modifies it to include the language Mr. Cook actually used in his email.

> Medical Officer issues a Medical Examiner's Certificate to the MVO as
> well.

*Id.* Mr. Cook's emails provided three different attachments to the recipients: (1) The

Medical Surveillance Procedures Manual and Medical Matrix; (2) Industrial Hygiene

Survey of Naval Facilities, Public Works Department—Maine 2013; and (3) excerpts

from the OPNAVINST 5100.23G (30DEC05).  *Id.*

On January 16, 2014, Mr. Cook and Mr. Palmer spoke with Mr. Richardson

and informed him that, because of his disqualification under the 706 stressor, he

would not be able to drive government vehicles.  *Stip.* ¶ 59; DSMF ¶ 87; PRDSMF ¶

87.  Prior to the loss of his commercial driving privileges, much of Mr. Richardson's

time not spent on union or EEO activities was spent either driving commercial

vehicles or being on call to drive commercial vehicles.  DSAMF ¶ 18; PRDSAMF ¶

18.[103]  Mr. Richardson showed Mr. Cook his January 14, 2014 medical examiner's

certificate from his personal physician and indicated that he was qualified to drive

commercial vehicles despite Dr. Harman's 706 stressor disqualification.  DSMF ¶ 87;

PRDSMF ¶ 87.  He also said that he had spoken with the Maine Bureau of Motor

Vehicles and that, pursuant to Maine regulations, he was exempt from needing a

medical certificate.  DSMF ¶ 88; PRDSMF ¶ 88.  Mr. Cook asked Mr. Richardson to

---

[103]    The Navy proposes this statement: "Prior to the loss of his commercial driving privileges,
virtually all of Mr. Richardson's time not spent on union or EEO activities was spent either driving
commercial vehicles or being on call to drive commercial vehicles."  DSAMF ¶ 18 (citing *Gagner Suppl.
Decl.* ¶ 10).

    Mr. Richardson denies the statement, pointing out that "it was common for him to operate
vehicles that were under 26,000 pounds."  PRDSAMF ¶ 18 (citing PSMF ¶¶ 2-3; PASMF ¶ 135).

    In keeping with footnote one-hundred [DSMF ¶ 85] (discussing PSMF ¶¶ 2-3), the Court
modifies the statement to say "much," instead of "virtually all," given (1) the claim that it was common
for Mr. Richardson to drive smaller vehicles and (2) the refinement that common meant no more than
five hours a week.

provide him with evidence that the Maine Bureau of Motor Vehicles was aware of his narcolepsy and had not pulled his commercial driver's license. *Id.* After speaking with Mr. Richardson, Mr. Cook spoke with Christopher Lynch, the NAVFAC MidLANT Training and Licensing Program Manager, who told him that Mr. Richardson's medical certificate must be signed by a Navy doctor. DSMF ¶ 89; PRDSMF ¶ 89. Mr. Cook also conducted research and confirmed that: (1) qualification under the 706 stressor was required for Navy MVOs, irrespective of a private physician-issued medical examiner's certificate; and (2) BUMED was the proper authority to conduct a 706 stressor examination. DSMF ¶ 90; PRDSMF ¶ 90.[104] He also met with Dr. Harman and confirmed Dr. Harman's conclusion to disqualify Mr. Richardson under the 706 stressor and that Dr. Harman, as the Shipyard's occupational health officer, had the authority to do that. *Id.*

In a follow up email, on January 21, 2014, Dr. Harman reiterated his recommendation to NAVFAC that based on Richardson's permanent medical condition, he not be certified to hold a CDL. DSMF ¶ 91; PRDSMF ¶ 91. On January 24, 2014, Dr. Harman provided specific information to NAVFAC human resources personnel regarding FMCSA guidance documents that specifically recommend disqualification of any commercial vehicle driver with a narcolepsy diagnosis,

---

[104]   Mr. Richardson objects "to the extent that this statement of material fact calls for a legal conclusion." PRDSMF ¶ 91. The Court does not perceive it as legally conclusory. Mr. Richardson then denies "that the 706 stressor was required for Mr. Richardson's position given his actual responsibilities" and "that BUMED could conduct a 706 stressor with no actual evaluation." *Id.* (citing PSMF ¶¶ 2-3, 44). The first denial is rejected because the Court reads this statement as being about Mr. Richardson's formal duties, not what he says he actually did. The second denial is also rejected, although it cites to a statement of fact to which the Navy admits in his response, PSMF ¶ 44; DRPSMF ¶ 44, because it is inapposite: this statement is about Mr. Cook's investigation, not whether BUMED had to actually evaluate Mr. Richardson's narcolepsy.

regardless of treatment; Dr. Harman did not, however, consider FAQ number twenty-six when he decided to not recertify Mr. Richardson. DSMF ¶ 92; PRDSMF ¶92; PSMF ¶ 43; DRPSMF ¶ 43.[105]  In his research, Mr. Cook learned that, on January 6, 2010, the FMCSA's Medical Review Board had revisited the issue of narcolepsy as an automatic disqualifier, irrespective of treatment, and had concluded that there was no reason to change the current guidance that drivers with a narcolepsy diagnosis are not eligible for a commercial driver's license.  *Id.*  Mr. Cook engaged in follow-up research regarding BUMED's authority to conduct 706 stressor examinations and regarding FMCSA's position on narcolepsy as a disqualifier for commercial driver's licenses because Mr. Gagner, Mr. Cook, and Mr. Palmer did not want to lose Mr. Richardson as a motor vehicle operator given the transportation division's needs for drivers, particularly during the winter months when Shipyard operations could be jeopardized by snowfall and inadequate MVO staffing.  DSMF ¶ 93; PRDSMF ¶ 93.[106] Accordingly, rather than relying blindly on Dr. Harman's disqualification of Mr. Richardson, Mr. Cook engaged in extensive efforts to confirm that the disqualification was proper and that BUMED had proper authority to make such a determination. DSMF ¶ 94; PRDSMF ¶ 94; PSMF ¶ 24; PRDSMF ¶ 24.[107]  After Mr. Cook's investigation, the managers of Mr. Richardson concluded that Dr. Harman and BUMED were the decision makers on whether Mr. Richardson could drive and that there was nothing further that NAVFAC management could or should do.  *Id.*

---

[105]     In keeping with Mr. Richardson's qualification, the Court inserts PSMF ¶ 44, which the Navy admits, into this statement.
[106]     *See supra* footnote ninety-two.
[107]     *See supra* footnote ninety-two.

### 9.    Navy Communications with the Maine Bureau of Motor Vehicles

Beginning on January 16, 2014, Mr. Richardson told Mr. Cook and Mr. Palmer that the Maine BMV had cleared him to drive despite his narcolepsy and that such clearance overrode Dr. Harman's 706 stressor disqualification.  DSMF ¶ 95; PRDSMF ¶ 95.  They asked for documentation from the BMV to that effect and were told by Mr. Richardson that there was no documentation and that Mr. Cook and Mr. Richardson had to call the BMV's medical division for that information.  DSMF ¶ 96; PRDSMF ¶ 96.[108]

Until January 28, 2014, management understood that Mr. Richardson had a valid license from the State of Maine and that there was not an issue with this license. PSMF ¶ 15; DRPSMF ¶ 15.[109]  Eventually, after receiving no written information from Mr. Richardson and having been told by Mr. Richardson on multiple occasions to call the BMV, at 9:20 am on January 28, 2014, Mr. Cook, along with Mr. Gagner and Mr. Palmer, called the BMV to confirm that Mr. Richardson retained a valid state

---

[108]    The Navy proposes this fact: "They asked for documentation from the BMV to that effect and were told by Richardson that there was no documentation and that Cook had to call the BMV's medical division for that information."  DSMF ¶ 96.  Mr. Richardson denies this statement on the ground that Mr. Richardson "never said that Mr. Cook should call the BMV without him."  PRDSMF ¶ 96.

The Court sees Mr. Richardson's denial as in substance a qualification, and a qualification supported by the record.  *See* PRDSMF Attach. 4 *Dep. of: Christopher Palmer & Ex. 14*, at 3 (ECF No. 63) ("Craig came to me this morning, and told me that I need to get on the phone with him and the State of Maine to figure out this whole driving issue").  It modifies the statement accordingly.

[109]    The Navy says Mr. Richardson's statement should be stricken as not supported by the record. DRPSMF ¶ 15.  It is wrong.  *Cook Dep.* 36:4-7 ("Q:  He did have a valid license.  That was never an issue.  Correct?  A:  To the best of my knowledge, no, it wasn't an issue").

It also denies the statement, pointing out that management learned on January 28, 2014, that Mr. Richardson had not informed the Maine BMV about his narcolepsy.  DRPSMF ¶ 15 (citing *Cook Suppl. Decl.* ¶ 8; *Palmer Suppl. Decl.* ¶ 5).  After reviewing the record evidence, the Court treats his denial as a qualification and grants it in part; in particular, it modifies the statement to include the date—January 28, 2014—on which management learned that there may be an issue with Mr. Richardson's Maine license.

commercial driver's license.  DSMF ¶ 97; PRDSMF ¶ 97.[110]  Mr. Richardson never

said that Mr. Cook should call the BMV without him.  *Id.*  None of the three NAVFAC

supervisors on the call indicated to the BMV that Mr. Richardson had narcolepsy, but

in response to a question from the BMV representative, Mr. Cook did indicate that

BUMED had disqualified Mr. Richardson from driving.  DSMF ¶ 98; PRDSMF ¶

98.[111]  The representative from the BMV's medical division, Lori Ezell, requested that

---

[110]    Viewing the facts in the light most favorable to Mr. Richardson as the nonmovant, the Court modifies the Navy's proposed statement for the reason set forth in footnote one-hundred and eight.

[111]    Mr. Richardson asserts:

> Denied.  On January 28, 2014, Steve Cook called Lori Ezzell, employed by the Maine Bureau of Motor Vehicles, and told her that due to his medical condition, Mr. Richardson could not drive, not even a class C vehicle.  PSMF ¶ 29.  The BMV was first informed of Mr. Richardson's narcolepsy by Dr. Harman and his supervisors.  Richardson Dep. pgs. 80-81; PRDSMF ¶¶ 97-98.

PRDSMF ¶ 98.

The first sentence makes for an odd denial, as the Navy's proposal and Mr. Richardson's response essentially agree that Mr. Cook called Ms. Ezzell and—one way or another—told her that BUMED had disqualified Mr. Richardson from driving.  So far as the Court can tell, the disagreement centers on whether Mr. Richardson volunteered this information (Mr. Richardson's version) or whether he turned it over in response to a question from Ms. Ezzell (the Navy's version).  Mr. Cook's declarations and certain statements made in his deposition support the Navy's version.  *See Cook Decl.* ¶ 33 ("[I]n response to a question from the BMV representative, I did indicate that BUMED had disqualified Richardson from driving"); *Suppl. Decl. of Stephen Cook* ¶ 8 (ECF No. 66) (*Cook Suppl. Decl.*) ("When I told Lori Ezell at the Maine Bureau of Motor Vehicles that Craig Richardson had lost his driving privileges due to an undisclosed medical condition, it was in response to a question from Ms. Ezell rather than simply offering that information without request"); *Cook Dep.* 38:14-21 ("I think she asked me why I was calling and I said I was calling to validate what the driver was telling me . . . . I think she asked me why I was calling").  There is little support for Mr. Richardson's version.  *Cook Dep.* at 15 (note in which Ms. Ezzell writes "Portsmouth Naval Yard called on this guy [i.e., Mr. Richardson] stating that due to his medical condition he cannot drive not even a class C").  Even looking at the facts generously to Mr. Richardson, the Court does not qualify the statement on this point; he can cite only one piece of oblique evidence, which does not clearly support his argument.

The second sentence denies the Navy's statement by stating that (1) Dr. Harman was a party to the call and (2) he informed the BMV of Mr. Richardson's narcolepsy.  The problem here is with the citations.  Mr. Richardson cites PRDSMF ¶ 97 despite the fact that it makes no mention of Dr. Harman, and he curiously cites PRDSMF ¶ 98 in support of PRDSMF ¶ 98.  Finally, the citation to his deposition is proper but hearsay.  *Richardson Dep. I* 81:18-24 ("A:  [S]he said that Dr. Harman said that he was not going to issue me a license, no matter what the State says.  Q:  Did she say that Dr. Harman identified you as having narcolepsy?  A:  Yes.  And she said that he said that he was not going to issue me a license").  The Court declines to qualify for lack of proper record evidence.

Mr. Cook provide her with relevant BUMED documentation.  *Id.*  On February 5, 2014, in response to Ms. Ezell's January 28, 2014 request for specific information, Mr. Cook sent her BUMED's disqualification of Mr. Richardson under the 706 stressor and the 712 stressor (for driving of government vehicles that do not require a commercial driver's license).  DSMF ¶ 101; PRDSMF ¶ 101.  The material provided to Ms. Ezell by Mr. Cook did not mention Mr. Richardson's narcolepsy or any other condition, merely showing his disqualification by BUMED under the two stressors. *Id.*  Although Mr. Cook did respond to Ms. Ezell's questions, the purpose of the call was to obtain information about Mr. Richardson's status, not to provide information to the BMV.  DSMF ¶ 102; PRDSMF ¶ 102.[112]

Shortly thereafter, at approximately 10:00 am on January 28, 2014, and on Mr. Richardson's suggestion, Mr. Richardson and Mr. Palmer called the BMV using the speakerphone in Mr. Richardson's office.  DSMF ¶ 99; PRDSMF ¶ 99.  On that call, Mr. Richardson disclosed to the BMV that he had a narcolepsy diagnosis.  DSMF ¶ 100; PRDSMF ¶ 100.[113]

On January 28, 2014, after the Maine BMV learned that Mr. Richardson had narcolepsy, the BMV sent Mr. Richardson a "Notice of Suspension and Opportunity for Hearing," stating that Mr. Richardson's CDL would be suspended on February 28, 2014.  DSMF ¶ 116; PRDSMF ¶ 116.[114]  The Notice indicated the cause for the

---

[112]   The Court rejects Mr. Richardson's qualification for the reasons set forth in footnote one-hundred and eight [DSMF ¶ 96].

[113]   The Court rejects Mr. Richardson's qualification for the reasons set forth in footnote one-hundred and eight [DSMF ¶ 96].

[114]   The Navy proposes this statement: "On January 28, 2014, after Richardson admitted to the Maine BMV that he had narcolepsy, the BMV sent Richardson a 'Notice of Suspension and

intended suspension as the BMV's discovery of Richardson's narcolepsy diagnosis, which Richardson disclosed to the BMV during his and Mr. Palmer's call on January 28, 2014.  DSMF ¶ 117; PRDSMF ¶ 117.[115]  The Notice indicated that Richardson needed to provide a "favorable medical evaluation from your physician" in order to retain or regain his driving privileges.  DSMF ¶ 118; PRDSMF ¶ 118.  Upon receiving the Notice, Mr. Richardson called the BMV and was told that the Notice had been sent because he had not provided necessary paperwork from his physician regarding his narcolepsy.  DSMF ¶ 119; PRDSMF ¶ 119.  Mr. Richardson told the BMV representative that his physician had faxed the completed paperwork to the BMV that very afternoon.  DSMF ¶ 120; PRDSMF ¶ 120.  The BMV representative told Mr. Richardson that "if [the paperwork] was satisfactory, don't worry about the suspension.  You'll get a letter taking that suspension back."  DSMF ¶ 121; PRDSMF ¶ 121.  Mr. Richardson did in fact receive a letter from the BMV withdrawing his Notice of Suspension.  DSMF ¶ 122; PRDSMF ¶ 122.  Mr. Richardson does not know

---

Opportunity for Hearing,' stating that Richardson's CDL would be suspended on February 28, 2014. Compl., Ex. I; Osborn Decl., ¶ 3, Ex. A at 82:23-83:9."  DSMF ¶ 116.

　　　Mr. Richardson both objects to and seeks to qualify the Navy's statement.  His qualification asserts that "[t]he BMV was first informed of Mr. Richardson's narcolepsy by Dr. Harman and his supervisors."  DSMF ¶ 116 (citing *Richardson Dep. I* 80:1-82:-25; PRDSMF ¶ 98).  The Court rejects this qualification because the cited record evidence is hearsay.  *See supra* footnote one-hundred and eleven [DSMF ¶ 98] (addressing the hearsay issue in greater depth).  His objection contends that "[t]he assertion that Mr. Richardson 'admitted' that he had narcolepsy is not supported by the record citation."  PRDSMF ¶ 116.  Here, Mr. Richardson has a point.  *See Compl.* Attach. 9 *Letter from Matthew Dunlap, Secretary of State, State of Maine, to Craig D. Richardson (Jan. 28, 2014)* (ECF No. 1) (stating that "[i]t has been brought to our attention that you are being treated for a medical condition of Narcolepsy," but not specifying who brought that to the Secretary of State's attention).  The Court modifies the statement to exclude the claim that Mr. Richardson is the person who informed the Secretary of State about his narcolepsy.

[115]　　　Interposing a qualification, Mr. Richardson denies "that the BMV was informed of the narcolepsy by Mr. Richardson; rather, the BMV was first informed of Mr. Richardson's narcolepsy by Dr. Harman and his supervisors."  DSMF ¶ 117 (citing *Richardson Dep. I* 80:1-82:-25; PRDSMF ¶ 98).  The Court rejects this qualification.  *See supra* footnote one-hundred and eight [DSMF ¶ 98].

if his license with the State of Maine was ever suspended.  DSMF ¶ 123; PRDSMF ¶ 123.[116]

BMV initiated contact with Dr. Harman, who had a phone conversation on February 7, 2014, with an employee in the BMV's medical division about his disqualification of Mr. Richardson.  DSMF ¶ 103; PRDSMF ¶103.

### 10.    2014 Accommodation Process

At 10:08 am, January 14, 2014, Ms. Plouffe-Richesin sent an e-mail to Mr. Sawyer, the Reasonable Accommodation Program Manager in the Norfolk, VA, EEO office stating:

> It has recently been determined by a NBHC Portsmouth Medical Provider that [Mr. Richardson] is unable to perform the essential functions of his position due to a medical condition.
>
> Management does not have another position to place him into and is asking what their obligations are with the RA process. They are planning on placing the employee on administrative leave. He will be eligible to retire next month.
>
> Will you please advise re the steps if any, management must take in affording the employee an accommodation?

PSMF ¶ 18; DRPSMF ¶ 18.  During the time of Mr. Richardson's 2014 reasonable accommodation request, the Shipyard's only MVO-6 employee, Vernon Brown, who did not have a commercial driver's license, generally drove the vehicles under 26,000 pounds.  DSAMF ¶ 17; PRDSAMF ¶ 17.

---

[116]    The Navy proposes this fact: "Richardson never in fact lost his CDL from the State of Maine. Osborn Decl., ¶ 3, Ex. A at 82:l. 23-84:22."  DSMF ¶ 123.  Mr. Richardson interposes a qualification: "Mr. Richardson does not know if his license with the State of Maine was ever suspended.  Richardson Dep. pg. 84."  PRDSMF ¶ 123.

Both parties cite the same record evidence, and after reviewing it, the Court determines that the qualification is called for.  *See Richardson Dep. I* 84:21-23 ("Q: Were you ever actually suspended? A:  Well, I'm not really sure, to be perfectly honest with you").

At 9:06 am, January 15, 2014, Mr. Sawyer emailed Mr. Palmer, explaining reasonable accommodation: "I recommend you have this interactive dialogue with Mr. Richardson to discuss the BUMED medical and to offer him RA." PSMF ¶ 19; DRPSMF ¶ 19.[117] Shortly after January 14, 2014, Mr. Richardson gave his second-line supervisor, Mr. Cook, a Medical Examiner's Certificate signed by Dr. Cvitkovich on January 14, 2014, authorizing Mr. Richardson to drive commercial vehicles. PSMF ¶ 20; DRPSMF ¶ 20.[118] Mr. Cook understood that Mr. Richardson had given the Certificate signed by Dr. Cvitkovich to Mr. Cook to show that he was reinstated to drive. PSMF ¶ 21; DRPSMF ¶ 21.[119] Mr. Cook did not give a copy of this January 14, 2014 Certificate signed by Dr. Cvitkovich to Dr. Harman, and Dr. Harman never saw it. PSMF ¶ 22; DRPSMF ¶ 22.[120] Receipt of that document would have had no impact on Dr. Harman's decision to disqualify Mr. Richardson based on his narcolepsy diagnosis, which Mr. Cook knew. *Id*.

On about January 16, 2014, Mr. Richardson's supervisors invited him to initiate a request for reasonable accommodation ("RA") of his narcolepsy. DSMF ¶ 104; PRDSMF ¶ 104.[121] Steven Sawyer, the Reasonable Accommodation Program

[117]   The Navy correctly points out that it should be January 15, 2014—not 2015. DRPSMF ¶ 19; *see Palmer Dep.* at 23.

[118]   The Navy admits this statement, though it says the statement is not supported by the record. DRPSMF ¶ 20. It is supported by the record. *Palmer Decl.* at 19 (note from Dr. Cvitkovich dated January 14, 2014).

[119]   The Navy admits this statement, though it says the statement is not supported by the record. DRPSMF ¶ 21. It is supported by the record. *Palmer Decl.* at 16:4-6 ("Q: Did he say why he was giving it to you? A: He gave it to me to show that he was fully reinstated as a driver").

[120]   The Navy interposes a qualification explaining why Mr. Cook did not hand off Dr. Cvitkovich's note to Dr. Harman. DRPSMF ¶ 22. Because the record evidence supports the qualification, *see Harman Suppl. Decl.* ¶ 9; *Cook Suppl. Decl.* ¶ 6, the Court includes it.

[121]   The Navy proposes this statement: "On about January 16, 2014, Mr. Richardson's supervisors invited him to initiate a request for reasonable accommodation ('RA') of his narcolepsy as his existing,

Manager for NAVFAC-LANT, was assigned Mr. Richardson's case. *Stip.* ¶ 60; DSMF ¶ 105; PRDSMF ¶ 105. On January 24, 2014, Mr. Richardson formally requested accommodation of his narcolepsy, specifically requesting that he be permitted to drive with his CDL, excluding HAZMAT and passenger bus vehicles. DSMF ¶ 105; PRDSMF ¶ 105.

As part of the RA process, Mr. Richardson was directed to attend a medical surveillance program MES 712 (also called a "712 stressor"), a certification examination for driving government vehicles that do not require a commercial driver's license. *Stip.* ¶ 61; DSMF ¶ 106; PRDSMF ¶ 106. Mr. Richardson attended a 712 stressor examination on January 21, 2014, but was disruptive and left prior to completion of the examination, ultimately being examined on January 27, 2014, by PA-C Kevin Kelley at BUMED. *Stip.* ¶ 62; DSMF ¶ 107; PRDSMF ¶ 107. A 712 stressor was potentially relevant to the RA process as it would determine whether Mr. Richardson could drive any government vehicles. DSMF ¶ 108; PRDSMF ¶ 108.[122] On January 27, 2014, PA-C Kelley completed a Request for Medical Examination in which Mr. Kelley wrote that Mr. Richardson "cannot drive any government vehicle whether DOT or not on or off base." PSMF ¶ 25; DRPSMF ¶

---

informal accommodation of no bus or HAZMAT vehicles was no longer feasible given his driving prohibition." DSMF ¶ 104

Mr. Richardson seeks to qualify this statement by denying "that the informal accommodation was no longer feasible." PRDSMF ¶ 104 (citing PSMF ¶¶ 2-3, 9, 23, 43-44). As discussed in footnote one-hundred [DSMF ¶ 85], there is support for this qualification, and the Court grants it.

[122] The Court rejects Mr. Richardson's qualification / denial as not responsive to the Navy's statement. *See* PRDSMF ¶ 108.

25.[123]  Dr. Harman discussed this conclusion with Mr. Kelly and agreed with it. PSMF ¶ 26; DRPSMF ¶ 26.

On January 27, 2014, Mr. Palmer gave Mr. Richardson a letter explaining the reasonable accommodation process and paperwork to be completed to request a reasonable accommodation.  PSMF ¶ 27; DRPSMF ¶ 27.[124]  Mr. Palmer understood that if Mr. Richardson was not given a reasonable accommodation that he was going to lose his job.  PSMF ¶ 28; DRPSMF ¶ 28.[125]  He also knew that the U.S. Navy had various procedures in place to help Mr. Richardson find another job at the Shipyard, or with the Navy elsewhere, or with another component of the United States Government.  *Id.*

Mr. Richardson was disqualified under the 712 stressor, also because of his narcolepsy, further limiting the work he could perform within his job description. *Stip.* ¶ 63; DSMF ¶ 109; PRDSMF ¶ 109.  However, Richardson's RA team ultimately determined that, even if Richardson had passed the 712 stressor, NAVFAC would have been unable to accommodate him as an MVO-7.  DSMF ¶ 109; PRDSMF ¶ 109.[126]  Mr. Richardson's RA team comprised Mr. Sawyer, Ms. Marshall-Barnes (NAVFAC MIDLANT Deputy EEO Officer), Ms. Richesin-Ploufe (NAVFAC

---

[123]    Mr. Richardson erroneously writes 2015 instead of 2104, which the Court corrects.  *See Harman Dep.* 64:23.

[124]    Once again, Mr. Richardson erroneously writes 2015 instead of 2014, which the Court corrects sua sponte.  *See Palmer Dep.* at 36.

[125]    The Navy qualifies the statement by pointing out that Mr. Palmer knew that even if Mr. Richardson could not be reasonably accommodated, there were other means of helping him find another job.  DRPSMF ¶ 28.  The record evidence supports this qualification, *Palmer Suppl. Decl.* ¶ 28, and the Court so qualifies.

[126]    The Court rejects Mr. Richardson's qualification / denial.  *See* PRDSMF ¶ 109.  He contests the basis of the RA team's determination, but the Court admits that determination as a fact and will address its legal validity in the discussion.

MIDLANT Labor and Employment Relations), Commander Weinstein, and Mr. Palmer, Mr. Cook, and Mr. Gagner. *Stip.* ¶ 66; DSMF ¶ 110; PRDSMF ¶ 110. The team met telephonically on multiple occasions to discuss Mr. Richardson's request and NAVFAC's ability to accommodate that request. DSMF ¶ 110; PRDSMF ¶ 110. After reviewing Mr. Richardson's job description and discussing the day-to-day responsibilities of an MVO-7 with Mr. Cook and Mr. Palmer, the team ultimately concluded that, because Mr. Richardson was disqualified under the 706 stressor from driving commercial vehicles on the Shipyard, he could not perform the essential functions of his position, with or without an accommodation. DSMF ¶ 111; PRDSMF ¶ 111.[127,128,129] Specifically, based both on the MVO-7 position description and the

---

[127] Mr. Richardson denies this statement. PRDSMF ¶ 111 (citing PSMF ¶¶ 2-3, 18). The Court is unpersuaded these citations. PSMF ¶¶ 2-3—cited time and again in Mr. Richardson's PRDMSF—recounts his argument that it was common for him to operate smaller vehicles and that he spent most of his time on union activities, *see* footnote one-hundred [DSMF ¶ 85], but the Navy's proposed statement is about the asserted basis on which the RA team decided to decline the request: hence, "the team ultimately concluded that . . . ." PSMF ¶ 18—the other citation—also does not change the Court's analysis.

[128] The Navy proposes additional statements that are redundant of this statement. *Compare* DSAMF ¶¶ 27-28, *with* DSMF ¶ 111. The additional statements and objections thereto do not change the Court's analysis.

[129] The Navy also proposes this additional statement:

> Richardson's reasonable accommodation team considered Richardson's position description, the judgment of his supervisors as to the essential functions of the MVO-7 position, the practical work requirements on the ground for MVO-7's, the practical work requirements for MVO-7's in previous years, and the impact of accommodating Richardson on the transportation division.

DSAMF ¶ 26. Mr. Richardson objects:

> Objection. The Plaintiff requests that the Court disregard the Defendant's citation to Ms. Marshall-Barne[s]'s supplemental declaration as it contradicts her initial declaration. *See Mahan v. Bos. Water & Sewer Comm'n*, 179 F.R.D. 49, 57 (D. Mass. 1998) (citing *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1 (1st Cir. 1994). Notwithstanding said objection, Plaintiff answers as follows: Denied. First, in her initial declaration [ECF. No. 55], Ms. Marshall Barnes stated that the reasonable accommodation team only reviewed Mr. Richardson's job description and discussed the day-to-day responsibilities of an MVO-7 with Mr. Cook and Mr. Palmer. *See* Marshall-

day-to-day responsibilities of an MVO-7 at the Shipyard, the RA team concluded that driving commercial vehicles (26,000 lbs or greater gross vehicle weight) was an essential function of the MVO-7 position.  DSMF ¶ 112; PRDSMF ¶ 112.[130]  Because Mr. Richardson could not drive commercial vehicles on the Shipyard due to his disqualification under the 706 stressor, NAVFAC decided it could not grant his RA of driving commercial vehicles except for HAZMAT and passenger bus and could not provide any other RA that would allow him to perform the essential functions of his position.  DSMF ¶ 113; PRDSMF ¶ 113;[131] DSAMF ¶ 25; PRDSAMF ¶ 25.[132]  On

---

Barnes Initial Decl., ¶ 13.  In her supplemental declaration and this factual assertion, she is now claiming that more things were considered.  Marshall-Barnes Supp. Decl., ¶ 8 [ECF No. 69].  The Plaintiff further denies this assertion as the essential functions of Mr. Richardson's responsibilities did not include responsibilities that required a CDL.  PSMF ¶¶ 2-3.

PRDSAMF ¶ 26.

    As the Court sees it, Ms. Marshall-Barnes does not so much contradict her earlier declaration as supplement it.  *Compare Marshall-Barnes Decl.* ¶ 13, *with Marshall-Barnes Suppl. Decl.* ¶ 8.  That said, she gives no explanation for the change in her testimony.  *Cf. Colantuoni*, 44 F.3d at 4-5 ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed").  Even viewing the facts favorably to the Navy as the nonmovant, the Court does not allow him to amend a statement on precisely the same subject matter by supplementing a witness's declaration without any explanation for the change.  Objection affirmed.

[130]    Mr. Richardson again denies the statement citing to PSMF ¶¶ 2-3.  PRDSMF ¶ 112.  The Court is chary to admit a legal conclusion as a statement of fact.  Viewing the facts in the light most favorable to Mr. Richardson, the Court qualifies the Navy's statement to clarify that it articulates the RA team's basis for their decision by adding "the RA team concluded that . . . ."

[131]    In qualifying the Navy's statement, Mr. Richardson denies "that [his] day to day responsibilities did not generally include those that required a CDL" and "that [he] was appropriately disqualified under the 706 stress."  PRDSMF ¶ 113 (citing PSMF ¶¶ 2-3, 9, 20, 43-44).  The Court assumes that he intends to deny that his day-to-day responsibilities *did* include those that required a CDL.  It qualifies the Navy's statement to clarify that it articulates NAVFAC's decision rather than a statement of fact.

[132]    The Navy proposes—and Mr. Richardson denies—this additional statement: "In responding to Mr. Richardson's accommodation request in January 2014, Mr. Richardson's [RA] team considered whether any reasonable accommodation existed that would allow him to perform the essential functions of his position."  DSAMF ¶ 25; PRDSAMF ¶25.  Having admitted a detailed account of the RA team's decision-making process, the Court decides to exclude this general statement.

March 17, 2014, Mr. Palmer presented Mr. Richardson with formal notification of NAVFAC's inability to accommodate him. *Stip.* ¶ 67; DSMF ¶ 113; PRDSMF ¶ 113.

Mr. Cook was given a copy of a Maine BMV Certificate of Examination completed by Dr. Cvitkovich on January 30, 2014, shortly after he completed it, but the Certificate was not given to Dr. Harman. PSMF ¶ 30; DRPSMF ¶ 30.[133] Receipt of that document would have had no impact on Dr. Harman's decision to disqualify Mr. Richardson based on his narcolepsy diagnosis. *Id.*; *see also* DSAMF ¶ 10; PRDSAMF ¶ 10. After speaking with Dr. Harman, Mr. Cook was aware that he viewed Mr. Richardson's narcolepsy diagnosis as permanently disqualifying for commercial vehicle drivers and that he would not have changed his position regarding Mr. Richardson's permanent disqualification under MES 706 surveillance examination just because Mr. Richardson's personal physician had provided Mr. Richardson with a medical examiner's certificate or had otherwise indicated that Mr. Richardson's narcolepsy was being treated. DSAMF ¶ 11; PRDSAMF ¶ 11. The January 30, 2014 Certificate completed by Dr. Cvitkovich states that Mr. Richardson's narcolepsy was being successfully treated with a prescription that "has abated daytime sleepiness"; the form also states that the patient has not demonstrated any side effects from current medication which would interfere with safe operation of a motor vehicle. PSMF ¶ 31; DRPSMF ¶ 31.

---

[133]     The Navy interposes a qualification to the effect that even if Dr. Harman were to have seen the January 30, 2014 Certification, it would not have changed his decision to disqualify Mr. Richardson on account of his narcolepsy. DRPSMF ¶ 30. Because the record evidence supports the qualification, *see Harman Suppl. Decl.* ¶ 10, the Court includes it.

On March 31, 2014, Mr. Richardson submitted a request for reassignment to another position at the Shipyard, at the Navy's facility in Portland, Maine, or at one of the Navy's New Hampshire facilities. *Stip.* ¶ 68; DSMF ¶ 114; PRDSMF ¶ 114. [134] Mr. Richardson submitted his reasonable accommodations request and received no clear follow up as to the next steps; instead, he was told that he had fifteen days to find a job. *Id.* He asked for help, but did not receive any. *Id.* On April 1, 2014, Mr. Sawyer requested an updated resume from Mr. Richardson in order to begin the placement process. *Stip.* ¶ 69; DSMF ¶ 114; PRDSMF ¶ 114. On April 10, 2014, a thirty-day search of local activity/command vacancies was initiated by Mr. Sawyer. DSMF ¶ 114; PRDSMF ¶ 114. On April 15, 2014, five days after the thirty-day search was initiated, NAVFAC was informed that Mr. Richardson had accepted a Railroad Repairer position, WG-8, under the NAVSEA command at the Shipyard. DSMF ¶ 115; PRDSMF ¶ 115. Mr. Richardson went looking for a job on his own, was approached and offered a job by another Shipyard superintendent, and accepted that job. PSAMF ¶ 138; DRPSAMF ¶ 138. [135] He thus transferred to this new position

---

[134] Mr. Richardson interposes a qualification, PRDSMF ¶ 114, which is supported by the record citation. *Richardson Dep. I* 103:13-18 ("And then all of a sudden I get this 15-day thing from my supervisor saying I've got 15 days to find a job. And I'm like, how do you do that? How is that reasonable? That doesn't even make sense to me. What kind of job? What am I supposed to do? Where am I supposed to go? Who is going to help me with this? Is HR going to provide somebody to sit with me and see what I'm—technically what I'm qualified for here or what I'm not?"). The Court qualifies the statement as requested. It notes that it is unclear when Mr. Richardson had this conversation; i.e., whether it was after submitting his RA request or after submitting a request for reassignment. It assumes the later based on his requested qualification.

[135] Mr. Richardson proposes this statement:

> Mr. Richardson, on his own, communicated with another superintendent at the Shipyard who was not intimidated by Mr. Richardson's current supervisor's efforts to remove him from his position, and Mr. Richardson found a new position at the Shipyard in another department. Richardson Dep. pg. 104.

80

within the Navy, at a higher-grade position (Grade 8, WG-3546-08, instead of Grade 7, WG-5703-07), with a higher hourly wage, and the same benefits as his old position. *Id.*; DSAMF ¶ 30; PRDSAMF ¶ 30; DSMF ¶ 115; PRDSMF ¶ 115.  Mr. Richardson formally left NAVFAC and started with NAVSEA on May 4, 2014.  *Stip.* ¶ 70; DSMF ¶ 115; PRDSMF ¶ 115.  At no point in 2014 was Mr. Richardson not employed by the United States Navy.  DSAMF ¶ 29; PRDSAMF ¶ 29.

On February 5, 2015, without informing Mr. Richardson or obtaining his permission, Mr. Cook e-mailed Ms. Ezzell, employed by the Maine BMV, the Request for Medical Examination form completed by Dr. Harman on January 14, 2014, in which Dr. Harman wrote that Mr. Richardson was permanently not to operate a vehicle under DOT license on the Shipyard and also attached the Request for Medical Examination form completed by Physician Assistant Kevin Kelley on January 27, 2014, in which Mr. Kelley wrote that Mr. Richardson "cannot drive any government vehicle whether DOT or not on or off base."  PSMF ¶ 32; DRPSMF ¶ 32.[136]  Mr. Cook needed no permission as the material had been requested by the Maine BMV and did not contain HIPAA-protected information.

---

PSAMF ¶ 138.
     The Navy correctly points out that Mr. Richardson's deposition "makes no reference to intimidation" and "states that the other 'superintendent at the Shipyard' in fact approach[ed] Richardson, not vice versa."  DRPSAMF ¶ 138; *see Richardson Dep. I* 104:19-24 ("[T]here was one shipyard superintendent that saw a little bit more light of me than what the NAVFAC arena had seen, and pulled me aside and said would you like to come work for me? And I said, absolutely").  The Court admits the statement but modifies it in keeping with the record evidence.  Moreover, it includes the Navy's qualification regarding the details of Mr. Richardson's new position (e.g., still in the Navy, same benefits, higher grade position and wages).  DRPSAMF ¶ 138; *Suppl. Decl. of Michelle Wintle-McMillan* ¶¶ 4-5 (ECF No. 80).
[136]     The Navy seeks to qualify Mr. Richardson's proposed statement about Mr. Cook providing Mr. Richardson's information to Ms. Ezzell of the Maine BMV to add that Mr. Cook did not need Mr. Richardson's permission to do so.  DSPRSMF ¶ 32.  The record evidence supports the qualification, *Cook Suppl. Decl.* ¶ 9, so the Court includes it.

Mr. Richardson submitted a request for reasonable accommodation that included Dr. Cvitkovich's completion of the activity sheet that the Navy had asked Mr. Richardson to have completed as part of his request for reasonable accommodation. PSMF ¶ 33; DRPSMF ¶ 33. On the completed form, Dr. Cvitkovich said Mr. Richardson could drive eight hours a day. PSMF ¶ 34; DRPSMF ¶ 34. This February 11, 2014 form completed by Dr. Cvitkovich was not given to Dr. Harman, though Dr. Harman contends that receipt of that document would have had no impact on his decision to disqualify Mr. Richardson based on his narcolepsy diagnosis. PSMF ¶ 35; DRPSMF ¶ 35.[137] Dr. Harman believed, as of January 13, 2014, and February 7, 2014, that Mr. Richardson's diagnosis of narcolepsy, "regardless of whether it was controlled, not controlled, medicated managed or not managed disqualified Mr. Richardson from a [sic] having a commercial driver's license." PSMF ¶ 36; DRPSMF ¶ 36.

Mr. Richardson's request for reasonable accommodation was denied because his primary role was to operate a commercial vehicle. PSMF ¶ 38; DRPSMF ¶ 38.[138]

---

[137]   The Navy seeks to qualify Mr. Richardson's statement about Dr. Cvitkovich's February 11, 2014 form to add that Dr. Harman's opinion would not have been changed by it. DRPSMF ¶ 35. The record evidence supports the qualification, *Harman Suppl. Decl.* ¶ 35, so the Court includes it.
   The Court also notes that Mr. Richardson erroneously writes 2011 instead of 2014, which the Court corrects sua sponte. *See Cook Dep.* at 22-23 (exhibit of Dr. Cvitkovich's note dated "2-11-'14").
[138]   Mr. Richardson proposes this statement: "Mr. Richardson's request for reasonable accommodation was denied because his primary role was to operate a commercial vehicle." PSMF ¶ 38. In support, he cites Mr. Cook's deposition. *Cook Dep.* 45:1-7 (". . . there's anything outside of his positon description that we would have been able to do given that his primary role was to operate a [CMV]. But I know it was discussed as far as, you know, what can we really—can we do anything with him and that particular ability"). This passage of deposition testimony picks up in medias res, as Mr. Richardson has not provided the prior page of deposition testimony, and it does not clearly support his proposed statement.
   The Navy seeks to qualify the statement, DRPSMF ¶ 38, citing Ms. Marshall-Barnes's supplemental declaration. *Suppl. Decl. of Vikki Marshall-Barnes* ¶ 6 (ECF No. 69) (*Marshall-Barnes Suppl. Decl.*). The qualification is properly supported, and the Court admits it.

Mr. Richardson's specific request for a reasonable accommodation was denied because his request involved him driving commercial vehicles other than bus and HAZMAT despite his having been disqualified by Dr. Harman under the MES 706 surveillance from driving any commercial vehicles. *Id.* Two of Mr. Richardson's supervisors indicated that there was not an issue with Mr. Richardson's driving or his restrictions. PSMF ¶ 40; DRPSMF ¶ 40.[139] Dr. Harman was never consulted about the reasonable accommodation process for Mr. Richardson. PSMF ¶ 41; DRPSMF ¶ 41.[140] Through his own contacts, Mr. Richardson found a new position at NAVSEA that started on May 4, 2014; NAVFAC had nothing to do with his obtaining that new position, though Mr. Gagner received a call from his new employer and did not give Mr. Richardson a negative review. PSMF ¶ 42; DRPSMF ¶ 42.[141]

---

[139]    Mr. Richardson proposes this statement: "None of Mr. Richardson's supervisors had an issue with Mr. Richardson's driving or with his restrictions." PSMF ¶ 40. He cites Mr. Cook's and Mr. Wyeth's depositions. *See Cook Dep.* 10:21-23 ("Q: Was there a performance issue? A: I mean at that time I don't think I was clear on what that would be measured against"); *Wyeth Dep.* 9:23-10:1 ("Q: Did you ever hear any criticisms of Mr. Richardson's performance as a motor vehicle operator before Dr. Harman's January 13th meeting? A: No").

        The Navy denies the statement, DRPSMF ¶ 40, citing Ms. Marshall-Barnes's supplemental declaration. *Marshall-Barnes Suppl. Decl.* ¶ 4 ("During our email correspondence regarding Mr. Richardson's requested accommodation, Mr. Landry expressed to me that allowing Richardson to avoid driving buses and hazmat vehicles may pose a hardship to NAVFAC and may be unfair to his fellow motor vehicle operators").

        The Navy cites inadmissible hearsay, as he premises his denial on what Ms. Marshall-Barnes says Mr. Landry said. The denial is accordingly overruled. Nonetheless, viewing the facts in the light most favorable to the Navy as the nonmovant, the Court modifies the statement. Though Mr. Richardson's statement says "none" of his supervisors had an issue, he cites the depositions of only two of his many supervisors, and their statements do not unequivocally support his statement—Mr. Cook, for instance, says it would be hard to know if there was a performance issue given how little driving Mr. Richardson did. *Cook Dep.* 10:7 ("He—he didn't do a lot of driving").

[140]    The Navy interposes a qualification that the Court deems inapposite and excludes. DRPSMF ¶ 41 ("Capt. Harman's role had been to conduct the MES 706 Surveillance examination of Richardson. Harman Suppl. Decl., ¶ 5").

[141]    The Navy denies Mr. Richardson's proposed statement that he got his new job entirely on his own on the ground that Mr. Gagner did not give him a "negative recommendation." DRPSMF ¶ 42 (citing *Ganger Suppl. Decl.* ¶ 13). The denial is rejected, as there is an obvious difference between (1) helping someone get a job and (2) not hindering someone from getting one. Nonetheless, viewing the facts favorably to the Navy, the Court qualifies the statement.

Mr. Richardson has, in sum, alleged as acts of retaliation four instances of alleged mistreatment by Mr. Pickering, the letter of reprimand, failure to promote, loss of driving privileges, and the communications with the state BMV.  DSMF ¶ 124; PRDSMF ¶ 124. [142,143,144]

## III.   PARTIES' POSITIONS

### A.   Craig Richardson's Motion for Partial Summary Judgment

#### 1.   Mr. Richardson's Motion

Mr. Richardson asserts a claim under the Rehabilitation Act, 29 U.S.C. § 794, arguing that he can make a prima facie showing "(1) that he is disabled under the Act; (2) that he was qualified to perform the essential functions of the job, with or without a reasonable accommodation; and (3) the employer took an adverse

---

[142]   Mr. Richardson both objects to and denies this fact.  He premises his objection on the claim that "[it] is an argument and is not a statement of material fact."  PRDSMF ¶ 124.

Here, however, the Navy cites specific instances during Mr. Richardson's deposition where he admits that these acts comprise his retaliation claim.  *Richardson Dep. I* 92:6-25, 102-8-19, 110:1-10.  This is not an argument but an assertion regarding the facts that undergird Mr. Richardson's claim; i.e., it is essentially factual.  The Court overrules Mr. Richardson's objection.

Additionally, the Court will not consider Mr. Richardson's denial because it improperly cites the entirety of his factual submissions at the summary judgment stage.  PRDSMF ¶ 124 (citing PSMF ¶¶ 1-44; PRDSMF ¶¶ 1-126; PASMF ¶¶ 127-149).  The Court does not consider a citation to 192 paragraphs as coming close to the specificity required by Local Rule 56(f), D. ME. LOC. RULE 56(f), and it admits the Navy's statement as submitted.

[143]   The Navy proposes this fact: "Richardson's earliest protected activity was his representation of David Brown, a deaf employee, on his EEO claim against the Navy, beginning in about April 2012.  Osborn Decl., ¶ 3, Ex. A."  DSMF ¶ 125.

Mr. Richardson objects on the ground that the Navy cites "the entirety of Mr. Richardson's deposition transcript."  PRDSMF ¶ 125.  Indeed, the Navy cites an exhibit that encompasses over 250 pages of deposition transcript.  *Richardson Dep. I*; *Richardson Dep. II*.  Mr. Richardson's objection is sustained pursuant to Local Rule 56(f).  D. ME. LOC. RULE 56(f).

[144]   The Navy proposes this fact: "He also claims he engaged in other protected activity, representing other employees with EEO claims, filing his own EEO claim and participating with a deaf employee advocacy group at the Shipyard, the Affinity Group. Osborn Decl., ¶ 3, Ex. A."  DSMF ¶ 126.

As in footnote one-hundred and forty-three, the Court sustains Mr. Richardson's objection that the Navy's citation is insufficiently specific.

employment action against him due to his disability." *Pl.'s Mot.* at 9 (citing *Ríos-Jiménez* v. *Principi,* 520 F.3d 31, 40-41 (1st Cir. 2008)).  Under the first prong, Mr. Richardson claims that "[i]t cannot be disputed that the defendant regarded Mr. Richardson as disabled because Dr. Harman and his supervisors perceived his narcolepsy diagnosis as substantially limiting his ability to engage in the major life activity of working." *Id.* at 10.  Under the second prong, he insists that for three years, he had been adequately performing his job responsibilities and had not received complaints about his driving; that he rarely drove vehicles, instead focusing on union matters, so maintaining a medical certification for interstate driving was not an essential function under the law; and that even if maintaining a certification for interstate driving were an essential function, he would be able to do so given his physician's opinion that medication had controlled his narcolepsy to the extent that he could drive without restriction.  *Id.* at 15.  Mr. Richardson also says that Dr. Harman "misinterpreted and misapplied the FMCSA regulations" by, for instance, reading advisory criteria as if they were binding and ignoring sections of those criteria in conflict with his disqualification decision.  *Id.* at 16-19.  From Mr. Richardson's perspective, his supervisors ratified and furthered Dr. Harman's discrimination, *id.* at 20-23, and the Navy failed to conduct an individualized assessment of his disability as required by the Rehabilitation Act.  *Id.* at 23-28.  Finally, under the third prong, Mr. Richardson contends that there is a direct causal relationship between his disability and his termination—i.e., the Navy explicitly fired

him because of his narcolepsy; given this direct relationship, he sees no need to reach the *McDonnell Douglas* burden-shifting regime. *Id.* at 28-29.

### 2.   The Navy's Opposition

The Navy agrees that *Ríos-Jiménez*'s three-part test sets out the correct standard. *Def.'s Resp.* at 8.  It elaborates on the test's burden-shifting regime: "[i]f the plaintiff can prove the first two factors," i.e., (1) disability within the meaning of the statute and (2) qualification to perform the job with or without reasonable accommodation, then "the employer [can] articulate a legitimate, non-discriminatory reason for the employment decision and [can] produce credible evidence to show that the reason advanced was the real reason." *Id.* (citing *Ríos-Jiménez*, 520 F.3d at 41). If the employer does so, according to the Navy, the burden shifts back to the plaintiff "to establish that the proffered reason is pretext intended to conceal discriminatory intent." *Id.* (citing *Ríos-Jiménez*, 520 F.3d at 41).

The Navy focuses on the second prong: qualification / essential function.  To be qualified for the job, "the plaintiff must demonstrate that he or she can perform the essential functions of his or her position, with or without reasonable accommodation." *Id.* at 8 (citing *Mulloy v. Acushnet Co.*, 460 F.3d 141, 147 (1st Cir. 2006)).  After analyzing the relationship between FMCSA regulations and the Rehabilitation Act, *id.* at 9-11, the Navy argues that an essential—nearly the sole—function of Mr. Richardson's position was to drive a commercial vehicles and that Dr. Harman correctly disqualified him from doing so. *Id.* at 12-15.  In particular, the Navy asserts that a plain reading of the relevant FMCSA regulations makes clear that narcolepsy,

86

like epilepsy, requires automatic disqualification.  *Id.* at 15-17 (citing 49 C.F.R. § 391.41(b)(8)).    Further, based on a FMCSA decision denying exemptions to § 391.41(b)(8)-(9) to three persons who had been successfully treated for narcolepsy, the Navy infers that the regulation "must be viewed as automatically disqualifying individuals with a narcolepsy diagnosis from driving commercial vehicles . . . ." *Id.* at 17-19.  This is buttressed in its view by FMCSA FAQs suggesting that a narcolepsy diagnosis disqualifies an employee from driving commercial vehicles "regardless of treatment." *Id.* at 20-23.

It also takes the position that an individualized assessment was not required, as the agency had a safety standard and there was no way that Mr. Richardson could meet that standard, *id.* at 23 (citing *Buck v. U.S. Dep't of Transp.*, 56 F.3d 1406, 1408 (D.C. Cir. 1995)), and this is an instance in which the Navy was entitled to "proceed by way of general rule of principle." *Id.* at 24 (quoting *Ward v. Skinner*, 943 F.2d 157, 162 (1st Cir. 1991)).  It nonetheless submits that in some respects Dr. Harman did conduct an individualized assessment by "consider[ing] the specific conditions of Richardson's case." *Id.* at 29.  Finally, the Navy clarifies that it reassigned Mr. Richardson on account of his disqualification, not his narcolepsy, *id.* at 29, and seeks to distinguish Mr. Richardson's caselaw. *Id.* 25-28.

### 3.    Mr. Richardson's Reply

Mr. Richardson likewise "focuses solely on the disputed aspect of his narcolepsy disability discrimination claim: whether Mr. Richardson is a qualified individual under the Rehabilitation Act." *Pl.'s Reply* at 2.  He first disputes the notion

87

that "[m]aintaining a medical certification for interstate driving under the DOT regulations" was an essential function of his position. *Id.* He urges the Court to consider "what [his] job responsibilities actually were" rather than the "MVO-7 job description," *id.* at 3, and says that he spent "the majority" of his time on union and Equal Employment Opportunity (EEO) matters—"not on driving activities." *Id.* Moreover, even when he did drive, he claims that "very infrequently would he ever have to leave the Shipyard to engage in interstate driving that required a CDL [commercial driver license]." *Id.* at 4.

Next, he contends with the Navy's argument that FMSCA regulations "permit the automatic CDL disqualification for individuals with a narcolepsy diagnosis without an individualized assessment." *Id.* at 5. Though the Navy premises its argument on the regulation's "plain language," "[n]owhere in [49 C.F.R. § 391.41(b)(8)] does it state that narcolepsy, like epilepsy, is an automatically disqualifying diagnosis." *Id.* Rather, to decide whether narcolepsy indeed disqualifies, Mr. Richardson submits that "employers must engage in an individualized assessment to determine whether the condition is likely to cause a loss of consciousness or ability to control a motor vehicle." *Id.* This position, as Mr. Richardson sees it, is consistent with the United States Supreme Court's holding in *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555 (1999). *Id.* at 6.

Mr. Richardson closes by deploying a squadron of counterarguments. He emphasizes that FMCSA guidance is merely advisory and that the Navy misreads the guidance anyway. *Id.* at 6-7. He casts a recent FMCSA decision rejecting an

88

exemption request as beside the point on the grounds that (1) he did not request an exemption, (2) the decision constitutes non-binding guidance, and (3) it post-dates the events underlying this dispute. *Id.* at 8. He returns to his core point, i.e., the failure to conduct an individualized assessment violated the Rehabilitation Act, and attempts to distinguish the Navy's cases as "addressing conditions that are directly listed as disqualifying in the DOT regulation." *Id.* at 10 (citing *Albertson's*, 527 U.S. at 559; *Ward*, 943 F.2d at 158; *Buck*, 56 F.3d at 1407). Finally, he alleges that Dr. Harman did not conduct an individualized assessment and that the Navy removed him from his position on account of his narcolepsy. *Id.* at 11.

### B.   The Navy's Motion for Summary Judgment

#### 1.   The Navy's Motion

The Navy moves to dismiss all four counts alleged in Mr. Richardson's complaint.

#### a.   Count I: Disability Discrimination

After setting out a five-part test for disability discrimination, *Def.'s Mot.* at 18 (citing *McDonough v. Donahoe*, 673 F.3d 41, 46 (1st Cir. 2012)), the Navy turns to the two instances in which Jim Pickering—Mr. Richardson's second-line supervisor—allegedly discriminated against Mr. Richardson for his diabetes: (1) "his low blood sugar event in the summer of 2013, where Pickering called an ambulance"; (2) "the December 26, 2012 exchange with Pickering at the Shipyard power plant." *Id.* Regarding the 2012 incident, the Navy contends that Mr. Pickering did not hear Mr. Richardson's reference to his diabetes, so the claim must fail the prong of the

*McDonough* test that requires the employer's conduct to be based on disability. *Id.* (citing *McDonough*, 673 F.3d at 46). Regarding the 2013 incident, the Navy does not consider Mr. Richardson's claim sufficient, as in its view "[s]ignificantly more severe, pervasive and threatening conduct is required under First Circuit precedent before entertaining the possibility of a hostile work environment." *Id.* at 19 (citing *Quiles-Quiles v. Henderson*, 439 F.3d 1, 3-4 (1st Cir. 2006)).

### b.      Count II: Age Discrimination

The Navy concedes that Mr. Richardson's coworkers mentioned retirement in conversation with him on three occasions in late 2012 and early 2013, but it perceives "no apparent nexus between [Mr. Richardson's] age and his perceived mistreatment." *Id.* at 20. Moreover, it argues that these three conversations were "innocuous" and do not even approach "conduct 'severe or pervasive enough to be actionable'" under a harassment theory. *Id.* at 21 (quoting *Rodriguez-Machado v. Shinseki*, 700 F.3d 48, 49 (1st Cir. 2012)). With regard to its promotion of Mr. Palmer over Mr. Richardson, another potential mistreatment theory, the Navy says that "[it] has articulated clearly legitimate, nondiscriminatory reason[s] for choosing Palmer." *Id.* at 22.

### c.      Count III: Retaliation

After setting out a three-part test and burden-shifting regime, *id.* (quoting *Palmquist v. Shinseki*, 689 F.3d 66, 70 (1st Cir. 2012)), the Navy runs through the incidents comprising Mr. Richardson's retaliation claim; all five incidents allege the Navy retaliated against Mr. Richardson for two protected activities—his involvement with EEO claims and his participation in a deaf employee advocacy group. *Id.*

90

First, the Navy argues that Mr. Pickering's treatment of Mr. Richardson did not constitute an adverse action when placed in context: "A combative . . . union representative having four verbal altercations with a quick-tempered, vocal supervisor, in an environment in which there was constant labor/management conflict, hardly can be viewed as 'severe or pervasive harassment that materially altered the conditions of employment.'" *Id.* at 23 (quoting *Noviello v. City of Bos.*, 398 F.3d 76, 91 (1st Cir. 2005)). It also argues that causation is lacking because, according to the Navy, Mr. Pickering treated all employees roughly and so his rough treatment of Mr. Richardson cannot be tied, even by implication through temporal proximity, to the employee's protected activities. *Id.* at 24. The Navy next contends that (1) the letter of reprimand for participation in union activities on behalf of another union for which he was unauthorized to use official union time and (2) the promotion of Mr. Palmer over Mr. Richardson were "not causally connected to protected activity" and were issued for "legitimate, non-retaliatory reason[s]." *Id.* at 24-27. Fourth, the Navy maintains that the revocation of Mr. Richardson's driving privileges cannot premise a retaliation claim, as Dr. Harman—who disqualified Mr. Richardson—was unaware of his protected activity, and so there is "a lack of 'competent evidence that the alleged retaliators knew of the plaintiff's protected activity and that a retaliatory motive played a part in the adverse employment actions alleged.'" *Id.* at 27 (quoting *Alvarado v. Donahoe*, 687 F.3d 453, 459 (1st Cir. 2012)). Finally, the Navy urges that calling the Maine BMV cannot premise a retaliation claim, as Mr. Richardson invited Navy officials to inquire about the status of his license and, later, called the BMV himself

to inform them of his narcolepsy diagnosis; thus, from the Navy's perspective, the BMV's subsequent Notice of Suspension was Mr. Richardson's own doing. *Id.* at 28-29.

### d.    Count VI: Failure to Accommodate

The Navy sees Mr. Richardson's failure to accommodate claim as meritless, pointing out that "to meet the essential functions of his position Richardson had to be able to drive commercial vehicles.  To allow Richardson to do so with a narcolepsy diagnosis would have required NAVFAC to disregard both BUMED's disqualification and the specific and recently reaffirmed guidance of the FMCSA . . . ."  *Id.* at 30. Given that the requested accommodation must be "feasible" and that Mr. Richardson requested an accommodation that violated federal safety recommendations as well as internal safety and licensing requirements, the Navy says accommodation on these facts would have been unreasonable.  *Id.* (quoting *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121,136 (1st Cir. 2009)).

### 2.    Mr. Richardson's Opposition

Mr. Richardson opposes the Navy's motion for summary judgment, which he addresses count by count.

### a.    Count I: Disability Discrimination

For narcolepsy-based disability discrimination, Mr. Richardson rests on the arguments he made in his own partial motion for summary judgment.  *Pl.'s Reply* at 16; s*ee supra* Section III.A.1.  For diabetes-based disability discrimination, Mr. Richardson mentions two incidents—one involving Mr. Richardson taking a break,

the other resulting in him having a "diabetic attack," both allegedly precipitated by Mr. Pickering—that he considers "extremely serious and egregious" and that "[a]t the very least" present a question for the jury. *Id.* at 16-18.

### b.  Count II: Age Discrimination

Mr. Richardson looks at "the totality of [his] workplace circumstances." *Id.* at 18.  Several remarks about retirement, as well as the promotion of a person thirty years his junior, convince Mr. Richardson that there is "sufficient evidence [of age discrimination] from which a reasonable jury could conclude that the offensive conduct 'is severe and pervasive enough to create an objectively hostile or abusive work environment . . . ." *Id.* at 19 (quoting *Landrau-Romero v. Banco Popular de P.R.*, 212 F.3d 607, 613 (1st Cir. 2000)).

### c.  Count III: Retaliation

Under the first prong of the *Palmquist* test, Mr. Richardson notes that the Navy "does not dispute that, beginning in 2012, [he] was engaged in protected activity—aiding Mr. Brown and others in their EEO claims, filing his own EEO claim, and advocating for the Affinity Group." *Id.*  The second two prongs are adverse action and causal connection between the protected activity and the adverse action.  *Id.* (quoting *Palmquist*, 689 F.3d at 70).  According to Mr. Richardson, "[his] supervisors, including Mr. Pickering, Mr. Gagner, and Mr. Wyeth, were angry at Mr. Richardson's involvement in this protected activity and made his working conditions hostile as a result." *Id.* at 20.  He then catalogues the instances of alleged hostility involving his supervisors and argues that "individually or in the aggregate, it is apparent that Mr.

Richardson has established his retaliation claim, or, at the very least, there is an issue of material fact such that the question is one better left to the jury." *Id.* at 20-23 (citing *Tobin*, 553 F.3d at 130).

### d.    Count IV: Failure to Accommodate

Here, Mr. Richardson again relies on arguments made in his partial motion for summary judgment, *id.* at 23; *see supra* Section III.A.1, and adds that "[he] asked for but received no help after he submitted his reasonable accommodations request; instead, he was told that he had 15 days to find a job." *Id.*

### 3.    The Navy's Reply

On Count I, the Navy argues that the two incidents referenced by Mr. Richardson regarding his diabetes disability do not constitute harassment "nor can they come anywhere near to creating a hostile work environment . . . ." *Def.'s Reply* at 1-2.  It addresses the narcolepsy disability aspect of Count I under Count IV.  *Id.* at 3.  On Count II, the Navy notes an inconsistency in Mr. Richardson's allegations about how many times his supervisors mentioned retirement and asserts that even assuming the higher number, they "do not constitute a hostile work environment under prevailing First Circuit law."  *Id.* at 3-4 (citing *Rodriguez-Fonseca v. Baxter Healthcare Corp. of P.R.*, 899 F. Supp. 2d 141, 151-52 (D.P.R. 2012)).  On Count III, the Navy casts as contrived, flawed, or hollow each of Mr. Richardson's allegations of retaliatory acts—the letter of reprimand, Mr. Palmer's promotion, the loss of driving privileges, and the Navy officials' communications with the Maine BMV.  *Id.* at 4-7.

The Navy treats Count IV at length.  It points out that Mr. Richardson's failure-to-accommodate claim must fail "as a matter of law," *id.* at 8 (quoting *Guice-Mills v. Derwinski*, 967 F.2d 794, 798 (2d Cir. 1992)), as he was "promot[ed] to a Shipyard job at a higher grade, with a higher hourly wage and the same benefits, and back at NAVSEA, where he has been reunited with MTC Portsmouth." *Id.* at 7-8.  It also puts forward a First Circuit rule that when "any employee's essential job functions implicate the safety of others (such as driving commercial vehicles on a nuclear military facility), it is the plaintiff's burden to demonstrate that he can perform those functions in a way that does not endanger others."  *Id.* at 8 (citing *EEOC v. Amego, Inc.*, 110 F.3d 135, 144 (1st Cir. 1997)).  It says Mr. Richardson fails to meet his burden.  *Id.* at 9-10.  Relatedly, the Navy argues that Mr. Richardson must be a "qualified individual" in order to fall within the Rehabilitation Act, and "[a] qualification standard is 'consistent with business necessity' if it substantially promotes safe job performance."  *Id.* at 10-11 (citing 42 U.S.C. § 12112(a)) (quoting *Dothard v. Rawlinson*, 433 U.S. 321, 331 n.7 (1977)).  It says Mr. Richardson fails to meet an applicable qualification standard: BUMED's MES 706 Surveillance.  *Id.* at 11-12.  Finally, the Navy says that Dr. Harman "had no obligation to perform an individualized assessment," yet he did so, "albeit a limited one." *Id.* at 12.

## IV.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A fact is "material" if it "has the potential to

change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)).  A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party."  *Id.* (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

Once this evidence is supplied by the moving party, the nonmovant must "produce 'specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994)).   In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)).  The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011).  However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Bos.*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

Where, as here, the parties have filed cross-motions for summary judgment, the court must evaluate each motion independently and "determine whether either

of the parties deserves judgment as a matter of law on facts that are not disputed." *Matusevich v. Middlesex Mut. Assur. Co.,* 782 F.3d 56, 59 (1st Cir. 2015) (citing *Barnes v. Fleet Nat'l Bank, N.A.,* 370 F.3d 164, 170 (1st Cir. 2004)). As such, for cross-motions for summary judgment, the standard of review is applied to each motion separately. *Libertarian Party of N.H. v. Gardner*, 759 F. Supp. 2d 215, 221 (D.N.H. 2010) *aff'd,* 638 F.3d 6 (1st Cir. 2011). The presence of cross-motions for summary judgment "does not alter or dilute" the summary judgment standard. *Id.* (citing *Kunelius v. Town of Stow,* 588 F.3d 1, 8 (1st Cir. 2009)).

## V.   DISCUSSION

### A.   Disability Discrimination and Failure to Accommodate Regarding Narcolepsy

The Rehabilitation Act prohibits the Navy from discriminating against its employees on the basis of disability. 29 U.S.C. § 794(a). Absent direct evidence of discrimination, the Court must test the validity of the disability discrimination claim under the familiar burden-shifting framework in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Ríos-Jiménez*, 520 F.3d at 40-41 (applying the *McDonnell Douglas* test in the context of a disability discrimination claim pursuant to the Rehabilitation Act). First, to make out a prima facie case, Mr. Richardson must prove by a preponderance of the evidence that: (1) "[he] was disabled within the meaning of the statute"; (2) "[he] was qualified to perform the essential functions of the job, either with or without a reasonable accommodation"; and (3) "the employer took adverse action against [him] because of the disability." *Id.* at 41 (citing *Bailey v. Georgia-Pac. Corp.*, 306 F.3d 1162, 1166 (1st Cir. 2002)).

Next, if Mr. Richardson is able to show the three prima facie elements, the burden shifts to the Navy "to articulate a legitimate, non-discriminatory reason for its employment decision and to produce credible evidence to show that the reason advanced was the real reason." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). Finally, if the Navy is able to do so, the burden then shifts back to Mr. Richardson to establish that "the proffered reason is pretext intended to conceal discriminatory intent." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804). Ultimately, the burden of proving unlawful discrimination rests at all times with Mr. Richardson as the plaintiff. *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000)).

### 1.    Mr. Richardson's Prima Facie Case

#### a.    Disability

Whether a plaintiff is disabled under the Rehabilitation Act is a question that must be decided on a case-by-case basis according to a three-part analysis. *McDonough*, 673 F.3d at 46-47 (citing *Ramos–Echevarría v. Pichis, Inc.*, 659 F.3d 182, 187–188 (1st Cir. 2011)). Mr. Richardson must show: (1) "[he] suffers from an impairment"; (2) that "the impairment affects a major life activity"; and (3) that "the impairment substantially limits the major life activity." *Id.* (citing *Rolland v. Potter*, 492 F.3d 45, 48 (1st Cir. 2007)). The terms "substantially limits" and "major life activity" have been narrowly interpreted in the First Circuit to create a demanding standard whereby "an individual must have a permanent or long-term impairment that prevents or severely restricts the individual from doing activities that are of

central importance to most people's daily lives." *McDonough,* 673 F.3d at 47 (quoting *Rolland,* 492 F.3d at 47) (internal quotation marks omitted).

Regarding narcolepsy, Mr. Richardson writes that there can be "no dispute" but that the Navy regarded him as disabled on account of his narcolepsy.  *Pl.'s Mot.* at 10.  Indeed, it is clear from the record that the Navy disqualified Mr. Richardson from driving commercial vehicles—and, later, noncommercial vehicles—because he was narcoleptic.  *Stip.* 35-36, 42-44, 56, 63; *see also Roetter v. Mich. Dep't of Corr.*, 456 Fed. App'x 566, 571-72 (6th Cir. 2012) (assuming without deciding that narcolepsy qualifies as a disability); *Ross v. Beaumont Hosp.*, 687 F. Supp. 1115, 118 (E.D. Mich. 1998) (same).  Moreover, in its response, the Navy does not dispute that narcolepsy is a disability.  *Def.'s Resp.* at 8 (skipping the question of whether Mr. Richardson is disabled and proceeding to the question of whether he is a qualified).  There is no genuine dispute of material fact that Mr. Richardson is disabled within the meaning of the law.

### b.    Job Performance and Qualifications

To be a "qualified individual," a plaintiff must show that (1) "[he] possesses the requisite skill, experience, education and other job-related requirements for the position" and (2) "[he] is able to perform the essential functions of the position with or without a reasonable accommodation." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 22 (1st Cir. 2004) (citing *García-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 646 (1st Cir. 2000)).

The nub of Mr. Richardson's narcolepsy-discrimination claim involves (1) determining whether he was qualified for the position and (2) defining what was, and what was not, within the province of Mr. Richardson's essential function. Mr. Richardson puts forward two basic arguments. He first argues that he rarely drove on the job, that he was generally competent, and thus he could fulfill the essential functions. *Pl.'s Mot.* at 12-15. He then argues at greater length that Dr. Harman was wrong to automatically disqualify him on account of his narcolepsy and that management compounded his error by ratifying it; from Mr. Richardson's perspective, were he not improperly disqualified, he would have remained a qualified individual. *Id.* at 16-28. As the Court understands it, Mr. Richardson's first argument is an essential function argument and the second is a qualification argument. In keeping with the sequencing of the test as articulated in the First Circuit, *Calero-Cerezo*, 355 F.3d at 22, the Court turns to qualification first and essential function second.

### i.      Qualified Individual

Here, the parties present starkly different answers to a pure question of law: whether under the federal regulations, Mr. Richardson's narcolepsy diagnosis allowed for automatic disqualification or required individualized assessment. The parties seem to agree that some disabilities require automatic disqualification, though they vigorously disagree on whether narcolepsy should be counted among them.

The Court begins with the text of the regulation at issue:

A person is physically qualified to drive a commercial motor vehicle if that person . . . (8) Has no established medical history or clinical

diagnosis of epilepsy or any other condition which is likely to cause loss of consciousness or any loss of ability to control a commercial motor vehicle; (9) Has no mental, nervous, organic, or functional disease or psychiatric disorder likely to interfere with his/her ability to drive a commercial motor vehicle safely.

49 C.F.R. §§ 391.41(b)(8)-(9).  The parties' disagreement centers on how to read § 391.41(b)(8).  The Navy asserts that "[t]he most reasonable interpretation of 49 C.F.R. § 391.41(b)(8) is that the regulation requires automatic disqualification on the basis of a narcolepsy diagnosis, just like an epilepsy diagnosis," *Def.'s Resp.* at 15, whereas Mr. Richardson points out that "[n]owhere in this section does it state that narcolepsy, like epilepsy, is an automatically disqualifying diagnosis." *Pl.'s Reply* at 5.  The Court agrees with Mr. Richardson that based on the text alone it is not apparent narcolepsy allows for automatic disqualification.

This is not the end of the matter, however, and the Court turns to an adjudicatory decision, interpretative guidance, and caselaw to resolve the precise issue before it: whether a condition not listed by name in the federal regulation can nonetheless be automatically disqualifying.

A recent adjudication throws light on the issue.  On April 17, 2015, the FMCSA published a notice of applications for exemption and request for comments regarding three persons with narcolepsy who sought exemption from 49 C.F.R. § 391.41(b)(8)-(9).  Qualification of Drivers; Exemption Applications; Narcolepsy, 80 Fed. Reg. 21,296 (Apr. 17, 2015).  Like Mr. Richardson, the persons seeking exemption received effective treatment for their narcolepsy and maintained clean driving records for years.  For instance, the first applicant:

was diagnosed with Narcolepsy without cataplexy in 2008.   His physician has treated him for 3 years and is supportive of [the applicant's] request.   He states that [the applicant] is treated with Adderall and has a known history of being very compliant with medical treatment, his Epworth Sleepiness Scale scores remain within normal limits, and he does not fall asleep at any inappropriate times.

*Id.* at 21,297.   The second applicant had the support of both his doctor and his employer, and the third was "by all accounts stable and well-treated on his current therapeutic regimen."  *Id.*

Still, on August 17, 2015, the FMCSA published a notice of denial of their exemption applications.   Qualification of Drivers; Exemption Applications; Narcolepsy, 80 Fed. Reg. 49,301 (Aug. 17, 2015).   The agency resolved two basic questions.  First, "[a]re individuals with narcolepsy (with and without cataplexy) at an increased risk for a motor vehicle crash when compared to comparable individuals without the disorder?"  *Id.* at 49,301.   Second, "[d]o currently recommended treatments for narcolepsy reduce the risk for a motor vehicle crash?"  *Id.*  The FMCSA answered the first question affirmatively and the second negatively,  and thus concluded that "the available medical and scientific literature and research provides insufficient data to enable the Agency to conclude that granting the exemptions would achieve a level of safety equivalent to or greater than the level of safety maintained without the exemption."  *Id.*  at 49,302.

According to the Navy, "[t]he only way to interpret the fact that the exemption were requested and denied is that the FMCSA views 49 CFR §§ 391.41 (b)(8) and (b)(9) to impose automatic disqualification on commercial motor vehicle operators with a narcolepsy diagnosis, regardless of treatment . . . ."  *Def.'s Reply* at 18.   The

Navy stresses the similarities between Mr. Richardson and the rejected applicants, and it urges the Court to give "particular deference" to the FMCSA's interpretation of its own regulation, especially given the complexity of the regulation being interpreted. *Id.* at 19 (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *S. Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 97 (1st Cir. 2002)).

After reviewing *Thomas Jefferson University* and *South Shore Hospital*, however, the Court notes that in those cases—both of which dealt in one way or another with the Health and Human Service's (HHS's) reimbursement decisions—the deference flowed from procedural postures distinct from these facts. *See Thomas Jefferson Univ.*, 512 U.S. at 510-12 (fiscal intermediary ruled plaintiff was entitled to less than full reimbursement, intermediate appellate tribunal reversed fiscal intermediary in part by ordering full reimbursement, HHS Secretary reinstated the fiscal intermediary's ruling, the district court then the Third Circuit affirmed the Secretary's decision, and the Supreme Court deferred to the Secretary); *S. Shore Hosp.*, 308 F.3d at 96-97 (Health Care Financing Administration rejected plaintiff's application for reclassification, Provider Reimbursement Review Board affirmed this ruling, HHS Secretary declined to intervene, and the district court reversed, only to be reversed by the First Circuit, which deferred to the Secretary). Tortuous as they may be, the tracing of these procedural histories makes clear that the agency decisions to which the Supreme Court and the First Circuit deferred were the very decisions that gave rise to the cases before them. By contrast, the Navy argues for deference on the basis of a separate agency decision and presents no authority that

bridges the gap between the facts in *Thomas Jefferson University* and *South Shore Hospital* and those at issue here.

For his part, Mr. Richardson argues the exemption denial has no bearing whatsoever on his case. After pointing out that he never applied for an exemption, Mr. Richardson argues that the denial of exemptions is "non-binding guidance" that "post-date[s]" the events precipitating his lawsuit. *Pl.'s Reply* at 8. He cites no authority for these propositions, and in the Court's view, he overstates matters, especially as regards retroactivity in an essentially adjudicatory context. *See, e.g.*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 224 (1988) ("[W]here legal consequences hinge upon the interpretation of statutory requirements, and where no pre-existing interpretive rule construing those requirements is in effect, nothing prevents the agency from acting retroactively through adjudication"); *Verizon Tel. Co. v. FCC*, 269 F.3d 1098, 1109 (D.C. Cir. 2001) ("In cases in which there are 'new applications of existing law, clarifications, and additions' the courts start with a presumption in favor of retroactivity") (quoting *Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 424 (D.C Cir. 2001)). Moreover, the Court declines Mr. Richardson's invitation to ignore an agency decision, arrived at through notice-and-comment, that answered a strikingly similar question to the one before it: whether people with successfully treated narcolepsy can obtain a commercial driver's license despite 49 C.F.R. § 391.41(b)(8)-(9). In sum, the Court considers the agency decision persuasive clarification of the regulation's meaning.

When Dr. Harman disqualified Mr. Richardson, he relied on FMCSA guidance then in effect.  In 1988, the DOT observed that narcolepsy is a "life-long condition" and that drugs can be effective but "generally do not control sleep attacks completely," ultimately recommending that "[p]atients with narcolepsy syndrome should not, therefore, be allowed to participate in interstate driving."  DSAMF ¶ 3; PRDSAMF ¶ 3.  In answering the FAQ about whether narcolepsy is disqualifying, the FMCSA "recommend[s] disqualifying a CMV driver with a diagnosis of Narcolepsy, regardless of treatment because of the likelihood of excessive daytime somnolence."  *FMCSA FAQs* at 3.  In assessing another FAQ within that same document, the FMCSA writes that "[a] driver with a diagnosis of (probable) sleep apnea or a driver who has Excessive Daytime Somnolence (EDS) should be temporarily disqualified until the condition is either ruled out by objective testing or successfully treated.  Narcolepsy and sleep apnea account for about 70% of EDS."  *Id.*  Lastly, in 2010, the FMCSA Medical Advisory Board revisited the FMCSA guidance that narcolepsy is disqualifying for commercial vehicle drivers and concluded that the guidance should not be changed.  DSAMF ¶ 6; PRDSAMF ¶ 6.

The statement of facts establishes that Dr. Harman relied on the three interpretations directly related to narcolepsy: the 1998 guidance, the FAQ regarding narcolepsy, and the 2010 guidance.  DSAMF ¶¶ 3, 5-6; PRDSAMF ¶¶ 3, 5-6.  These three documents unequivocally support the Navy's position that narcoleptics are categorically disqualified.  At the same time, Dr. Harman did not consider the FAQ that mentions narcolepsy in the course of its discussion of sleep apnea and that could

be read to complicate the agency's otherwise clear guidance.  PSMF ¶ 43; DRPSMF ¶ 43.  He also did not consider Mr. Richardson's claim that his personal physician was successfully treating his narcolepsy, DSAMF ¶ 7; PRDSAMF ¶ 7, though he maintains that review of Dr. Cvitkovich's note would not have changed his position on Mr. Richardson's disqualification.  DSAMF ¶ 8; PRDSAMF ¶ 8.  As the Court sees it, neither of these facts matters much; an FAQ about another disorder loses its persuasive force in the presence of a directly on-point FAQ, and Dr. Harman's disregard of Dr. Cvitkovich's note is consistent with the Navy's theory of the case (i.e., that no such inquiry was called for).  On the aggregate, the Court takes the FMCSA guidance as strongly supporting the Navy's position.

Finally, the Court turns to precedent, where the parties rely on contrasting lines of caselaw.  The Navy's cases address automatic disqualification for conditions explicitly mentioned in the regulations.  *See Albertson's*, 527 U.S. at 573-74 (visual acuity standards codified at 49 C.F.R. § 391.41(b)(10)); *Buck*, 56 F.3d at 1408 (hearing standards codified at 49 C.F.R. § 391.41(b)(11)); *Ward*, 943 F.2d at 162 (epilepsy prohibition codified at 49 C.F.R. § 391.41(b)(8)).  The Court views the First Circuit's decision in *Ward* as especially instructive because it construes § 391.41(b)(8)—a regulation whose reach is at issue here, too.

In *Ward*, the plaintiff—who had a history of epilepsy, but who had been on anticonvulsant drugs and without seizures for seven years—applied for a waiver from § 391.41(b)(8).  943 F.2d at 158.  DOT denied his waiver, and Ward sought judicial review, arguing "that DOT did not make a sufficiently individualized inquiry in his

case; and had it done so, it would have found that he can safely drive." *Id.* at 161. Then-Chief Judge Breyer phrased the question as "whether DOT could rely upon the general statement embodied in the Task Force conclusion, or whether the Act required it to make a more detailed and individualized inquiry into Ward's particular circumstances . . . ." *Id.*  The Court upheld DOT's reliance on the general statement, after deciding (1) the agency was reasonable in doing so, (2) individualized inquiry would have imposed significant burdens, and (3) Congress, as well as the agency, approved of the general rule. *Id.* at 162. *Buck*, which the D.C. Circuit decided after *Ward*, cited the First Circuit decision for the perhaps broader proposition that "[o]nce an individual has admitted that he does not meet such a necessary—as opposed to merely convenient—standard, the Rehabilitation Act does not forbid the application to him of the general rule." *Buck*, 56 F.3d 1406, 1409 (citing *Traynor v. Turnage*, 485 U.S. 535, 551 (1988); *Ward*, 943 F.2d at 162-64).

Mr. Richardson, meanwhile, cites a casebook's worth of cases for his position. *See Pl.'s Mot.* at 24-25 (discussing, inter alia, *Kapche v. City of San Antonio*, 304 F.3d 493 (5th Cir. 2002); *Nichols v. City of Mitchell*, 914 F. Supp. 2d 1052 (D.S.D. 2012); *Millage v. City of Sioux City*, 258 F. Supp. 976 (N.D. Iowa 2003); *EEOC v. Tex. Bus Lines*, 923 F. Supp. 965 (S.D. Tex. 1996); *see also Pl.'s Reply* at 10 (citing these same five cases). *Millage*, in relevant part, depends on a reading of *Kapche*. 258 F. Supp. at 992 ("This Court agrees with the reasoning in *Kapche* to hold that determination of whether or not a claimant under the ADA can perform the essential functions of a particular job must be based upon an 'individualized assessment' of his or her ability

to perform the job safely, and cannot be based simply on a blanket exclusion").
Moreover, *Nichols* follows *Millage*'s reading of *Kapche*, s*ee Nichols*, 914, F. Supp. 2d
at 1060-61, so the Court goes to the source and considers the first case in this line of
decisions: *Kapche*.

*Kapche*, a 2002 Fifth Circuit decision, dealt with an applicant to the police force
who had insulin-treated diabetes mellitus (ITDM).  304 F.3d at 494.  The Fifth Circuit
identified driving as an essential function, then asked whether the plaintiff was
qualified to drive, at which point the question became whether he posed a "direct
threat" behind the wheel.[145]  *Id.*  Under two Fifth Circuit precedents, there was a per
se rule that drivers with ITDM posed such a threat, but the *Kapche* Court queried
whether advances in medicine had rendered the per se rule obsolete.  *Id.* at 494-95.
Its review of recent Supreme Court precedents found that they "consistently point to
an individualized assessment mandated by the ADA under various sections of the
Act," *id.* at 499, which compelled its conclusion that "an individualized assessment of
[plaintiff's] present ability to safely perform the essential functions of [a police officer]
is required."  *Id.* at 499-500.

Chief among the Supreme Court cases relied upon in *Kapche* is *Sutton v.
United Air Lines, Inc.*, 527 U.S. 471 (1999).  There, the Supreme Court discussed the
definition of disability under the ADA; the issue was whether the petitioners, severely
myopic aspiring pilots, were disabled despite the fact that their vision was perfectly

---

[145]    It seems that the Fifth Circuit treats essential functions before qualification, a variation on
the First Circuit framework where qualification precedes essential functions.  *See Calero-Cerezo*, 355
F.3d at 22 (citing *García-Ayala*, 212 F.3d at 646) (setting out First Circuit test).

capable of correction by glasses.  527 U.S. at 475-76.  The Court held that they were not disabled, writing that "whether an individual is disabled should be made with reference to measures that mitigate the individual's impairment, including, in this instance, eyeglasses and contact lenses."  *Id.* at 575; *see also id.* at 483 ("The agency guidelines' directive that persons be judged in their uncorrected or unmitigated state runs directly counter to the individualized inquiry mandated by the ADA").

That same day, the Supreme Court decided *Albertson's*—a case the Navy leans on heavily.  Both decisions addressed visual acuity standards, though only *Albertson's* does so in the context of 49 C.F.R. § 391.41(b)(10).  527 U.S. at 559.  The *Albertson's* Court refers to *Sutton* as standing for the proposition "that mitigating measures must be taken into account in judging whether an individual possesses a disability."  *Id.* at 565.  Then its analysis shifts to the employer's "primary contention" that "even if [the employee] was disabled, he was not a 'qualified' individual with a disability…because [the employer] merely insisted on the minimum level of visual acuity set forth in DOT's Motor Carrier Safety regulations…."  *Id.* at 567.  It held that an employer who requires as a job qualification that an employee meet an otherwise applicable federal safety regulation—here, § 391.41(b)(10)—need not justify enforcing the regulation solely because its standard may be waived in an individual case.  *Id.* at 558.  The complicating factor was the waiver, and without it, "there would be no basis to question petitioner's unconditional obligation to follow the regulations and its consequent right to do so."  *Id.* at 570.

Having reviewed the parties' contrasting lines of cases, the Court must make a close call.  The facts are undisputed that Mr. Richardson had narcolepsy and was disqualified on that basis.  Should the Court find individualized assessment to be required, the parties dispute whether one actually occurred.  At this point, however, the question is whether Dr. Harman was correct—as a purely legal matter—to rely on his understanding that categorical disqualification applies to narcoleptics when he disqualified Mr. Richardson.  The Court decides that he was.

This case can be conceived of as a slight extension of *Ward*.  There, the First Circuit decided that epilepsy is automatically disqualifying under § 391.41(b)(8), provided the tripartite test is met, and here the question is whether narcolepsy is automatically disqualifying under what might be called § 391.41(b)(8)'s residual clause—"or any other condition which is likely to cause loss of consciousness or any loss of ability to control a commercial motor vehicle"—as well as under § 391.41(b)(9).  The *Ward* test applies differently to these facts, as it was the Navy (the employer) and not Secretary of the DOT (the agency) that made the contested decision.  Still, the Navy's reliance on general guidance was reasonable in this instance, primarily because of the clear guidance provided by the FMCSA that categorically disqualified narcoleptics from possessing commercial driver's licenses.  *See FMCSA FAQs* at 3; DSAMF ¶¶ 3, 6; PRDSAMF ¶¶ 3, 6.  That guidance begins in 1988, was reaffirmed in 2010, and was given its most crystalline articulation yet in 2015, which—as discussed—the Court considers persuasive.  The fact that three persons whose medical and professional histories substantially mirror Mr. Richardson's had their

applications for exemption from §§ 391.41(b)(8)-(9) rejected bolsters Dr. Harman's already reasonable reading of then-existing FMCSA guidance.   Further, obvious administrative burdens would incur were the Navy to conduct superfluous individualized review of conditions that the FMCSA has treated as automatically disqualifying, and the Court cannot ignore that the Shipyard is a nuclear facility where safety standards must be scrupulously observed. *See* DSMF ¶¶ 2-3; PRDSMF ¶¶ 2-3.

To the extent that *Kapche* and its progeny call for a different result, the Court must follow First Circuit's rulings.   It also points out that those cases, including *Sutton*, tended to turn on the definition of disability, which was conceded in this case, whereas the *Albertson's*, *Ward*, *Buck* line of cases addresses qualification—the aspect of disability discrimination on which the Court rules at this juncture.   While Mr. Richardson's cases are likely relevant and were well-briefed, the Navy's cases are a better fit.

In sum, the Court decides as a matter of law that no individualized review was required on these facts.   That being the case, it need not reach whether an individualized review actually occurred or the direct threat analysis.

### ii.    Essential Function

**The Law.**   Now, the dispute homes in on the second prong: Mr. Richardson's essential function.   "An 'essential function' is a fundamental job duty associated with a particular position . . . ."   *Calero-Cerezo*, 355 F.3d at 22 (quoting *Ward v. Mass. Health Research Inst.*, 209 F.3d 29, 34 (1st Cir. 2000)); *see also Gillen v. Fallon*

111

*Ambulance Serv., Inc.*, 283 F.3d 11, 25 (1st Cir. 2002) (pointing out that defining "essential job functions" as "fundamental job duties" verges on the tautological).  It follows that essential functions are exclusive of "marginal functions of the position." *Mulloy*, 460 F.3d at 147 (citing *Kvorjak v. Maine,* 259 F.3d 48, 55 (1st Cir. 2001) (quoting 29 C.F.R. § 1630.2(n)(1))).[146]  Section 1630 provides a non-exhaustive list of reasons a job function may be considered essential, including that "the reason the position exists is to perform that function."  29 C.F.R. § 1630.2(n)(2)(i).  Section 1630.2 goes on to list relevant considerations:

> Evidence of whether a particular function is essential includes, but is not limited to:
> (i)    The employer's judgment as to which functions are essential;
> (ii)   Written job descriptions prepared before advertising or interviewing applicants for the job;
> (iii)  The amount of time spent on the job performing the function;
> (iv)   The consequences of not requiring the incumbent to perform the function;
> (v)    The terms of a collective bargaining agreement;
> (vi)   The work experience of past incumbents in the job; and/or
> (vii)  The current work experience of incumbents in similar jobs.

*Id.* § 1630.2(n)(3)(i)-(vii).

The Court's "inquiry into essential functions 'is not intended to second guess the employer or to require the employer to lower company standards.'"  *Mulloy*, 460 F.3d at 147 (quoting *Mason v. Avaya Commc'ns, Inc.,* 357 F.3d 1114, 1119 (10th Cir.

---

[146]    Although *Mulloy*, *Gillen*, and several other cited cases were in the context of the Americans with Disabilities Act (ADA), the same standards apply to ADA and Rehabilitation Act cases.  *Enica v. Principi*, 544 F.3d 328, 338 n.11 (1st Cir. 2008) ("[S]ince the same standards apply to both the Rehabilitation Act and the ADA, we rely on precedent construing both statutes") (citing *Calero-Cerezo*, 355 F.3d at 11 n.1).  Likewise, the Equal Opportunity Employment Commission's (EEOC's) regulations promulgated under the ADA at 29 C.F.R. 1630 apply to the Rehabilitation Act as well.  29 C.F.R. § 1614.203(b).

2004)); *see also* 29 C.F.R. app. § 1630 ("It is important to note that the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards, whether qualitative or quantitative, nor to require employers to lower such standards"). At the same time, "the employer's good-faith view of what a job entails, though important, is not dispositive." *Gillen,* 283 F.3d at 25. In determining whether an employee can perform essential functions, the employer may consider "an employee's actual limitations, even when those limitations result from a disability." *Calef v. Gillette Co.,* 322 F.3d 75, 86 (1st Cir. 2003). In the end, this analysis "involves fact-sensitive considerations and must be determined on a case-by-case basis." *Gillen,* 283 F.3d at 25.

**Application.** The Court begins by reviewing the job description. 29 C.F.R. § 1630.2(n)(3)(ii). It focuses on driving "gasoline diesel or vehicles powered by other sources with a gross vehicle weight of 26,000 LBS or greater"—i.e., commercial vehicles—and mentions that the employee "[m]ay occasionally operate engineering ground equipment." DSAMF ¶¶ 12-14; PRDSMF ¶¶ 12-14; *see also Stip.* Attach. 1 *Job Description*, at 1 (ECF No. 47) (*Job Description*). It also states that the employee "must possess a valid Commercial Driver's License (CDL) with air brake, (P) passenger, (T) tanker, and (H) hazmat endorsements as a minimum." DSMF ¶ 8; PRDSMF ¶ 8; *see also Job Description* at 2. The job description affirms the centrality of driving commercial vehicles and related tasks (e.g., keeping records on loaded and unloaded cargo, logging times of departure and return), and the requirements contained within the description, notably the CDL, can be taken as representing

"[t]he employer's judgment as to which functions are essential." 29 C.F.R. § 1630.2(n)(3)(i). The Court thus decides the job-description and employer's-judgment factors weigh in favor of the Navy's position. Indeed, at least considered in the abstract, the MVO-7 position seems to exist for the very purpose of driving commercial vehicles, DSAMF ¶¶ 19-20; PRDSAMF ¶¶ 19-20, and if the reason a position exists is to perform a function, that function may be an essential one. 29 C.F.R. § 1630.2(n)(i); *see also* 29 C.F.R. app. § 1630 ("The first factor is whether the position exists to perform a particular function"). There is a strong case that driving commercial vehicles was not just an—but the—MVO-7's essential function.

Things get more complicated when the Court considers how Mr. Richardson actually spent his time working as an MVO-7. 29 C.F.C. § 1630.2(n)(3)(iii); *see also* 29 C.F.R. app. § 1630 ("The inquiry into whether a particular function is essential initially focuses on whether the employer actually requires employees in the position to perform the functions that the employer asserts are essential"). The parties stipulate that the Navy learned of Mr. Richardson's narcolepsy diagnosis in 2008, *Stip.* ¶¶ 8-9, that it restricted him from bus and hazmat vehicle duty in 2011, *id.* ¶¶ 10-11, and that there were no complaints about his driving through January 2014. *Id.* ¶¶ 47-49. Despite his failure to submit a formal accommodation request in the spring of 2011, the Navy informally accommodated him until the events precipitating this lawsuit occurred in late 2013 and early 2014. *Id.* at 12-15. The question is what exactly Mr. Richardson did during this time. *See* 29 C.F.R. app. § 1630 ("The time

spent performing the particular function may also be an indicator of whether that function is essential").

The record reveals that Mr. Richardson spent between eight and twenty-six hours a week carrying out his union duties in his position as steward and, more often, chief steward.  DSMF ¶¶ 15, 26; PRDSMF ¶¶ 15, 26; PSMF ¶ 3; DRPSMF ¶ 3.  The Navy allots eight hours a week for union activity to a steward and eighteen hours a week to a chief steward, and when one person performs both positions' duties in a given week, his hours from both positions combine to achieve the maximum: twenty-six.  DSMF ¶ 46; PRDSMF ¶ 46.  He also worked on EEO complaints, which were separate from his union duties, though it is unclear how much time he spent on the complaints.  PSAMF ¶ 135; DRPSAMF ¶ 135.

Besides union and EEO activities, Mr. Richardson commonly drove noncommercial vehicles, but he spent no more than five hours a week doing so.  PSMF ¶ 2; DRPSMF ¶ 2.  Before he lost his CDL, much of Mr. Richardson's time not spent on union or EEO activities was spent either driving commercial vehicles or being on call to drive commercial vehicles.  DSAMF ¶ 18; PRDSAMF ¶ 18.  At least until 2012, he drove "off the island" maybe a couple times a month and to New Hampshire even less frequently, PSMF ¶ 3; DRPSMF ¶ 3, but even loads that may not weigh enough to require transport on a commercial motor vehicle often are large enough or loaded on pallets large enough to require the bed size of commercial trucks.  DSAMF ¶ 21; PRDSAMF ¶ 21.  Tasks that would not require a CDL include clearing snow during winter months, cleaning the shop and vehicles, and local delivery of vehicles for

115

vendors. DSAMF ¶ 22; PRDSAMF ¶ 22. Mr. Richardson expressed an unwillingness to do any such cleaning, and Vernon Brown—an MVO-6 without a CDL—generally performed tasks not requiring a CDL. DSAMF ¶¶ 17, 23; PRDSAMF ¶¶ 17, 23. After loss of his CDL, there would be fewer than ten hours of work a week falling within his position description. DSAMF ¶ 24; PRDSAMF ¶ 24. From the Court's perspective, the fact weighing most heavily in Mr. Richardson's favor is that he carried a restriction on driving certain commercial vehicles (i.e., buses and hazmat) between 2011 and 2014 without issue.

One novel aspect of the fact pattern here is that the union work is more a separate position than a function of the MVO-7 position. Furthermore, while driving noncommercial vehicles garners a mention in the position description, it casts those duties as secondary to the driving of commercial vehicles. In a sense, the question is whether Mr. Richardson so occupied his time with separate and lesser duties that the primary one became no longer essential.

Taking a larger view of the facts, Mr. Richardson spent as much as twenty-six hours on union activity and no more than five hours a week driving noncommercial vehicles, plus an unknown amount of time working on EEO complaints. The record indicates that he spent as much as thirty-one hours a week on tasks that fell outside of the core of his position description, assuming he spent the maximum amount of time on both union and non-CDL driving duties during the same week. Still, caselaw suggests that the percentage of time he spent driving commercial vehicles or being on call to drive commercial vehicles—about 25%, at the very least—would not render

that function marginal. *See Mulloy*, 460 F.3d at 153 ("Even if [plaintiff] had not stipulated to the essential nature of this function, a job function requiring 10% of [plaintiff's] time is not insignificant when considered in relation to the five remaining essential functions of his job, each of which requires only 10% to 25% of his time").

In sum, because (1) the position exists for the purpose of driving commercial vehicles, (2) the job description portrays the driving of commercial vehicles as the primary task and explicitly requires a CDL, (3) Mr. Richardson continued to drive commercial vehicles consistent with his MVO-7 position albeit with restrictions until his disqualification, (4) the other tasks he may have done were in the service of a separate position (i.e., as union steward or chief steward), could be better performed by another employee (i.e., by Mr. Brown driving non-commercial vehicles as an MVO-6), or were subject to refusal by Mr. Richardson (i.e., cleaning the shop and vehicles), there is not enough for Mr. Richardson to generate a genuine dispute of material fact as to whether driving commercial vehicles was an essential function for an MVO-7.

### iii.   Adverse Employment Action

At this point, the Court notes an inconsistency in the legal theories underlying Mr. Richardson's motion for partial summary judgment. So far, Mr. Richardson has set out to prove his prima facie case under the three-part framework he attributes to *Ríos-Jiménez*. *Pl.'s Mot.* at 9. As has been shown, *Ríos-Jiménez* identifies the *McDonnell Douglas* test as the one that applies where there is no direct evidence of discrimination based on disability, and Mr. Richardson has vigorously argued in accordance with the first and second parts of the *McDonnell Douglas* test. *Id.* at 10

("There is no dispute that Mr. Richardson is 'regarded as' disabled by the Defendant"); *id.* at 11 ("Mr. Richardson is a qualified individual with a disability"). But at the third part, i.e., whether the employer took adverse action, Mr. Richardson disavows the regime he had been applying. *Id.* at 28 ("Because the individuals who made the decision regarding Mr. Richardson's termination knew about his disabilities and discriminated against him on that basis, the Court need not utilize the McDonnell Douglas burden shifting regime"). In other words, Mr. Richardson argues under the third prong of the *McDonnell Douglas* test that the *McDonnell Douglas* test does not apply.

The problem is that a separate doctrinal lens—mixed motive analysis—applies "where direct evidence exists that an employer, in making an adverse employment decision, considered a proscribed factor, e.g. race or disability, as well as one or more legitimate factors, e.g. competence or performance." *Ríos-Jiménez*, 520 F.3d at 39 (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 241-42 (1989); *Fernandes v. Costa Bros. Masonry, Inc.,* 199 F.3d 572, 580 (1st Cir. 1999), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 102 (2003)). But Mr. Richardson never mentions even in passing a mixed-motive analysis in his capacious briefs. Perhaps the point he is trying to make is that the adverse employment action is obvious; the Navy disqualified him because of his narcolepsy. *See Pl.'s Mot.* at 28-29. Regardless of Mr. Richardson's attempt to import a separate and incompatible analytic into what he characterizes as "the third element of a discrimination claim under the Rehabilitation Act [i.e., the *McDonnell Douglas* test]," *id.* at 28, the Court takes the

point that the bone of contention here is about the qualification and essential functions of Mr. Richardson's position—issues the Court has already resolved.  In other words, there is no genuine dispute of material fact as to whether there was an adverse employment action; indeed, there was one, in the form of Mr. Richardson's disqualification.

### iv.   Conclusion

Given the Court's legal determinations, no reasonable factfinder could find that Mr. Richardson made out his prima facie case.  The Court grants summary judgment to the Navy on the narcolepsy-based disability discrimination claim in Count I.  Additionally, because the essential function requirement is also a part of reasonable accommodation claim and because the Court determined that no reasonable factfinder could find Mr. Richardson capable of carrying out the position's essential function, the Court grants summary judgment to the Navy on the narcolepsy-based failure to accommodate claim in Count IV.  *See Ríos-Jiménez*, 520 F.3d at 41 ("To make out a reasonable accommodation claim, a plaintiff must prove the first two of the three factors [from the disability discrimination test] and further that the employer, despite knowing about the disability, did not acquiesce to a request for a reasonable accommodation by the employee . . . .  It matters less precisely what stage of the rubric the issues get tackled; more important is that they are confronted . . . ."); *see also Mulloy*, 460 F.3d at 148 ("[W]e must decide whether the ADA requires us to evaluate this claim as an essential function issue or as a reasonable accommodation issue.  Courts have treated the issue both ways").

### B.     Disability Discrimination regarding Diabetes

#### 1.     The Law

To succeed on his hostile work environment claim premised on diabetes, Mr.
Richardson must show that (1) "[he] was disabled as defined under the Rehabilitation
Act"; (2) "[he] was subjected to uninvited harassment"; (3) "[his] employer's conduct
was based on [his] disability"; (4) "the conduct was so severe or pervasive that it
altered the conditions of [his] work environment"; and (5) "the harassment was
objectively and subjectively offensive." *McDonough*, 673 F.3d at 46 (citing *Prescott v.
Higgins*, 538 F.3d 32, 42 (1st Cir. 2008); *Ríos-Jiménez*, 520 F.3d at 43).  The dispute
narrows to the fourth prong.  The Navy takes the position that the events as Mr.
Richardson remembers them are "not so severe or pervasive that they altered the
conditions of his work and created an abusive work environment." *Def.'s Mot.* at 19.
Mr. Richardson disagrees, characterizing his interactions with Mr. Pickering as not
"a single incident of harassment" but a "pattern" of behavior severe and pervasive
enough to constitute hostility under the law.  *Pl.'s Resp.* at 16-17.

Under First Circuit law, "[d]etermining whether harassment is 'sufficiently
severe or pervasive to alter the conditions of the victim's employment and create an
abusive working environment' depends on all the relevant circumstances." *Heath v.
Brennan*, 2015 WL 2340781, at *5, 2015 U.S. Dist. LEXIS 63254, at *14 (D. Me. May
14, 2015) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21–23 (1993)).  Relevant
factors include "the severity of the conduct, its frequency, and whether it
unreasonably interfered with the victim's work performance." *Quiles-Quiles*, 439

F.3d at 7.  The law is without a "mathematically precise test to determine whether [a plaintiff] present[s] sufficient evidence" of a severely and pervasively hostile work environment, *Colón-Fontánez v. Municipality of San Juan*, 660 F.3d 17, 44 (1st Cir. 2011) (first alteration in original) (citing *Pomales v. Celulares Telefónica, Inc.*, 447 F.3d 79, 83 (1st Cir. 2006)), but "[t]he thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." *Noviello*, 398 F.3d at 92 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

### 2.  Application

The facts establish that Mr. Richardson and Mr. Pickering had a relationship fraught with tension and marked by confrontation.  Mr. Richardson premises his hostile work environment claim as regards diabetes on two such interactions with Mr. Pickering.  Though recollections differ on some points, the Court credits Mr. Richardson's account as the nonmovant for the purposes of summary judgment. First, on about December 26, 2012, Mr. Richardson took a bathroom break at the Shipyard power plant, after which he paused to get a drink of water and talk about the holidays with Mr. Anderson.  DSMF ¶¶ 29-30; PRDSMF ¶¶ 29-30.  Mr. Pickering confronted Mr. Richardson, screaming at him to "get the fuck back to his truck." DSMF ¶ 30; PRDSMF ¶ 30.  Mr. Richardson said that he needed a nourishment break because of his diabetes, to which Mr. Pickering reacted angrily—but without explicitly mentioning his diabetes.  DSMF ¶¶ 31, 33; PRDSMF ¶¶ 31, 33.  Second, during the summer of 2013, Mr. Richardson was again taking a break, this time

suffering from a sugar low, when Mr. Pickering again yelled at him for taking a break. DSMF ¶ 34; PRDSMF ¶ 34.  Mr. Richardson explained that he was struggling with his diabetes, but Mr. Pickering insisted that he get back to work and eventually called an ambulance.  DSMF ¶ 35; PRDSMF ¶ 35.  The paramedics treated Mr. Richardson and confirmed his account that he had a problem with his diabetes.  DSMF ¶ 36; PRDSMF ¶ 36; PSAMF ¶ 131; DRPSAMF ¶ 131.  Again, Mr. Pickering did not explicitly mention diabetes during this encounter.  DSMF ¶ 36; PRDSMF ¶ 36.

Looking at events in the light most favorable to Mr. Richardson as the nonmovant, the Court determines that Mr. Pickering's behavior toward Mr. Richardson, though inappropriate, was not the stuff of a hostile work environment claim.  There were two incidents of harassment, and neither of which included an actual reference by Mr. Pickering of Mr. Richardson's diabetes; rather, Mr. Pickering displayed a callous lack of sympathy when Mr. Richardson mentioned the condition. Two incidents strikes the Court as unlikely to constitute a pattern.  *Compare Ponte v. Steelcase, Inc.*, 741 F.3d 310, 320-21 (1st Cir. 2014) (behavior not severe and pervasive enough where plaintiff alleged sexual harassment based on two "very uncomfortable" car rides with her boss), *with Quiles-Quiles*, 439 F.3d at 7 (behavior severe and pervasive enough where plaintiff "was subject to constant ridicule about his mental impairment that it required him to be hospitalized and eventually to withdraw from the workforce").  That said, even a single act of harassment, "if egregious enough, [may] suffice to evince a hostile work environment."  *Noviello*, 398 F.3d at 84 (citations omitted).  But the one-off instances that qualify are much more

egregious than the facts here.  *See Ponte*, 741 F.3d 320-21 (collecting cases of egregious conduct, including threatened rape and unwanted touching).   Mr. Richardson's account more resembles the sort of "rudeness or ostracism" that is regrettable but insufficient to support a hostile work environment claim.

There is no genuine dispute of material fact on the diabetes-based discrimination claim.

### C.   Age Discrimination

Mr. Richardson claims the Navy violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, by discriminating against him on the basis of his age through harassment, the creation of a hostile work environment, and an adverse employment action.  *Pl.'s Resp.* at 18-19.  As the Court understands it, the harassment and hostile work environment claim arise from comments about Mr. Richardson's retirement, and the adverse employment action claim arises from the Navy's decision to hire Mr. Palmer over Mr. Richardson.  *Id.*  The Court considers these two claims in turn.

#### 1.   Age-Based Hostile Work Environment

##### a.   The Law

The test for age-based hostile work environment closely resembles the test for disability-based hostile work environment.  *See supra* Section V.B.1.  To succeed on his hostile work environment claim premised on age discrimination, Mr. Richardson must show that: (1) he is a member of a protected class (here, age); (2) he was subjected to unwelcome harassment; (3) the harassment was based on age; (4) the

harassment was sufficiently severe or pervasive so as to alter the conditions of his employment and create an abusive work environment; (5) the harassment was both subjectively and objectively offensive; (6) there is some basis for employer liability. *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001) (applying test in sexual harassment context); *Collazo v. Nicholson*, 535 F.3d 41, 44 (1st Cir. 2008) (recognizing hostile work environment claims under the ADEA).

Once again, the contested issue is whether the age-based discrimination was severe and pervasive enough.  In an ADEA case, the First Circuit wrote that "[t]o prove a hostile-work-environment claim, a plaintiff must provide sufficient evidence from which a reasonable jury could conclude that the offensive conduct 'is severe and pervasive enough to create an objectively hostile or abusive work environment and is subjectively perceived by the victim as abusive.'"  *Rivera-Rodríguez v. Frito Lay Snacks Caribbean, Inc.*, 265 F.3d 15, 24 (1st Cir. 2001) (quoting *Landrau-Romero*, 212 F.3d at 613).  Severity and pervasiveness is assessed as it was in the diabetes context—i.e., by a totality of the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is threatening or humiliating, or merely an offensive utterance; and whether it unreasonably interferes with the employee's work performance."  *Id.* (citing *Landrau-Romero*, 212 F.3d at 613).

### b.    Application

Viewing the facts favorably to Mr. Richardson, his supervisors referenced his retirement on four occasions.[147]   Mr. Pickering asked Mr. Richardson about his

---

[147]    Mr. Richardson also mentions a fifth occasion.  After his disqualification, Ms. Plouffe-Richesin wrote an email to a colleague in which she mentioned that "[Mr. Richardson] will be eligible to retire

retirement three times: "With all your problems, why don't you retire?"; "When are

you retiring?"; and "Are you retiring with Billy Brown?"  DSMF ¶¶ 24, 26; PRDSMF

¶¶ 24, 26; PSAMF ¶ 139; DRPSAMF ¶ 139.  In addition,  Mr. Gagner once told Mr.

Richardson that he had him on the "radar" for retirement.  DSMF ¶¶ 49, 51; PRDSMF

¶¶ 49, 51; PSAMF ¶ 136; DRPSAMF ¶ 136.  These references to Mr. Richardson's

retirement are more frequent than the references to his diabetes, but they are still

not especially frequent. *Rodriguez-Fonseca*, 899 F. Supp. at 149-152 (insufficiently

severe and pervasive conduct where plaintiff was referred to as a "crazy, little, old

man" during every encounter with one supervisor).  The references are also somewhat

oblique; rather than speak to Mr. Richardson's age directly, they suggest it through

references to his retirement. *But see Rivera-Rodríguez*, 265 F.3d at 25 (reversing

district court's grant of summary judgment against a plaintiff who had suffered six

comments directly related to his age, including supervisors' disparaging remarks and

their expressed preference to hire younger people and fire older people).  A more likely

interpretation of Mr. Richardson's supervisors' comments—at times coming as

something of a non sequitur the midst of acrimonious disagreements—is that they

evince a simple desire to be rid of Mr. Richardson, who seems to have been especially

vocal and occasionally confrontational and whom they may have considered an

extreme annoyance, but not with any special animus regarding his age.  Though it is

---

next month." *Pl.'s Resp.* at 19; PSMF ¶ 18; DRPSMF ¶ 18.  But Mr. Richardson was not a party to the email, which he presumably received through discovery, so it could not have contributed to his sense of a hostile working environment.  For this reason, the Court excludes this occasion from the application.  *See Rivera-Rodríguez*, 265 F.3d at 25 (assuming without stating that the plaintiff's presence or knowledge is required for an occurrence to contribute to his sense of hostility).

a closer question than the hostile work environment claim based on diabetes, the Court again concludes that no reasonable jury could find the statements about retirement sufficiently severe or pervasive. The Navy is entitled to summary judgment on the age-based hostile work environment claim.

### 2.   Age-Based Adverse Employment Actions

#### a.   The Law

Under the ADEA, the Navy must make hiring and firing decisions about employees "free from any discrimination based on age." 29 U.S.C. § 633a(a). The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual . . . because of such individual's age." *Id.* § 623(a)(1). There is some uncertainty in the First Circuit regarding the burden of proof applicable to a federal employee's ADEA claim. *See Velazquez-Ortiz v. Vilsack*, 657 F.3d 64, 74 (1st Cir. 2011) (discussing without deciding whether the First Circuit follows the D.C. Circuit's reading of the ADEA to require the more lax mixed-motive framework for federal employees instead of the more demanding "but-for" test applied to private-sector employees). In an abundance of caution, the Court assumes the mixed-motive standard applies; thus, Mr. Richardson must show that the adverse employment action he suffered "was caused at least in part by a forbidden type of bias." *Hillstrom v. Best Western TLC Hotel*, 354 F.3d 27, 31 (1st Cir. 2003).

So far as the Court can tell, Mr. Richardson does not claim to have direct evidence of adverse employment actions, as such evidence "refers to a 'smoking gun' showing that the decisionmaker *relied upon* a protected characteristic in taking an

employment action." *PowerComm, LLC v. Holyoke Gas & Elec. Dep't*, 657 F.3d 31, 35 (1st Cir. 2011) (emphasis in original) (citing *Smith v. F.W. Morse & Co.*, 76 F.3d 413, 421 (1st Cir. 1996)); *see also Vesprini v. Shaw Contract Flooring Servs., Inc.*, 315 F.3d 37, 41 (1st Cir. 2002) ("Although its exact contours remain somewhat murky, the term 'direct evidence' normally contemplates only those statements by a decisionmaker that directly reflect the alleged animus and *bear directly on the contested employment decision*") (internal quotation marks omitted) (emphasis in original).

Absent direct evidence, the Court uses the familiar *McDonnell Douglas* burden-shifting framework "to facilitate the process of proving discrimination." *Bonefont-Igaravidez v. Int'l Shipping Corp.*, 659 F.3d 120, 123-24 (1st Cir. 2011) (citations omitted); *see also supra* Section V.A (discussing *McDonnell Douglas* framework). An ADEA plaintiff establishes a prima facie case by showing that: (1) the plaintiff was at least forty years old; (2) he applied and was qualified for the position; (3) the employer took an adverse employment action against him; and (4) the employer subsequently filled the position. *Cameron v. Idearc Media Corp.*, 685 F.3d 44, 48 (1st Cir. 2012) (citing *Vélez v. Thermo King de P.R., Inc.*, 585 F.3d 447, 447-48 (1st Cir. 2009); *see also Boyajian v. Starbucks Corp.*, 587 F. Supp. 2d 295, 304 n.4 (D. Me. 2008) (collecting cases for this standard). The burden then shifts to the employer to proffer a legitimate, nondiscriminatory reason for the action, and if this done, the plaintiff bears the ultimate burden of proving the proffered reason is pretextual. *Cameron*, 685 F.3d at 48 (citing *Vélez*, 585 F.3d at 447-48).

### b.   Application

There are two conceivable grounds for Mr. Richardson's ADEA claim: (1) the promotion of Mr. Palmer over Mr. Richardson and (2) the CDL disqualification. Mr. Richardson's briefing on the latter is vanishingly sparse: a single sentence referring to an email about his retirement eligibility. *Pl.'s Resp.* at 19. To ensure full consideration of Mr. Richardson's claims, the Court considers both the disqualification and failure-to-promote theories, though it focuses on failure to promote as his primary theory.

For the first part of his prima facie case, it is undisputed that Mr. Richardson, who was born in 1952, is over forty years old. PSAMF ¶¶ 132, 140; DRPSAMF ¶¶ 132, 140. Second, he applied for the transportation equipment operations supervisor position, WS-5701-10, in the fall of 2013. *Stip.* ¶ 21. Mr. Richardson's qualification can be inferred from the fact that the selection committee appointed him the alternate candidate and so would have offered him the position had their first-choice candidate, Mr. Palmer, declined the offer. *Id.* ¶¶ 27-32. Third, there is an adverse employment action because Mr. Richardson was not hired because, fourth, Mr. Palmer took the position at issue. *Stip.* ¶¶ 33-34. Mr. Richardson thus satisfies his prima facie burden. *See Boyjian*, 587 F. Supp. 2d at 304 (prima facie burden is "quite easy to meet") (quoting *Villanueva v. Wellesley Coll.*, 930 F.2d 124, 127 (1st Cir. 1991)).

Having found the prima facie burden satisfied, "the burden of production—as distinguished from the burden of proof—shifts to [the Navy] to articulate a legitimate, nondiscriminatory basis for its adverse employment action." *González v. El Dia, Inc.*, 304 F.3d 63, 69 (1st Cir. 2002). The Navy explains the process by which it selected

Mr. Palmer as its first-choice candidate for the position: Ms. Wintle announced the opening, *Stip.* ¶¶ 21-22, Mr. Gagner chose both the interview panel of three persons and the questions to be asked of the applicants, *id.* ¶¶ 24-26, each interview-panel member scored the applicants based on their responses to a written list of interview questions spanning six categories, DSMF ¶ 58; PRDSMF ¶ 58, and once aggregated, Mr. Palmer had the highest score, in part due to his Class A CDL and in part due to his superior articulation of his supervisory knowledge, skills, and abilities.  DSMF ¶¶ 59-60; PRDSMF ¶¶ 59-60.  The Court concludes that this is sufficient to "enable a rational factfinder to conclude that there existed a nondiscriminatory reason" for the selection of Mr. Palmer over Mr. Richardson.  *Ruiz v. Posadas de San Juan Associates*, 124 F.3d 243, 248 (1st Cir. 1997).

Now the burden shifts back to Mr. Richardson to provide facts from which a reasonable factfinder could conclude that the Navy's proffered reason for choosing Mr. Palmer is pretextual and that its true reason was discrimination against Mr. Richardson on account of his age.  *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 72 (1st Cir. 2004).  "It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must 'elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination.'"  *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991) (quoting *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 9 (1st Cir. 1990)).  Pretext can be based on "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in the Navy's explanation.  *Santiago-Ramos v.*

129

*Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998)).

Perhaps implicitly conceding the lack of support for the argument that the Navy is putting on pretexts, as it were, Mr. Richardson does not argue pretext as such; instead, he says he can make out a prima facie case and mentions incidents that could be assembled into a pretext argument. *Pl.'s Resp.* at 18-19.  Mr. Gagner, who headed the committee, did once tell Mr. Richardson that he had him on his "radar" for retirement.  DSMF ¶¶ 49, 51; PRDSMF ¶¶ 49, 51.  This comment came about ten months before the Navy's failure to hire him for the supervisory position. In short, Mr. Richard falls far short of a showing of pretext.  *See, e.g.*, *Shorette v. Rite Aid of Me., Inc.,* 155 F.3d 8, 13 (1st Cir. 1998) (asking the plaintiff "how old he was and when he planned to retire" was "a textbook example of an isolated remark which demonstrates nothing"); *Wallace v. O.C. Tanner Recognition Co.,* 299 F.3d 96, 100 (1st Cir. 2002) ("None of the inquiries about [the employee's] retirement plans had significant probative value; they were brief, stray remarks unrelated to the termination decisional process").

Mr. Richardson also cannot establish a prima facie case as regards the other adverse employment action: his disqualification.  What follows is the extent of his briefing on the matter: "Ms. Plouffe-Richesin's email to Mr. Sawyer and her statement that Mr. Richardson would be 'eligible to retire' in a month demonstrate[] that Mr. Richardson's age was a motivating factor in the CDL disqualification process."  *Pl.'s Resp.* at 19.  For clarity, the Court notes the email and the statement

are one and the same; i.e., the email contained the statement.  PSMF ¶ 18; DRPSMF ¶ 18.  The problem with Mr. Richardson's theory is that Ms. Plouffe-Richesin sent the email on January 14, 2013—the day after another person, Dr. Harman, disqualified him.  *Stip.* ¶¶ 39-43.  Moreover, it seems perfectly sensible that an email about reasonable accommodation would include information about an employee's eligibility for retirement.  Though the prima facie burden is "quite easy to meet," *Boyjian*, 587 F. Supp. 2d at 304 (quoting *Villanueva*, 930 F.2d at 127), there is simply not enough to generate a genuine dispute of material fact here.

In sum, the Court grants summary judgment to the Navy on Count II.

### D.  Retaliation

#### 1.  Legal Standard

The parties agree on the legal standard, both citing to the same language from the same First Circuit case:

> In a Rehabilitation Act retaliation suit, the plaintiff can make out a prima facie case by showing that (1) he or she engaged in protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) there was a causal connection between the protected conduct and the adverse action.  The burden then shifts to the employer to articulate a legitimate, nonretaliatory reason for the employment decision.  This is merely a burden of production and, once such a reason is articulated, it is up to the employee to show that the proffered reason was pretextual and that retaliation was the true reason.  The burden of proof remains throughout with the employee.

*Palmquist*, 689 F.3d at 70 (brackets, internal quotation marks, and citations omitted).

#### a.  Prima Facie Case

The parties also agree that the first prong of the prima facie test has been met on these facts, as Mr. Richardson asserts, and the Navy concedes, that (1) filing EEO

complaints and (2) advocating for an affinity group of deaf employees constitute protected conduct. *See* PSAMF ¶¶ 135, 142, 144-45; DRPSAMF ¶¶ 135, 142, 144-45. The first prong is met for the myriad retaliatory theories on which Mr. Richardson alleges his retaliation claim. The Court focuses on one such theory: harassment.

Under First Circuit law, retaliatory harassment can constitute an adverse action for the second prong of the prima facie test. *Noviello*, 398 F.3d at 91 ("subjecting an employee to a hostile work environment in retaliation for protected activity constitutes an adverse employment action"). The Navy argues that "context matters," and casts Mr. Pickering's treatment of Mr. Richardson as not severe or pervasive harassment "in an environment in which there was constant labor/management conflict." *Def.'s Mot.* at 23. Mr. Richardson does not think it is acceptable "for supervisors to scream, swear, and berate employees for any reasons, even if illegal, because they work in blue collar settings." *Pl.'s Resp.* at 20.

The Court begins with Mr. Richardson's account of a meeting on the topic of EEO complaints on December 20, 2012. At one point, Mr. Pickering lost his temper—telling Mr. Richardson that "we're not doing this shit anymore" and to "get the fuck out of this meeting now." DSMF ¶¶ 27-28; PRDSMF ¶¶ 27-28; PSAMF ¶ 130; DRPSAMF ¶ 130. Unlike the diabetes- and age-based discrimination claims, where the Court determined no reasonable jury could find the conduct reached a level of severity and pervasiveness so as to constitute a hostile work environment on account of his diabetes or age, respectively, the Court finds it significant that here the event

132

giving rise to the harassment is directly about EEO complaints—the protected conduct.

Moreover, the meeting was attended by four other people, one of whom, Mr. Gagner, told Mr. Richardson after Mr. Pickering's outburst that he had him on his "radar" for retirement.  DSMF ¶¶ 49, 51; PRDSMF ¶¶ 49, 51; PSAMF ¶ 136; DRPSAMF ¶ 136.  While it is true that Mr. Gagner's position included forecasting out which employees were approaching retirement, there is nothing conspiratorial about deriving from the context of Mr. Gagner's remark the suggestion that management wanted to be rid of Mr. Richardson on account of his protected conduct; in other words, a reasonable jury could find that where Mr. Pickering was brash, Mr. Gagner was subtle, but the message remained the same.  This conclusion is bolstered by the fact that Mr. Richardson reckons he had five other such encounters with Mr. Pickering beginning in late 2012 and continuing through summer 2013.  DSMF ¶¶ 23-26, 29-32, 34; PRDSMF ¶¶ 23-26, 29-32, 34; PSAMF ¶¶ 132, 139; DRPSAMF ¶¶ 132, 139.  There is a genuine issue of material fact as to whether this behavior extended beyond "rudeness or ostracism" to create a hostile work environment. *Noviello*, 398 F.3d at 92 (citations omitted).

On the third prong, the *Palmquist* Court scrutinized the Rehabilitation Act's causation standard and decided that it "requires retaliation to be the but-for cause of an adverse employment action in order for the plaintiff to obtain a remedy." *Palmquist*, 689 F.3d at 74 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175-77 (2009)).  This is a high bar, and the Navy argues that "Richardson cannot show that

Pickering's alleged yelling and cursing at him was because of Richardson's protected conduct" and that there is insufficient "temporal proximity" from which to infer causation. *Def.'s Mot.* at 24 (citing *Calero-Cerezo*, 355 F.3d at 25). Mr. Richardson emphasizes that he has direct evidence of harassment and so need not rely on temporal proximity alone. *Pl.'s Resp.* at 20-21.

Proceeding with the harassment theory, a factfinder could reasonably agree with Mr. Richardson that Mr. Pickering's and Mr. Gagner's behavior at the December 20, 2012 meeting about EEO complaints provides a clear causal link—i.e., he was harassed because of the EEO complaints—that obviates the question of whether the temporal proximity is too tenuous. *See Calero-Cerezo*, 355 F.3d at 25 ("The Supreme Court has stated that 'the cases that accept *mere* temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close"'") (emphasis supplied) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)).

There are less glaring flaws in the Navy's temporal proximity argument. For instance, even in the absence of a direct tie between the harassment and the protected conduct, the confrontation between Mr. Richardson and Mr. Pickering at the Shipyard power plant, DSMF ¶¶ 29-30; PRDSMF ¶¶ 29-30; *see supra* Section V.B.2 (discussing incident under the rubric of diabetes-discrimination), occurred on December 26, 2012—just six days after the meeting about the EEO complaints. *Id.* at 26 (finding one month to be temporally proximate). Furthermore, though the Navy

134

contends that Mr. Richardson's protected activity began in April 2012 and the first alleged harassment did not occur until the fall of that year, it is not clear from the record whether Mr. Richardson's activity continued after April 2012 so as to draw nearer to the contested incidents.  PSAMF ¶¶ 135, 145; DRPSAMF ¶¶ 135, 145.  In short, there is enough to generate a genuine dispute of material fact as to whether Mr. Richardson can meet his prima facie case.

### b.   Neutral, Non-Discriminatory Reason and Pretext

The parties do not play out the burden-shifting framework, but the Court will do so briefly here.  *Calero-Cerezo*, 355 F.3d at 26 ("[O]n summary judgment, the need to order presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a question for the a factfinder as to pretext and discriminatory animus") (quoting *Fennell v. First Step Designs*, 83 F.3d 526, 535 (1st Cir. 1996)).  Perhaps the Navy fails to offer a neutral, nondiscriminatory reason because it found it hard to come up with one where the allegation is that it harassed someone on account of his concededly protected conduct.

Even if the Navy were able to come forward with such a reason, there is some evidence of pretext on these facts.  Earlier in 2012, for instance, there were two emails that could be read to suggest that management's patience with Mr. Richardson's protected conduct had worn thin.  On January 30, 2012, upon learning that Mr. Richardson intended to help another employee with an EEO complaint, Mr. Gagner wrote: "My personal opinion is this is out of control.  Guidance?"  PSAMF ¶ 145;

DRPSAMF ¶ 145.  On July 10, 2012, Ms. Cushing, an employee and management support specialist, wrote in an email that Mr. Wyeth had said to her "that David Brown is the ring leader and stirring the pot with other hearing-impaired employees; this isn't and shouldn't be tolerated."  PSAMF ¶ 146; DRPSAMF ¶ 146.  The second instance is less convincing because it refers to Mr. Brown, not Mr. Richardson, but given Mr. Richardson helped Mr. Brown with his EEO complaint, a colorable argument for pretext remains.  PSAMF ¶ 144; DRPSAMF ¶ 144.

In sum, there is a genuine dispute of material fact as to whether the Navy retaliated against Mr. Richardson on account of his protected conduct.  Having reached this conclusion as regards one retaliation theory, the Court need not address the other theories.  The Court denies summary judgment on Count III.

## VI.    CONCLUSION

The Court GRANTS summary judgment to the Navy as to Counts I, II, and VI and DENIES summary judgment as to Count III of the Navy's Motion for Summary Judgment (ECF No. 50).  The Court DENIES Mr. Richardson's Motion for Partial Summary Judgment (ECF No. 49).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 24th day of August, 2016